ACCEPTED
13-15-00342-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
12/29/2015 5:01:53 PM
Dorian E. Ramirez
CLERK

# No. 13-15-00342-CV

_____ FILED IN

13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/29/2015 5:01:53 PM
DORIAN E. RAMIREZ
Clerk

# Court of Appeals
# Thirteenth District of Texas

_____

**COPANO NGL SERVICES, LLC**,

*Appellant*,

**v.**

**JOHN ASHCRAFT, INDIVIDUALLY AND AS TRUSTEE FOR
THE JOHN ASHCRAFT FAMILY TRUST 2012**,

*Appellee*.

_____

*On Appeal from Cause No. 15-H-0082
23rd District Court, Matagorda County, Texas
Hon. Ben Hardin, Judge Presiding*

---

## APPELLANT'S REPLY BRIEF

---

Charles R. "Skip" Watson, Jr.
  State Bar No. 20967500
  cwatson@lockelord.com
Daniel Durell
  State Bar No. 24078450
  daniel.durell@lockelord.com
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 305-4700 (Telephone)
(512) 305-4800 (Facsimile)

Christopher Dove
  State Bar No. 24032138
  cdove@lockelord.com
Ken McKay
  State Bar No. 13690835
  kmckay@lockelord.com
A. Antroy Arreola
  State Bar No. 24006769
  aarreola@lockelord.com
Harry Holmes Thompson
  State Bar No. 24088527
  hthompson@lockelord.com
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

**ATTORNEYS FOR APPELLANT**

**Page**

Index of Authorities ........................................................................................... iii

Brief of the Argument in Reply ............................................................................1

I.      Section 21.049 and *John* cannot be rewritten to change the unambiguous term "parties" to "landowners." ................................................1

    A. The plain language of section 21.049 applies to all "parties," not just landowners. .............................................................................2

    B. The Supreme Court's holding that section 21.049 tolls the time for the "parties" to object is binding on all courts. ...............................2

    C. The Supreme Court's policy that drove *John* — not allowing procedural technicalities to bar appeals — is not abandoned to benefit landowners. ...................................................................5

II.     The Supreme Court's holding in *John* cannot be distinguished, watered-down, or limited to its facts. ...........................................................6

    A. The Supreme Court does not write broad holdings for one-of-a-kind cases. ..............................................................................6

    B. Actual knowledge will not suffice when the form of notice is "mandatory." .....................................................................................7

    C. *John* does not say whether the parties had "no notice." ............................9

III.    E-filing is no substitute for compliance with section 21.049. .........................9

    A. The e-filing rule did not purport to repeal section 21.049. .......................10

    B. There is no evidence of notice by e-service. ...........................................11

IV.     There is no uncertainty of title. .....................................................................13

Conclusion and Prayer .......................................................................................14

Certificate of Compliance ..................................................................................16

Certificate of Service .........................................................................................16

ii

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Few v. Charter Oak Fire Ins. Co.*,
    463 S.W.2d 424 (Tex. 1971) ...............................................................................11

*Greater Houston P'ship v. Paxton*,
    468 S.W.3d 51 (Tex. 2015)....................................................................................2

*In re K.M.S.*,
    91 S.W.3d 331 (Tex. 2002).....................................................................................4

*John v. State*,
    826 S.W.2d 138 (Tex. 1992) ..........................................................................passim

*Oncor Elec. Delivery Co. v. Schunke*,
    No. 04-13-00067-CV, 2013 WL 6672494 (Tex. App.—San Antonio Dec.
    18, 2013, pet dism'd) .............................................................................................4

*Roccaforte v. Jefferson County*,
    341 S.W.3d 919 (Tex. 2011) ..........................................................................5, 8, 9

*Shepard v. Ledford*,
    926 S.W.2d 405 (Tex. App.—Fort Worth 1996, writ granted) ..........................12

*Tex. Co. v. Charles Clarke & Co.*,
    182 S.W. 351 (Tex. Civ. App. 1915, writ dism'd) ..............................................12

*Tex. Dep't of Transp. v. A.P.I. Pipe and Supply, LLC*,
    397 S.W.3d 162 (Tex. 2013) .................................................................................3

*Tutson v. Upchurch*,
    203 S.W.3d 428 (Tex. App.—Amarillo 2006, pet. denied) ...............................12

*Verburgt v. Dorner*,
    959 S.W.2d 615 (Tex. 1997) .................................................................................5

**CONSTITUTION AND STATUTES**

TEX. GOV'T CODE 22.004(c) ......................................................................................10

TEX. PROP. CODE § 21.049 ...............................................................................passim

iii

TEX. R. CIV. P. 11 ................................................................................................12

TEX. R. CIV. P. 21(f)(10) .....................................................................................10

**OTHER AUTHORITIES**

The Supreme Court of Tex., Misc. Docket No. 13-9165, 38 Tex. Reg. 9683,
(2013) ...............................................................................................................10

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

Ashcraft's brief teeters on the false premise that liberal construction, which can ensure a landowner's right to appeal a condemnation award, can be turned from a shield into a sword to prevent condemnors from appealing. That radical proposition is not supported by precedent — instead it requires this Court to rewrite the plain language of *both* the controlling statute and the Supreme Court's opinion interpreting it.

## BRIEF OF THE ARGUMENT IN REPLY

**I.     Section 21.049 and *John* cannot be rewritten to change the unambiguous term "parties" to "landowners."**

Liberal construction does *not*:

(i)     rewrite plain language of statutes and Supreme Court holdings; or

(ii)    deny parties' right to appeal.

But that is what Ashcraft is asking this Court to do.

Lacking case law supporting his contortion of liberal construction, Ashcraft spends nearly 10,000 words trying to convince this Court to be the first to use the doctrine of liberal construction to rewrite section 21.049 to keep condemnors out of court. Ashcraft's premise that liberal construction means the landowner can bar the courthouse door simply cannot withstand even cursory scrutiny.

**A.    The plain language of section 21.049 applies to all "parties," not just landowners.**

The Legislature's language precludes rewriting section 21.049 to benefit only landowners:

> Not later than the next working day after the day the decision is filed, the clerk *shall* send notice of the decision by certified or registered United States mail [] *to the **parties*** in the proceeding, or to their attorneys…

TEX. PROP. CODE §21.049 (emphasis added).

Simply put, liberal construction cannot change the Legislature's pronouncement that section 21.049 must apply to all "parties" to instead apply to only one party – the landowner.  "[E]ven a liberal construction must remain grounded in the statute's language. . . ."  *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 62 (Tex. 2015).  When the relevant portion of the provision is unambiguous, courts may not apply liberal construction, or "any other extra-textual construct" to change its meaning.  *See id*. at 67.

Section 21.049 is unambiguous.  It applies to all "parties."  No construction, "liberal" or otherwise, can change its plain language.

**B.    The Supreme Court's holding that section 21.049 tolls the time for the "parties" to object is binding on all courts.**

Ashcraft spends the bulk of his brief alternately:

(i)    ignoring the Supreme Court's holding in *John* that section 21.049 tolls filing objection for all "parties";

2

(ii)     implying this Court is not bound by the Supreme Court's "judicially-imposed interpretation" of section 21.049; and

(iii)    attempting to distinguish *John* as limited to its facts.

Each argument leads this Court into error.

### 1.    The Supreme Court's holding in *John* is clear — time for filing objections is tolled for "parties," not just landowners.

There is nothing unclear about the Supreme Court's holding in *John v. State*:

> [T]his court holds that, in a condemnation proceeding, the ***parties' time to object*** to the special commissioners' award *is tolled* until the *clerk sends the required notice* pursuant to section 21.049 of the Texas Property Code.

826 S.W.2d 138, 139 (Tex. 1992) (emphasis added).  Ashcraft's brief does not mention the Supreme Court's holding.  Instead his brief focuses on why the Court applied its holding to the landowner that missed the section 21.018 deadline.  While liberal construction certainly supports the Court's holding, it is hardly necessary in order for landowners to be "parties[] [whose] time to object . . . is tolled until the clerk sends the required notice" prescribed by section 21.049.  *See id*.  The Supreme Court *did not hold* that "parties" means "only landowners," or that "notice pursuant to section 21.049" means *any* form of notice.  Instead, the Supreme Court has not wavered from its holding in *John* that the "parties'" time to object is tolled until section 21.049 notice is given.[1]

---

1 That is why the Supreme Court repeated that jurisdiction over an objection to a condemnation award is tolled "if the parties are not given proper notice."  *Tex. Dept. of Transp. v. A.P.I. Pipe and Supply, LLC*, 397 S.W.3d 162, 167 n.18 (Tex. 2013) (citing *John*, 826 S.W.2d at 141 n.5).

### 2. The Supreme Court's interpretation is the law of this State.

No doubt because *John*'s holding is both controlling and dispositive, Ashcraft repeatedly implies that this Court is free to ignore it as "a <u>judicial</u>, not a statutory, construct" of section 21.049 imposed by the Supreme Court, rather than by the Legislature. (AppelleeBr:22, 38) (emphasis in original).) But, the Supreme Court is the final authority concerning the meaning of all legislation. Its holdings are the law of this State and are binding on this Court. *See In re K.M.S.*, 91 S.W.3d 331, 331 (Tex. 2002) (per curiam) (admonishing a court of appeals for refusing to follow Texas Supreme Court precedent: "courts of appeals are not free to disregard pronouncements from this Court").

That is why rather than ignoring *John*, the court of appeals in *Oncor Electric Delivery Co. v. Schunke*, recognized that *John* controlled its holding that hand-delivery of actual notice of a commissioner's award *did not satisfy* section 21.049's requirement that the clerk must send notice by certified mail. No. 04-13-00067-CV, 2013 WL 6672494, at *3-*4 (Tex. App.—San Antonio Dec. 18, 2013, pet. dism'd) ("[A]ny admission concerning the date the commissioners' award was filed does not change the fact that the time to file objections was tolled until the clerk mailed notice to the parties or their attorneys as required by section 21.049").

This Honorable Court should be wary of any invitation to ignore an unambiguous Supreme Court holding construing an unambiguous statute.

**C.** **The Supreme Court's policy that drove *John* — not allowing procedural technicalities to bar appeals — is not abandoned to benefit landowners.**

The Supreme Court's holding that section 21.049 tolls the time for "parties" to object to commissioners' awards "until the clerk sends the required notice pursuant to section 21.049," *John*, 826 S.W.2d at 139, follows the Supreme Court's long-standing policy that "the right of appeal should not be lost due to procedural technicalities." *See Roccaforte v. Jefferson Cnty*, 341 S.W.3d 919, 924 (Tex. 2011); *see also Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997) ("This Court has never wavered from the principle that appellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation" would preserve the appeal.).

Yet, Ashcraft boldly says that such "liberal constitution (sic) is afforded to the landowner, not the condemning party." (AppelleeBr:44.) The problem of course, is that no court has ever transformed liberal construction that ensures a landowner's appeal, into strict construction to ensure procedural technicalities deny an appeal.

*Simply put*, section 21.049 says the notice it specifies must be given to the "parties." And the Supreme Court squarely held that the "parties'" time to object is tolled until that notice is given in the form prescribed by section 21.049. There is no ambiguity in the statute or in the Supreme Court's holding construing it. And

5

there is no authority holding to the contrary.  This Court should be wary of any request to create such a conflict.

**II.    The Supreme Court's holding in *John* cannot be distinguished, watered-down, or limited to its facts.**

Ashcraft is thus forced to try to limit *John* to its facts or create exceptions where none exist.

**A.    The Supreme Court does not write broad holdings for one-of-a-kind cases.**

*John*'s holding resolved once-and-for-all Ashcraft's "lynchpin issue" of when timely objections must be made.  (*See* AppelleeBr:31.)  So Ashcraft tries to limit *John* to its facts because he does not like the Supreme Court's holding that the parties' time to object is tolled until the clerk sends the required notice pursuant to section 21.049.  He characterizes *John* as applying to landowners who receive "no notice" of a condemnation awards.  (AppelleeBr: 22, 23, 28, 34, 47.)

But the Supreme Court only decides cases with broad significance to the State's jurisprudence:

- *John*'s holding, like section 21.049, expressly applies to *all* "parties" until notice in the form required by the statute is given; and

- nowhere does *John* say the landowner had "no notice" of the condemnation award or that other forms of notice will suffice.

6

**B. Actual knowledge will not suffice when the form of notice is "mandatory."**

Ashcraft's protracted attempt to substitute "actual knowledge" of the commissioners' award for notice in the form required by the Legislature, (AppelleeBr:35-46), flounders because it must rely on cases in which statutory notice provisions are ***not*** "*regarded as mandatory*." (AppelleeBr:41 (emphasis added).)

In contrast, *John* turned on the Supreme Court's holding that "this section must be construed as *mandatory*." *See John* at 140 (emphasis added), and n.3. Thus, because "the language of the statute is clear and unambiguous, it should be *enforced as written*." *Id.* (emphasis added). "Therefore, in condemnation cases, the clerk must comply with the notice provisions." *Id.*

**1. "Reasonable strictness" does not permit substitute forms of service.**

Thus, Ashcraft cannot change *John*'s holding by pointing to a footnote saying the clerk failed to follow section 21.049's mailing requirement with "reasonable strictness." (AppelleeBr:39 (citing *John* at 141 n.4.).) The Court's reference to "reasonable strictness" in footnote dicta did not say that any other form of notice can substitute for "the required notice pursuant to section 21.049." *John* at 139. Read in context, note 4 creates no such exception:

*First*, immediately after stating that notice provisions require reasonable strictness, the Court held that the clerk "failed to follow the notice requirement with reasonable strictness" *because* the notice required by section 21.049 was sent "*after* their time to object had lapsed." *Id*. at 141 n.4 (emphasis added). That is what happened here.

*Second*, any doubt that reasonable strictness might not require the form of notice "required . . . pursuant to section 21.049" was dispelled when the Court reaffirmed in the next footnote that it was the clerk's failure to send the notice that tolls the time to object. *Id*. at 141 n.5.

### 2. Personal service will not suffice.

Similarly misplaced is Ashcraft's reliance on *Roccaforte v. Jefferson County*, 341 S.W.3d 919 (Tex. 2011) as creating a personal service exception to section 21.049's requirement. (AppelleeBr:39-41.) It misses the mark on two critical points.

*First*, *Roccaforte* did not involve section 21.049 and there was no analysis or holding that the language of the statute in question elevated it from merely "directive" (which allows alternative compliance) to "mandatory," (which does not allow alternative compliance). *See John* at 140-41.

*Second*, *Roccaforte* is actually an example of how the overarching policy that "the right of appeal should not be lost to procedural technicalities" is imposed *to prevent* (not to cause) loss of access to the courts. *Roccaforte* at 924, 926.

## C. *John* does not say whether the parties had "no notice."

To bolster his claim that actual knowledge should substitute for the "mandatory" notice in the form prescribed by section 21.049, Ashcraft repeatedly claims the landowner in *John* had no notice of the award. (AppelleeBr:22, 23, 28, 34, 46.) But *John* says no such thing. If it mattered whether a party had no notice the Supreme Court would surely have said so.

*To sum up*: both section 21.049 and *John* are clear and unambiguous. The time for filing objections is tolled for all "parties." No amount of distinguishing or parsing can alter the clear rule of law intended to clarify the duties of all parties to ensure that rights to appeal will not be lost on procedural technicalities. Ashcraft is inviting this Court to overrule the Legislature's unambiguous language and the controlling interpretation by the Supreme Court.

## III. E-filing is no substitute for compliance with section 21.049.

Failing to demonstrate that the Legislature did not intend for section 21.049 to apply to both "parties" and that the Supreme Court did not intend for the statute's "mandatory" certified mail notice requirement to "toll" the time for the statutes filing objections, Ashcraft claims that the Supreme Court intended for its

9

e-filing Rule of Civil Procedure to trump the Legislature's requirements in section 21.049. (AppelleeBr:52-56.) Ashcraft's end-run around, the statute's "mandatory" notice requirement is condemned by these barriers:

**A.      The e-filing rule did not purport to repeal section 21.049.**

Buried at the bottom of footnote 4, Ashcraft's brief notes the obvious – in a conflict between statutes and rules, "the statute prevails" unless the rule . . . "repeals the statute" as provided by section 22.004 of the Texas Government Code. (AppelleeBr:54 n.4). That did not happen here.

Under section 22.004 of the Texas Government Code, for a rule to repeal a statute the Texas Supreme Court is required to "file with the secretary of state a list of each article or section of general law or each part of an article or section of general law that is repealed or modified in any way." *See* TEX. GOV'T CODE §22.004(c).

Section 21.049 of the Texas Property Code was not included in the list of statutes repealed by the adoption of the amendments to Rule 21 of the Texas Rules of Civil Procedure. *See* The Supreme Court of Tex., Misc. Docket No. 13-9165, 38 Tex. Reg. 9683, 9683-84 (2013) (adopting amendments to Rule 21 of the Texas Rules of Civil Procedure). Accordingly, the mandatory notice requirements of section 21.049 control over Rule 21(f)(10) of the Texas Rules of Civil Procedure.

10

*See Few v. Charter Oak Fire Ins. Co.*, 463 S.W.2d 424, 425 (Tex. 1971) ("[Where a] rule of the court conflicts with a legislative enactment, the rule must yield.").

Thus, as a matter of law, e-filing did not repeal the mandatory form of notice required by section 21.049.  Ashcraft is asking this Court to violate the separation of powers at the heart of our Constitution.

**B.    There is no evidence of notice by e-service.**

Equally fatal to Ashcraft's judgment is his inability to point to evidence supporting the bogus legal positions he is asking this Court to take.

*First*, and most telling, Ashcraft consistently cites only to findings of fact in response to Copano's challenge that there is no evidence to support those findings of fact.  There is simply no evidence to support Ashcraft's claim (and the trial court's findings) that Copano's counsel received notice of the commissioner's award from the clerk by e-service.  If such evidence existed it was Ashcraft's duty to get it into the record.  He did not.

*Second*, Ashcraft's attempt to shift the burden of proof to Copano, to "deny" his unproven claim that the clerk e-served notice of the award, (AppelleeBr:43) should be seen for what it is – an admission of his failure to satisfy the legal sufficiency standard of review.  Absence of evidence is no evidence.[2]

_____

[2] A "case cannot be sustained when it depends wholly upon the failure of defendant, who is shown to be in possession of the facts, to disprove plaintiff's claim.  To hold otherwise would be to abrogate the rule which places the burden upon a plaintiff to make out his case.  Until this burden is discharged by evidence produced by plaintiff sufficient prima facie to make out the

11

*Third*, Ashcraft violates the fundamental requirements for stipulations by attempting to transform a "discussion" at a hearing where no record was kept into "stipulations" memorialized in findings of fact. (AppelleeBr:57.) Stipulations are governed by Rule 11 of the Texas Rules of Civil Procedure. *See*, *e.g.*, *Shepherd v. Ledford*, 926 S.W.2d 405, 410 (Tex. App.—Fort Worth 1996, writ granted) *aff'd and remanded*, 962 S.W.2d 28 (Tex. 1998); *see also Tutson v. Upchurch*, 203 S.W.3d 428, 431 (Tex. App.—Amarillo 2006, pet. denied) (providing that a concession that did not comport with Rule 11 was unenforceable). Rule 11 requires a stipulation either to be *in writing, signed, and filed* of record, or made in open court and *entered of record*. *See* TEX. R. CIV. P. 11.

"Parties in open court are allowed to narrow the issues presented to the trial court, *provided they do so by a signed written agreement that is filed in the trial record*. A 'stipulation' that is made pursuant to rule 11 is defined as an agreement, admission, or concession made in a judicial proceeding by the parties or their attorneys about a matter that is incident to the trial." *Shepherd*, 926 S.W.2d at 410 (internal citations omitted) (emphasis added).

---

case alleged by him, the defendant is not required to offer any evidence, and his failure to do so cannot, under any circumstances, be regarded as any evidence of the truth of plaintiffs claim." *Tex. Co. v. Charles Clarke & Co.*, 182 S.W. 351, 353-54 (Tex. Civ. App. 1915, writ dism'd).

## IV. There is no uncertainty of title.

Ashcraft's ultimate argument, that interpreting section 21.049 and *John* as written will open the floodgates of "title uncertainty," is belied by the last quarter century of practice under *John* (and by common sense). (*See* AppelleeBr:50-51.)

Titles are no more uncertain today than they were in 1992 when *John* tolled filing objections until district clerks comply with the mandatory duty imposed by section 21.049. The bench and bar alike have long known that the receipt of notice by certified mail starts the clock for objection. And all parties, in addition to the judge that appointed the commissioners, have an interest in seeing that the clerk does her job so judicial proceedings can either enter judgment on the award or challenge it.

That is why Copano went to the trouble of literally spelling out the clerk's duties in bold-face typeset. (CR:29.) This is not a case of a condemnor laying behind a log to achieve some imagined advantage. This case is an attempt to bar an appeal by using a procedural technicality that was eliminated by the Supreme Court nearly 25 years ago.

## CONCLUSION AND PRAYER

Ashcraft failed to produce legally sufficient evidence to support the trial court's denial of jurisdiction. Denial of jurisdiction was prohibited by the plain language of section 21.049 and Supreme Court precedent construing it. Copano was entitled to rely on the Supreme Court's unequivocal holding that the time for filing objections was tolled for all parties. Mr. Ashcraft is not just inviting this Court to snub unambiguous legislation and controlling Supreme Court precedent – he is inviting this Court to do so in order to prevent judicial review that is at the heart of Texas citizens' rights to judicial redress. The trial court's judgment and order must be reversed.

Respectfully submitted,

**LOCKE LORD LLP**

By: /s/ Charles R. "Skip" Watson, Jr.
Charles R. "Skip" Watson, Jr.
State Bar No. 20967500
cwatson@lockelord.com
Daniel Durell
State Bar No. 24078450
daniel.durell@lockelord.com
600 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 305-4700 (Telephone)
(512) 305-4800 (Facsimile)

14

Christopher Dove
  State Bar No. 24032138
  cdove@lockelord.com
Ken McKay
  State Bar No. 13690835
  kmckay@lockelord.com
A. Antroy Arreola
  State Bar No. 24006769
  aarreola@1ockelord.com
Harry Holmes Thompson
  State Bar No. 24088527
  hthompson@lockelord.com
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

**COUNSEL FOR APPELLANT**

**CERTIFICATE OF COMPLIANCE**

I certify that this Reply Brief contains 3,047 words (excluding the sections

excepted under Texas Rule of Appellate Procedure 9.4(i)(1)).

/s/ Charles R. "Skip"Watson, Jr.

Charles R. "Skip" Watson, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 29, 2015, a true and correct copy of the

foregoing was served via EFileTx.Gov e-service upon the following:

| | |
|---|---|
| Vincent L. Marable III | John T. McDowell |
| trippmarable@sbcglobal.net | jtm@houstontrialattorneys.com |
| PAUL WEBB, P.C. | Kacy J. Shindler |
| 221 N. Houston | ks@houstontrialattorneys.com |
| Wharton, Texas 77488 | MCDOWELL WELLS, LLP |
| (979) 532-5331 (Telephone) | 603 Avondale Street |
| (979) 532-2902 (Facsimile) | Houston, Texas 77006 |
| | (713) 655-9595 (Telephone) |
| | (713) 655-7868 (Facsimile) |

Danny Shindler
dwshindler@sbcglobal.net
MCDOWELL WELLS, LLP
2232 Avenue G
Bay City, Texas 77414
(979) 245-4666 (Telephone)
(979) 244-5342 (Facsimile)

**Counsel for Appellee**

/s/  Charles R. "Skip" Watson, Jr.

Charles R. "Skip" Watson, Jr.

HYPERLINKED MATERIAL

468 S.W.3d 51
Supreme Court of Texas.

Greater Houston Partnership, Petitioner,

v.

Ken Paxton, Texas Attorney General;
and Jim Jenkins, Respondents.

No. 13–0745 | Argued March 25, 2015
| OPINION DELIVERED: June 26, 2015

**Synopsis**

**Background:** Private nonprofit organization that received public funds from city pursuant to quid pro quo contract brought action against Attorney General seeking declaratory judgment that it was not "government body" within meaning of Texas Pubic Information Act. Petitioner whose records request organization denied intervened. The District Court, Travis County, 98th Judicial District, Scott H. Jenkins, J., entered judgment for Attorney General and ordered disclosure of records requested. Organization appealed, and Austin Court of Appeals, 407 S.W.3d 776, affirmed. Petition for review was granted.

**[Holding:]** The Supreme Court, Guzman, J., held that private organization was not "supported in whole or in part by public funds," and thus, was not "government body," within meaning of TPIA.

Reversed and rendered.

Boyd, J., filed dissenting opinion in which Johnson and Willett, JJ., joined.

West Headnotes (15)

**[1]** **Records**
👉 Agencies or custodians affected

326 Records
326II Public Access
326II(B) General Statutory Disclosure Requirements
326k51 Agencies or custodians affected

Nonprofit organization that received public funds for services provided to city under quid pro quo contract, which services were designed enhance economic development, was not "supported in whole or in part by public funds," and thus, was not "government body," within meaning of Texas Public Information Act (TPIA); funds received from city constituted compensation for services rendered under contract, organization received only small portion of its annual revenues from contract, organization would still continue to operate and perform same services without public funds. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[2]** **Records**
👉 Judicial enforcement in general

326 Records
326II Public Access
326II(B) General Statutory Disclosure Requirements
326k61 Proceedings for Disclosure
326k63 Judicial enforcement in general
Whether an entity is a "governmental body" whose records are subject to disclosure under the Texas Public Information Act (TPIA) presents a matter of statutory construction that the appellate court reviews de novo. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[3]** **Statutes**
👉 Language and intent, will, purpose, or policy
**Statutes**
👉 Plain Language; Plain, Ordinary, or Common Meaning

361 Statutes
361III Construction
361III(A) In General
361k1078 Language
361k1080 Language and intent, will, purpose, or policy
361 Statutes
361III Construction

361III(B)  Plain Language;  Plain, Ordinary, or Common Meaning

361k1091  In general

When interpreting a statute, the court's primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding the act's scope, and the court seeks that intent first and foremost in the plain language of the text.

1 Cases that cite this headnote

**[4]**   **Statutes**
   👉 Undefined terms

   **Statutes**
   👉 Context

   361  Statutes
   361III  Construction
   361III(D)  Particular Elements of Language
   361k1123  Undefined terms
   361  Statutes
   361III  Construction
   361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
   361k1153  Context

Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, the court will apply that meaning.

1 Cases that cite this headnote

**[5]**   **Statutes**
   👉 Undefined terms

   **Statutes**
   👉 Construing together;  harmony

   361  Statutes
   361III  Construction
   361III(D)  Particular Elements of Language
   361k1123  Undefined terms
   361  Statutes
   361III  Construction
   361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
   361k1155  Construing together;  harmony

A court will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute; therefore, even if an undefined term has multiple meanings, the

court recognizes and applies only the meanings that are consistent with the statutory scheme as a whole.

Cases that cite this headnote

**[6]**   **Statutes**
   👉 In general;  factors considered

   **Statutes**
   👉 Extrinsic Aids to Construction

   361  Statutes
   361III  Construction
   361III(C)  Clarity and Ambiguity;  Multiple Meanings
   361k1103  Resolution of Ambiguity;  Construction of Unclear or Ambiguous Statute or Language
   361k1104  In general;  factors considered
   361  Statutes
   361III  Construction
   361III(F)  Extrinsic Aids to Construction
   361k1171  In general

When interpreting a statute, the court will only resort to rules of construction or extrinsic aids when a statute's words are ambiguous.

Cases that cite this headnote

**[7]**   **Statutes**
   👉 Liberal or strict construction

   361  Statutes
   361III  Construction
   361III(A)  In General
   361k1069  Liberal or strict construction

When interpreting a statute, liberal-construction objectives do not permit a construction of the act untethered from its statutory moorings.

Cases that cite this headnote

**[8]**   **Statutes**
   👉 Context

   361  Statutes
   361III  Construction
   361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
   361k1153  Context

Meanings of statutory terms cannot be determined in isolation but must be drawn from

the context in which they are used; the court must therefore analyze the reasonableness of each definition in light of the statutory context.

Cases that cite this headnote

**[9]    Records**

🔑 Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

For a private entity to be "sustained" by public funds, which would render the entity a "government body" subject to the Texas Public Information Act (TPIA) suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent; however, financial dependence need not be absolute. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[10]    Records**

🔑 Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

A private entity "supported" by public funds, which would qualify the entity as a "government body" subject to the Texas Public Information Act (TPIA), would not just receive government funds; it would require them to operate in whole or in part. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[11]    Statutes**

🔑 Associated terms and provisions; noscitur a sociis

361   Statutes
361III   Construction

361III(E)   Statute as a Whole; Relation of Parts to Whole and to One Another
361k1159   Associated terms and provisions; noscitur a sociis

The canon of statutory construction known as "noscitur a sociis" —"it is known by its associates"—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it.

Cases that cite this headnote

**[12]    Statutes**

🔑 Language

361   Statutes
361III   Construction
361III(A)   In General
361k1078   Language
361k1079   In general

Even a liberal construction of a statute must remain grounded in the statute's language.

1 Cases that cite this headnote

**[13]    Records**

🔑 Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

Determining whether a private entity partially funded with public funds qualifies as a "governmental body" subject to the Texas Public Information Act (TPIA) will likely require case-specific analysis and a close examination of the facts. Tex. Gov't Code Ann. § 552.003(1)(A).

1 Cases that cite this headnote

**[14]    Statutes**

🔑 Associated terms and provisions; noscitur a sociis

361   Statutes
361III   Construction
361III(E)   Statute as a Whole; Relation of Parts to Whole and to One Another
361k1159   Associated terms and provisions; noscitur a sociis

The canon of statutory construction "noscitur a sociis" that a word or phrase, especially one in a list, should be known by the words immediately surrounding it, cannot be used to render express statutory language meaningless.

Cases that cite this headnote

**[15]     Statutes**
👈 Superfluousness

361    Statutes
361III    Construction
361III(E)    Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1156    Superfluousness
When interpreting a statute, the court will generally attempt to avoid treating statutory language as surplusage.

Cases that cite this headnote

 **\*53**  On Petition for Review from the Court of Appeals for the Third District of Texas. Honorable Scott H. Jenkins, Judge.

**Attorneys and Law Firms**

Bill Aleshire, Aleshire Law PC, Jennifer S. Riggs, Riggs Aleshire & Ray, Austin, TX, Lynne Liberato, Polly B. Fohn, Haynes and Boone LLP, Houston, TX, for Petitioner.

Charles Roy, Daniel T. Hodge, First Asst. Attorney General, David A. Talbot Jr., Consumer Protection, David C. Mattax, James Edward Davis, Kimberly L. Fuchs, Matthew H. Frederick, Assistant Solicitor General, Warren Kenneth Paxton Jr., Office of the Attorney General, Rosalind L. Hunt, Office of Attorney General, Administrative Law Divison, Austin, TX, Eric Lyf Yollick, Yollick Law Firm, P.C., The Woodlands, TX, for Respondents.

**Opinion**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

The question presented here is whether a private entity operating like a chamber of commerce is a "governmental

body" subject to public disclosure of its private business affairs under the Texas Public Information Act. In seeking to promote the public's legitimate interest in transparent government, the Act imposes considerable disclosure obligations on "governmental bod[ies]." Importantly, the statutory definition of "governmental body" extends only to "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or *that is supported in whole or in part by public funds*." *See* TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added). This operates to prevent nominally private entities whose work might otherwise qualify them as de facto public agencies from circumventing the Act's disclosure requirements. This case requires us to decide whether the term "supported" encompasses private entities contracting at arm's length with the government to provide general and specific services or whether the term properly includes only those entities that could not perform similar services without public funds and, are thus, sustained—in whole or part—by such funds.

When a private entity enters into a contract and receives government funds in exchange for its services, the entity's right to conduct its affairs confidentially may be in tension with the public's right to know how government funds are spent. Transparency, openness, and accountability in the government are all of fundamental importance. However, these important policy objectives cannot extinguish the privacy rights properly belonging to private business entities in Texas. By liberally authorizing public access to government records while simultaneously shielding private business from unwarranted interference, the Legislature carefully balanced these **\*54** conflicting interests. Mindful of the delicate equilibrium between these equally compelling concerns, we conclude that the term "supported," which helps define the breadth of the Act, unambiguously includes only those entities at least partially sustained by public funding. Because the statutory language is unambiguous, we need not consider the accuracy or vitality of the test articulated in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224 (5th Cir. 1988), which the Attorney General's Open Records Division has traditionally applied to private entities in cases involving open-record requests.

Here, Greater Houston Partnership, a nonprofit corporation providing economic-development services to the City and other clients pursuant to quid pro quo contracts, contests whether it is a "governmental body" in whole or in part. Applying *Kneeland,* the Attorney General and lower courts

held that it is. We hold, however, that Greater Houston Partnership is not a "governmental body" under the Texas Public Information Act because it is not wholly or partially sustained by public funds; we therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

## I. Factual and Procedural Background

Greater Houston Partnership (GHP) is a private, nonprofit corporation that promotes regional economic growth and an attractive business climate for a ten-county area centered around Houston, Texas. GHP's stated purpose is to enhance economic prosperity, facilitate business relocation and expansion, encourage international outreach initiatives, and provide strategic planning to advocate for "the improvement of commercial, industrial, agricultural, civic, and cultural affairs" in the Houston region. In furtherance of this objective, GHP provides consulting, event planning, and marketing services (including advertising and market research) to its roughly 2,100 member companies on a contractual basis. GHP also hosts numerous networking and professional development events, including several weekly GHP Council meetings on topics relevant to the regional economy. GHP operates on an annual budget of approximately $11.7 million, and these funds emanate primarily from membership revenue. In short, GHP functions much like thousands of chambers of commerce across the nation that promote municipal and regional economies.

Consistent with its business model, GHP contracted to provide consulting, event planning, and marketing services to the City of Houston, pursuant to an "Agreement for Professional Services." GHP and the City signed similar agreements annually for several years, including 2007 and 2008, the time periods at issue here. The contracts included a "Scope of Services" exhibit that delineated, under general headers, the specific services that GHP would provide to the City. Under these contracts, GHP received quarterly payments in arrears contingent upon the City's approval of performance reports detailing the particular services GHP provided in that quarter. If GHP failed to deliver the contracted-for services to the City's satisfaction, the contracts authorized the City to pay GHP for the portion of services satisfactorily rendered. Notably, however, the two contracts differed in one significant respect: the 2008 contract expressly provided that "[n]othing in this Agreement shall be construed

to imply that [GHP] is subject to the Texas Public Information Act."

The instant suit arose from a May 2008 request Houston-area resident Jim Jenkins submitted to GHP in which he sought "a copy of the check register for [GHP] for **\*55** all checks issued for the year 2007." Jenkins grounded his request in the Texas Public Information Act (TPIA), claiming that "[p]ublic records show that [GHP] is an organization that spends or that is supported in whole or in part by public funds," and GHP is, therefore, "subject to the Public Information Act in the same manner as a governmental body." *See* TEX. GOV'T CODE § 552.003(1)(A)(xii) (defining "governmental body" for purposes of the TPIA).

GHP objected to Jenkin's request and did not disclose the information. GHP acknowledged it received public funds from the City but disagreed it qualified as a "governmental body" under the TPIA because the public funds were compensation for vendor services provided pursuant to an arm's-length contract with the City. The City's annual payments under the contract amounted to less than 8% of GHP's total annual revenue; member contributions, on the other hand, totaled more than 90% of its revenue. GHP further noted that of the roughly 2,100 companies that comprise its membership, only four could be described as governmental bodies. Refusing to disclose the requested information, GHP referred the matter to the Texas Attorney General as required under the TPIA. *See id.* §§ 552.301(a), .307.

In an informal letter ruling, the Attorney General's Open Records Division agreed with Jenkins, and concluded that GHP was a "governmental body" subject to the TPIA's disclosure requirements specifically with respect to the 2007 contract with the City.[1] Tex. Att'y Gen. OR2008–16062; *see also* TEX. GOV'T CODE § 552.306. In reaching this conclusion, the Attorney General determined that GHP's operations were "supported" by the City because: (1) GHP provided vague and indefinite services to the City aimed at advancing the City's overall economic development; (2) GHP and the City shared a common purpose and objective centered around the City's economy; and (3) GHP provided services traditionally supplied by the government. Tex. Att'y Gen. OR2008–16062.

---

[1]  GHP did not claim any exemptions from mandatory disclosure and only challenged that it is a governmental body subject to the TPIA in the first instance.

In response to the Attorney General's informal ruling, GHP filed a declaratory-judgment action against the Attorney General seeking a declaration that: (1) the Attorney General lacked jurisdiction over the dispute and (2) even if jurisdiction was proper, GHP was not a "governmental body" under the TPIA. *See* TEX. GOV'T CODE §§ 552.3215(e), .321, .325(a). Shortly after GHP filed suit, Jenkins filed an additional request seeking a copy of GHP's 2008 "disbursement registers and/or check registers," including the number, date, payee name, amount, and purpose. Noting that GHP had already filed suit regarding the 2007 check-register request, the Attorney General closed the second request without a finding and directed the trial court to resolve the dispute. Jenkins intervened in the lawsuit shortly thereafter. *See id.* § 552.325 (authorizing a requestor to intervene in the suit).

After a bench trial, the trial court found GHP was a "governmental body" supported by public funds and ordered disclosure of the 2007 and 2008 check registers.[2] The trial court determined that:

**\*56** • GHP received public funds to provide economic development and promotion services for or on behalf of the City;

• GHP and the City shared the common purpose of economic development and promotion; and

• An agency-type relationship was created between GHP and the City of Houston.

[2] The sole witness was Tracye McDaniel, GHP's executive vice president and chief operating officer. Documentary evidence included: six other contracts between GHP and other governmental bodies executed after 2008; the contracts between the City and GHP for fiscal years 2007, 2008, and 2009; GHP's Articles of Incorporation; Jenkins's requests for the 2007 and 2008 check registers; all four quarterly performance reports GHP submitted to the City in 2007; and performance reports GHP submitted to other governmental bodies in 2007 and 2010.

The court of appeals agreed with the trial court and affirmed its judgment, albeit over a strongly worded dissent. 407 S.W.3d at 786, 787. Finding the phrase "supported in whole or in part by public funds" ambiguous, the lower court relied on an extra-textual analytical construct known as the *Kneeland* test to conclude GHP qualified as a governmental body under the TPIA.[3] *Id.* at 782–83. The dissent criticized the court's reliance on the *Kneeland* test, finding the statutory

context unambiguously dictated only the narrow construction of "supported" as applied to a private entity. *Id.* at 788 (Jones, C.J., dissenting).

[3] Derived from a handful of nascent open-records rulings, the *Kneeland* test originated in a 1986 case considering whether the National Collegiate Athletic Association and Southwest Athletic Conference were "supported in whole or in part by public funds" under the TPIA's predecessor statute. *See Kneeland v. Nat'l Collegiate Athletic Ass'n,* 650 F.Supp. 1047 (W.D.Tex.1986), *rev'd,* 850 F.2d 224 (5th Cir. 1988). "Finding no dispositive Texas jurisprudence on this issue," the Fifth Circuit "closely examine[d] the opinions of the Texas Attorney General" and discovered "helpful signs, albeit mixed signals, in the [Attorney General] opinions." *Id.* at 228. Despite a rather tepid endorsement, and without considering the statutory language, the court identified and applied "three distinct patterns of analysis in opinions interpreting [the funding-source element] of the Act" to private entities. *Id.* Those "patterns of analysis" provided the foundation for what became the three-pronged *Kneeland* test.

On appeal to this Court, GHP advances three principal reasons why it is not a "governmental body" under the TPIA. First, GHP contends the phrase "supported ... by public funds" unambiguously excludes the City's payments to GHP. Second, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory language. Third, GHP argues it is not "supported ... by public funds" even under the *Kneeland* test. The Attorney General disputes all three points. First, it contends that GHP plainly qualifies as a "governmental body" under the TPIA; limiting the statute's reach to entities that exist solely to carry out government functions would frustrate its purpose of openness, and GHP is "supported" by public funds. Second, the *Kneeland* test is not only the relevant framework in which to evaluate the TPIA's application to otherwise private entities, the Legislature has effectively endorsed the *Kneeland* test.[4] Third, the court of appeals properly applied the three *Kneeland* elements to GHP, a "governmental body" subject to regulation under the TPIA.

[4] The Legislature has amended the TPIA several times without materially altering the funding-source element of the "governmental body" definition. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 1035, § 2, 1995 Tex. Gen. Laws 5127, 5128; *see also* Act of May 20, 1991, 72nd Leg., R.S., ch. 306, § 5, 1991 Tex. Gen. Laws 1340,

1341–42; Act of May 17, 2001, 77th Leg., R.S., ch. 633, § 2, 2001 Tex. Gen. Laws 1194, 1194–95; Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 18.24, 1999 Tex. Gen. Laws 127, 403; Act of May 24, 2001, 77th Leg., R.S., ch. 1004, § 2, 2001 Tex. Gen. Laws 2186, 2187; Act of May 20, 2003, 78th Leg., R.S., ch. 1276, § 9.014, 2003 Tex. Gen. Laws 4158, 4218.

**\*57** We granted GHP's petition for review to determine the proper scope of the funding source element of the TPIA's "governmental body" definition.

## II. Discussion

### A. Background Law

The Legislature enacted the Texas Open Records Act in 1973 to increase government transparency in the wake of public scandals, including a massive stock-fraud imbroglio known as the Sharpstown scandal.[5] In 1993, the Open Records Act was recodified without substantive revision as the Texas Public Information Act.[6] Currently codified in Chapter 552 of the Texas Government Code, the TPIA's stated policy objectives are to provide accountability and transparency in government by establishing mechanisms to foster public access to government records. *See* TEX. GOV'T CODE §§ 552.001–.353. Importantly, an entity's disclosure obligations under the TPIA hinge on whether it is in fact a "governmental body."

[5] *See* Act of May 19, 1973, 63rd Leg., R.S., ch. 424, § 1–16, 1973 Tex. Gen. Laws 1112, 1112–18 (codified at TEX. REV. CIV. STAT. art. 6252–17a); *see generally Mutscher v. State,* 514 S.W.2d 905, 910–11 (Tex.Crim.App.1974) (summarizing events of Sharpstown scandal).

[6] Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 986 (codified at TEX. G OV'T CODE §§ 552.001–.353).

The TPIA defines a "governmental body" as one of twelve different types of entities. *See id.* § 552.003(1)(A). Most of the entities listed in section 552.003(1)(A) are identified quite precisely; for example, a "school district board of trustees" is statutorily defined as a "governmental body." *Id.* § 552.003(1)(A)(v). Others are more amorphous, including the section at issue here, which subjects "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is

supported in whole or in part by public funds" to the TPIA. *Id.* § 552.003(1)(A)(xii). The crux of our inquiry in this case is the meaning of "supported in whole or in part by public funds." The proper scope of this phrase is significant because the consequences of being characterized as a governmental body are considerable. The most obvious is that under section 552.221 of the Texas Government Code, a "governmental body" must promptly produce "public information" on request unless an exemption from disclosure applies and is timely asserted.[7] *See id.* §§ 552.101–.123, .221; *see also Tex. Comptroller of Pub. Accounts v. Att'y Gen. of Tex.,* 354 S.W.3d 336, 341–48 (Tex.2010) (construing an exemption under the TPIA). The term "public information" broadly includes "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business" either: (1) "by a governmental body" or (2) "for a governmental body and the governmental body owns the information or has a right of access to it." TEX. GOV'T CODE § 552.002(a).

[7] To claim an exemption, a governmental body must, within ten business days after receiving a request, submit a written statement to the Attorney General explaining why the information should be withheld and request an Attorney General opinion. TEX. GOV'T CODE § 552.301(a), (b). If the Attorney General rules that the Act does not exempt the information from required disclosure, the governmental body must make it available to the requesting party or seek a judicial determination that the information does not have to be disclosed. *Id.* §§ 552.3215(e), .324, .325(a); *see also City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 356 (Tex.2000). If the governmental body refuses to disclose the requested information, the Attorney General may seek to compel disclosure through a mandamus proceeding. TEX. GOV'T CODE § 552.321.

### **\*58 B. Statutory Construction**

 **[1]** **[2]** **[3]** **[4]** **[5]** **[6]** GHP argues that as a private entity, it is not subject to the TPIA's disclosure requirements because it does not qualify as a "governmental body" under the statute's plain language. GHP therefore contends that it is entitled to seek the privacy protections typically afforded to nongovernmental entities. Determining whether GHP is a "governmental body" whose records are subject to disclosure under the TPIA presents a matter of statutory construction that we review de novo. *City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 357 (Tex.2000). When interpreting a statute,

our primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding the Act's scope. *City of Lorena v. BMTP Holdings, L.P.,* 409 S.W.3d 634, 641 (Tex.2013). We seek that intent first and foremost in the plain meaning of the text. *Id.*; *see also Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). "However, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute." *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 180 (Tex.2013). Therefore, even if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole. *Id.* at 180–81. We only resort to rules of construction or extrinsic aids when a statute's words are ambiguous. *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009). Finally, in construing the TPIA, we are mindful of the legislative mandate that the TPIA be "liberally construed in favor of granting a request for information." TEX. GOV'T CODE § 552.001(b).

As an initial matter, we observe the parties' agreement that GHP is a "governmental body" only if it, or a "part, section, or portion" of it "is supported in whole or in part by public funds." It is likewise undisputed that GHP receives "public funds." [8] The parties disagree, however, on the meaning and application of the statutory phrase, "supported in whole or in part by." GHP argues that the TPIA cannot reasonably be interpreted to apply to privately-controlled corporations that perform services under quid pro quo government contracts. According to GHP, the Legislature unambiguously intended "supported in whole or in part by public funds" to identify entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds. Conversely, the Attorney General declares the statutory language ambiguous because it could reasonably be read to apply to any contract between the government and a private entity. We agree with GHP.

[8] "Public funds" refers to the "funds of the state or of a governmental subdivision of the state." TEX. GOV'T CODE § 552.003(5).

 [7]  "Supported" is an undefined term with multiple and varied dictionary definitions. However, only two of the definitions are even remotely possible as applied to the TPIA

and only one of those definitions is reasonable when the statute is considered as a whole. Reading the definition of "governmental body" in its contextual environment—as we are bound to do—reveals that the TPIA applies only to entities acting as the functional equivalent **\*59**  of a governmental body that are "sustained" at least in part, by public funds. In reaching this conclusion, we remain ever mindful of the statute's liberal-construction clause. But liberal-construction objectives do not permit a construction of the Act untethered from its statutory moorings.

Familiar interpretive guides and established canons of construction inform our reading of section 552.003(1)(A)(xii). In determining the meaning of "supported ... by public funds," we begin, as we must, with the statute's plain language. *Tex. Lottery Comm'n,* 325 S.W.3d at 635. Common English words frequently have a number of dictionary definitions, some quite abstruse and esoteric, others more comprehensible and commonplace. *See, e.g., $1,760.00 in U.S. Currency,* 406 S.W.3d at 180–81 (noting that "novelty" has multiple dictionary definitions). Not surprisingly, "supported," the key term here, is subject to at least six disparate definitions in its verb form alone, with many of those including more nuanced sub-definitions. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002). By reading the term in context, however, we can narrow the universe of possible definitions to the most apposite. *See TGS–NOPEC Geophysical Co.,* 340 S.W.3d at 439.

 [8]  As always, we are cognizant of the "fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Id.* at 441. We must therefore analyze the reasonableness of each definition in light of the statutory context. *See Jaster v. Comet II Const., Inc.,* 438 S.W.3d 556, 562 (Tex.2014); *see also R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 628 (Tex.2011) ( "We generally avoid construing individual provisions of a statute in isolation from the statute as a whole."). The statute's first contextual clue emerges from the words immediately surrounding "supported." To avoid disharmony with the rest of the statute, "supported" must bear reference to "public funds," so it is clear that non-monetary definitions of "supported" make little sense in context. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 921 (2002) (defining "funds" as "available pecuniary resources"). Applying this limitation, we winnow

the field down to two potential meanings for "supported," both of which are faithful to the statutory context:

> (1) to pay the costs of: maintain; to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining; or

> (2) to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of.

*See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002); *accord* BLACK'S LAW DICTIONARY 1668 (10th ed. 2009) (defining the term "support" to mean "[s]ustenance or maintenance"). In statutory context, "supported" must thus mean sustenance, maintenance, or both.

Another contextual clue derives from the Act's purpose. The statutory context indicates that all section 552.001(a) entities are either the government or its functional equivalent. First, the statute provides the public with "complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). The stated purpose of permitting access to this information is to allow the public to "retain control over the instruments they have created." *Id.* A reasonable definition of "supported" must be compatible with this stated purpose. The statute also specially **\*60** defines the term "governmental body." In defining that term, the Legislature carefully omitted any broad reference to private entities, instead including private entities insofar as they are "supported ... by public funds." *Compare id. with* FLA. STAT. § 119.011(2). In light of this omission, which we presume the Legislature purposefully selected, the scope of the term "governmental body," as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government. Thus, the Act only applies to private entities acting as the functional equivalent of the government. *See TGS–NOPEC Geophysical Co.,* 340 S.W.3d at 439.

Defining "supported" to mean "maintenance" is untenable because doing so risks sweeping any private entity that received any public funds within the definition of a "governmental body." *See* 407 S.W.3d at 781 (citing *Tex. Ass'n of Appraisal Dists., Inc. v. Hart,* 382 S.W.3d 587, 591–92 (Tex.App.–Austin 2012, no pet.)). To resurrect the example provided by the court of appeals, if we equate "supported" with supplying an entity with a means by which the entity can pay for necessities, then even a paper vendor

with hundreds of clients would qualify as a "governmental body" merely by virtue of getting paid for selling office supplies to a single state office. *See* 407 S.W.3d at 781. Every company must expend funds to stay in business; it would be impossible to conclude that any business compensated for providing goods or services to a governmental entity pursuant to a quid pro quo contract was not using public funds to pay for necessities. Thus, any entity doing business with the government would be a "governmental body."

"Quid pro quo" means "[a]n action or thing that is exchanged for another action or thing of more or less equal value." *See* BLACK'S LAW DICTIONARY 1443 (10th ed. 2009). As the dissent agrees, the Legislature did not intend for the statute to reach entities involved in quid pro quo transactions with the government, and it is undisputed that a fair reading of the statute cannot countenance such a result. 407 S.W.3d at 789. We reject any reading of "supported" that would injudiciously apply public transparency laws to private businesses merely because they receive public funds under a contract with the government. Accordingly, the "maintenance" definition of "supported" is not textually viable.

 [9]    [10]   In contrast, defining "supported" as "sustenance" ensures that only an entity, or its "part, section or portion," whose existence is predicated on the continued receipt of government funds would qualify as a "governmental body." Among the meanings of "sustain" are "to cause to continue; to keep up; to carry or withstand; to nourish; to prevent from sinking or giving way." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2304 (2002); *see also* BLACK'S LAW DICTIONARY 1676 (10th ed. 2009) (defining "sustain" to mean "to nourish and encourage"). Applying this construction, the universe of private entities constituting governmental bodies is obviously more circumscribed because only a small segment of private entities could fairly be considered to be sustained by the government. To be "sustained" by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent. Financial dependency need not be absolute, however. Rather, the government could be one of several contributing sources. But sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations. Unquestionably, a **\*61** private entity would qualify under a financially dependent construction of "supported" if it could not pursue its mission and objectives without the receipt of public funds, even if that funding

only partially financed the entity's endeavors. In short, an entity "supported" by public funds would not just receive government funds; it would require them to operate in whole or in part. [9] If we construe "supported ... by public funds" in this manner, we must conclude GHP is not "supported" by public funds because it receives only a small portion of its revenue from government contracts. And even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources. Moreover, GHP could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members. GHP, in sum, does not require public funds and thus, is not sustained by public funds.

[9]     It is possible, of course, that a portion of a private entity could be sustained by public funds even where the private entity, as a whole, is not. In such instances, if the department or division is sustained by public funds, the division may be subject to the TPIA's disclosure obligations. Here, GHP did not segregate funds, and it argued that such segregation would be logistically impossible.

 [11]  Because only one definition fits the statutory context, we conclude that "supported ... by public funds" must be appropriately defined to only include those entities "sustained" by public funds—thereby ensuring that the statute encompasses only those private entities dependent on the public fisc to operate as a going concern. Although not dispositive, our conclusion is reinforced by the fact that this construction of the term "supported" is consistent with the scope and nature of the eleven other types of entities more clearly described as a "governmental body" in the same provision. *See* TEX. GOV'T CODE § 552.003(1)(A). The canon of statutory construction known as *noscitur a sociis* —"it is known by its associates"—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it. *See TGS– NOPEC Geophysical Co.,* 340 S.W.3d at 441. We rely on this principle to avoid ascribing to one word a meaning so broad that it is incommensurate with the statutory context. Accordingly, in evaluating the breadth of "supported in whole or in part by public funds," we may consider the scope of the enumerated categories preceding it. *See Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 750–51 (Tex.2006). Of the eleven other examples of a "governmental body" listed in the statutory definition of the term, two stand out as arguably the most analogous to a private nonprofit like GHP. Thus, we briefly consider each in comparison.

First, the statute expressly identifies as a "governmental body" the governing board of a nonprofit water supply or wastewater service corporation that is organized under Chapter 67 of the Texas Water Code and exempt from ad valorem taxation under the Texas Tax Code. *See* TEX. GOV'T CODE § 552.003(1)(A)(ix). A nonprofit corporation of this type is authorized to engage in several traditional governmental functions, such as the right to build and operate water- and waste-treatment facilities and sell water to political subdivisions, private entities, or individuals. *See* TEX. WATER CODE § 67.002. Additionally, depending on the size of the county it serves, a nonprofit water or waste-water service provider may even establish and enforce "customer water conservation practices" through the assessment **\*62** of "reasonable penalties as provided in the corporation's tariff." *See id.* § 67.011(a)(5), (b). By virtue of their special powers and privileges, these nonprofit utility operators essentially function as quasi-public corporations servicing the public. *See Garwood Irr. Co. v. Williams,* 243 S.W.2d 453, 456 (Tex.Civ.App.–Galveston 1951, writ ref'd n.r.e.).

The second potentially private "governmental body" identified in the statute is a nonprofit corporation eligible to receive federal funding, in the form of block grants, for anti-poverty programs at the state level. TEX. GOV'T CODE § 552.003(1)(A)(xi). Under this federal initiative, a nonprofit may receive funds if it demonstrates "expertise in providing training to individuals and organizations on methods of effectively addressing the needs of low-income families and communities" through a detailed application process. [10] 42 U.S.C. § 9913(c)(2) (2012); *see also* OFFICE OF CMTY. SERVS., U.S. DEP'T OF HEALTH & HUMAN SERVS., COMMUNITY SERVICES BLOCK GRANT STATE AND ELIGIBLE ENTITY TECHNICAL ASSISTANT SERVICES 16–17(2015) (listing eligibility requirements). [11] A section 552.003(i)(A)(xi) "governmental body" must be "authorized by this state to serve a geographic area of the state." *See* TEX. GOV'T CODE § 552.003(1)(A) (xi). This requirement presupposes that the nonprofit has a close working relationship with the state government. *See* 10 TEX. ADMIN. CODE § 5.211 (requiring an authorized nonprofit to submit monthly performance reports to the state agency monitoring the program).

[10]     The federal program is codified at 42 U.S.C. §§ 9901-9926 (2012) and is administered by the U.S.

Department of Health and Human Services Office of Community Service. *See* 42 U.S.C. § 9912 (2012).

11    Available at http://www.acf.hhs.gov/grants/open/foa/files/HHS-2015-ACF-OCS-ET-1007_1.pdf.

The foregoing examples describe ostensibly private entities deputized by the government to provide services traditionally considered governmental prerogatives or responsibilities. Thus, although nominally private, each is in fact acting as a quasi-public entity performing a core governmental function. There is a significant difference between an entity of this nature and one like GHP, and our construction of "supported in whole or in part by public funds" reflects as much by capturing only those entities acting as the functional equivalent of the government. *See Fiess,* 202 S.W.3d at 751.

 [12] Our construction of the term "supported" remains faithful to the TPIA's liberal-construction clause. *See* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information."). We have consistently recognized this clause expresses an important statement of legislative purpose, and we continue to adhere to it today. *See, e.g., City of* Garland, 22 S.W.3d at 364 ("Unlike the [Freedom of Information Act], our Act contains a strong statement of public policy favoring public access to governmental information and a statutory mandate to construe the Act to implement that policy and to construe it in favor of granting a request for information."). Still, even a liberal construction must remain grounded in the statute's language and cannot overwhelm contextual indicators limiting public intrusion into the private affairs of nongovernmental entities. [12]

12    There is little to support the view that open-records laws were envisioned as tools to pry open the sensitive records of private entities or to function as a private discovery tool. *See N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (describing the Freedom of Information Act). Instead, we have recognized:

> The Texas Legislature promulgated the TPIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." The Act is aimed at preserving a fundamental tenet of representative democracy: "that the government is the servant and not the master of the people." At its core, the TPIA reflects the public policy that the people of Texas "insist on

remaining informed so that they may retain control over the instruments they have created."

*Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 293 (Tex.2011) (citations omitted).

 [13]    **\*63** In sum, we define "supported in whole or in part by public funds" to include only those private entities or their sub-parts sustained, at least in part, by public funds, meaning they could not perform the same or similar services without the public funds. If GHP (as a private entity that receives government funds even while not being supported by them) presents the hard case, entities on the ends of the spectrum—those that receive no government money, and those that receive only government money—will obviously present much more straightforward questions. Determining whether a partially funded entity qualifies as a "governmental body" will likely require case-specific analysis and a close examination of the facts. Nonetheless, we recognize as a general proposition that an entity, like GHP, that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds.

### C. Other Jurisdictions

While our construction of the TPIA is supported by a plain-meaning reading of the statute, an examination of similar open-records statutes from other jurisdictions is also instructive. In states where open-records acts apply to entities "supported in whole or in part by public funds," our sister courts have unanimously construed the phrase to exclude, as a general matter, private entities receiving public funds pursuant to quid pro quo agreements without regard to whether such an agreement is the entity's only funding source. *See, e.g., Indianapolis Convention & Visitors Ass'n, Inc. v. Indianapolis Newspapers, Inc.,* 577 N.E.2d 208, 214 (Ind.1991) ("In situations involving a *quid pro quo,* that is, measured goods or services given in exchange for payment based on identifiable quantities of goods or services, a private entity would not be transformed into a public entity because it would not be maintained and supported by public funds."); *Weston v. Carolina Research & Dev. Found.,* 303 S.C. 398, 401 S.E.2d 161, 165 (1991) ("[T]his decision does not mean that the [open-records act] would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms length basis."); *Adams Cnty. Record v. Greater N.D. Ass'n,* 529 N.W.2d 830, 836 (N.D.1995) ("When there is a bargained-for exchange of value, a *quid pro quo,* the entity is not supported by public funds."). Additionally, even in those

states whose open-records acts fail to define "governmental body" or an equivalent term, our sister courts still narrowly construe the statute to include only private entities that have a relationship so intertwined with the government that they are the "functional equivalent of a governmental agency." *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.,* 87 S.W.3d 67, 78–79 (Tenn.2002); *see also State ex rel. Oriana House, Inc. v. Montgomery,* 110 Ohio St.3d 456, 854 N.E.2d 193, 198–99 (2006).

Recognizing the right of private businesses to conduct their affairs autonomously, at least one court has adopted a **\*64** presumption that a private entity is not subject to an open-records request absent clear and convincing evidence that the private entity is the functional equivalent of a governmental body. *See, e.g., State ex rel Oriana House, Inc.,* 854 N.E.2d at 200. In Florida, the only state whose statute expressly includes private entities, the Florida Supreme Court narrowly interpreted its open-records act to exclude private entities merely providing professional services to a governmental body. *See News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So.2d 1029, 1031 (Fla.1992) (construing FLA. STAT. § 119.011(2)). In fact, of those states with similar statutes, we have not encountered one that has construed an open-records act to include a private entity providing specific and measurable vendor services to a governmental body, even if that entity receives public funds. We find it difficult to ignore this interpretative uniformity, especially considering the gravitas of the interests at stake.

Our plain-meaning construction also comports with federal precedent interpreting the federal analogue—the Freedom of Information Act (FOIA). *See Tex. Comptroller of Pub. Accounts,* 354 S.W.3d at 342 (noting that because the Legislature modeled the TPIA on the FOIA, federal precedent is persuasive in construing the Act). Under the FOIA, "agency," the federal equivalent of "governmental body," is defined to include:

> any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f)(1) (2012). In interpreting this broad language, the United States Supreme Court held that a private entity receiving federal funding is considered a "government controlled corporation" and subject to FOIA disclosure requirements only if the private entity is also subjected to "extensive, detailed, and virtually day-to-day supervision" by the government. *Forsham v. Harris,* 445 U.S. 169, 180, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980). The federal supervision must be "substantial ... and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant." *Id.* at 180 n.11, 100 S.Ct. 977. Thus, narrowly defining "supported in whole or in part by public funds" under Texas law is consistent with the approach of other jurisdictions featuring similar acts and the United States Supreme Court's interpretation of the federal act on which the TPIA is based.

### D. Response to the Dissent

 **[14]** We briefly address some of the contentions in the dissenting opinion. Regarding statutory construction, there is little disagreement about the guiding principles and relevant canons involved here, and we agree, of course, that the canon of *noscitur a sociis* "cannot be used to render express statutory language meaningless." Op. at 83 (Boyd, J., dissenting). We disagree as to the proper implementation of the canon, however. The dissent asserts that the first eleven definitions of "governmental body" in the TPIA should be cabined off from the twelfth definition of that term because the twelfth definition "uses specific language, inherently different than the language of the other definitions." *Id.* at 82. The dissent, thus, argues that the nature of the first eleven definitions cannot inform the twelfth. We disagree. All twelve are definitions of governmental bodies, and given that the twelfth definition is the most open-ended, blinders would be required to construe it in isolation **\*65** from its statutory predecessors. Separating the definitions in this way would not only be artificial, it would also deprive us of a key source of insight into the parameters of the more expansive twelfth definition.

More significant, however, is the dissent's suggestion that the statute is ambiguous. The dissent, building on this imprudent reading, would look to Attorney General decisions and the *Kneeland* test for "further guidance." *Id.* at 85. In canvassing the landscape of informal Attorney General rulings and divining instruction therefrom, the dissent resurrects *Kneeland*'s questionable methodology, which did the same. And as that court itself noted, even if "[o]ne may have no quarrel with the formulae," "the direction given is a mite uncertain." *Kneeland,* 850 F.2d at 228. The dissent finds *Kneeland* "persuasive" but we do not reach

that analysis because of our determination that the statutory language unambiguously excludes GHP from qualifying as a "governmental body." Nonetheless, we think it worth brief pause to note *Kneeland*'s questionable foundation, as it—along with the raft of informal Attorney General rulings that bookend the decision—constitute the "forty years of legal interpretations" that we supposedly ignore in today's opinion.[13] Op. at 68 (Boyd, J., dissenting). But many of these rulings were informal and, as such lack any precedential value. Put simply, the weight of this legal authority is considerably less august than the dissent's formulation implies.

[13] The *Kneeland* test gained prominence by happenstance rather than design. It derived from a single federal district court opinion based on five conclusory Attorney General opinions written without any attempt to construe the statutory language. After *Kneeland* issued, the Attorney General adopted the test without further analysis. Thereafter, the lower courts used the *Kneeland* test out of deference to the Attorney General, also without scrutinizing the test in light of the statutory text and legislative intent embodied therein. We decline to defer to a test created without consideration of the statutory language.

While the dissent purports to rehabilitate *Kneeland,* its revised test is at best a partial improvement. The revised test makes it virtually impossible for an entity that provides intangible deliverables, such as consulting, advertising, or legal services, to satisfy the "specific and measurable services" prong of the test. The dissent portrays GHP as sharing only broad, amorphous goals with the City. Yet, the "broad" contract language referenced by the dissent actually refers to GHP's more general overarching objectives (essentially, these statements of objectives function as titles under which specific obligations of the contract are delineated). Each broad objective is followed by a list of specific services GHP promised to provide to achieve those objectives. For example, GHP was hired "to identify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business." In furtherance of that objective, GHP is contractually obligated to develop business relationships with the top twenty-five companies not currently headquartered in the City; create and implement a business-retention program to provide quick responses to companies in the City; and arrange and host ten recruiting trips, or "Signature Events," for Houston-based executives to

visit target companies and pitch them on the City's business advantages. These services are specific and measurable and are the sort of quid pro quo exchanges typical of a vendor services contract in that industry.

**\*66** Thus, we do not believe that the monetary payments due to GHP under the 2007 and 2008 agreements are "general or unrestricted payment[s] provided to subsidize or underwrite the entity's activities" rather than "specific measurable services." *Id.* at 86. Even the dissent admits that some—but not all—of GHP's activities qualify as "specific measurable services," so the disagreement here is more a matter of degree than anything else.

The dissent's revised test would also require that "the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue even in the absence of their contractual relationship." *Id.* at 88. The dissent posits that a law firm may share a broad goal with a client, but the firm's interest remains "transaction specific" in a way that GHP's engagement is not. *Id.* at 89. At the risk of quibbling, we dispute that this metaphorical dividing line is nearly that clear or marked. Many law firms are hired not merely for a specific litigation matter but rather to provide more enduring and wide-ranging counsel. And more importantly, while the dissent takes for granted that GHP and the City's interests are perfectly aligned (and presumably always will be), that assumption is debatable. For instance, although the vast majority of cities presumably welcome financial investment, growth can prove politically divisive—just witness the debates over gentrification that grip many major cities experiencing explosive economic expansion. Regardless, the point is that GHP is hardly the auxiliary and mirror of the City that the dissent portrays it to be, and the proposed revision of the *Kneeland* test will not significantly clarify this confused area of the law.

**[15]** The dissent also contends that "the Court writes the words 'in part' completely out of the statutory definition." *Id.* at 79. Nothing so drastic is occurring here. The statute's "in part" language may envision a multi-division entity that does business with the government, but not uniformly and not across all units. For instance, one can conceptualize a subdivision of a large corporation wholly funded by government contracts; nevertheless, because the subdivision is only a small part of the large organization, the government business forms a relatively small portion of the corporation's total revenue. In this scenario, the organization may be said to be supported "in part" by public funds. Moreover,

there may be more overlap between "in part" and the neighboring statutory language than the dissent allows. While we generally attempt to avoid treating statutory language as surplusage, "there are times when redundancies are precisely what the Legislature intended." *In re Estate of Nash,* 220 S.W.3d 914, 917–18 (Tex.2007); *see also In re City of Georgetown,* 53 S.W.3d 328, 336 (Tex.2001) (noting that statutory redundancies may mean that "the Legislature repeated itself out of an abundance of caution, for emphasis, or both"). Regardless of whether such drafting caution is at work here, the point remains that there are a host of possible explanations addressing the dissent's concerns.

### III. Conclusion

Amidst all the argument attempting to classify GHP as a governmental body, it is worth recalling precisely what GHP is not: GHP is not a government agency, nor is it a quasi-public agency specifically listed under the Texas Government Code as a "governmental body." GHP does not rely on its government contracts to sustain itself as a going concern; as all parties acknowledge, the government funds it receives constitute a relatively minuscule portion of **\*67** GHP's annual budget. The only way GHP can qualify as a "governmental body," then, is if it can be said to be "supported in whole or in part by public funds."

GHP, like countless chambers of commerce nationwide, provides marketing, consulting, and event-planning services to the City and other clients pursuant to quid pro quo contracts. Like the lobbying shops and law firms that also populate the State payroll, GHP shares many common objectives with the City, but without more, such shared interests can hardly transform a service provider into a government appendage. A private entity engaged in economically delicate work should not be subjected to invasive disclosure requirements merely because it counts the government as one client among many. Transparency is a real concern, to be sure, and the TPIA's liberal-construction mandate reflects the depth of this interest. But liberal construction is not tantamount to boundless reach. Yet, even if not directly subject to disclosure obligations under the TPIA, GHP's transactions with the government are hardly in a black box; the City—which is indisputably a "governmental body"—must disclose information regarding its contractors, including GHP.

Applying the TPIA's plain and unambiguous language, we hold that GHP is not "supported in whole or in part by public funds" and thus is not a "governmental body" under the TPIA. Because the relevant provisions of the TPIA are unambiguous, we do not apply the analysis outlined in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224 (5th Cir. 1988), nor any other extra-textual construct. We therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON and JUSTICE WILLETT joined.

JUSTICE BOYD, joined by JUSTICE JOHNSON and JUSTICE WILLETT, dissenting.

Forty-two years ago, the Texas Legislature passed what has become "widely regarded as the strongest and most successful open government law in the country." [1] Just three years later, in this Court's first opinion addressing the new Texas Open Records Act, [2] we confirmed that it is the Legislature's policymaking role to balance "the public's right of access" against "potential abuses of the right," and the Court's role is merely "to enforce the public's right of access given by the Act." *Indus. Found. of the S. v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 675 (Tex.1976). Balancing these interests, the Legislature decided that the Act should apply to "the part, section, or portion" of any "organization [or] corporation ... that is supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). That may be bad policy, or it may be good policy, but it is *the* policy of Texas, and this Court's only task is to enforce it.

[1]   *City of Dall. v. Abbott,* 304 S.W.3d 380, 395 n.5 (Tex.2010) (Wainwright, J., dissenting); *see also* CHARLES L. BABCOCK ET AL., OPEN GOVERNMENT GUIDE: OPEN RECORDS AND MEETINGS LAWS IN TEXAS 1–2 (6th ed. 2011) (describing Texas Public Information Act as "among the strongest in the nation" and "among the most liberal in the United States"), *available at* http://www.rcfp.org/rcfp/orders/docs/ogg/TX.pdf.

[2]   Act of May 19, 1973, 63d Leg., R.S., ch. 424, 1973 Tex. Gen. Laws 1112–18 (codified at TEX. REV. CIV. STAT. art. 6252–17a). In 1993, the Legislature codified the Act in the Texas Government Code and renamed it the Texas Public Information Act. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, secs. 552.001–.353, 1993 Tex. Gen.

Laws 583, 594–607 (codified at TEX. G OV'T CODE §§ 552.001–.353).

To enforce the Legislature's policy choice in this case, we must decide what it **\*68** means for a "part, section, or portion" of a corporation to be "supported in whole or in part by public funds." *See id.* The Court adopts the narrowest construction possible, identifying two requirements that appear nowhere in the statute's language. The Court's all-or-nothing construction is irreconcilable with the provision's express inclusion of a "part, section, or portion" of an entity that is "supported in whole *or in part* by public funds." *See id.* (emphasis added). Striving to be faithful to the Act's plain language, mindful of its express mandate that courts construe it liberally in favor of access to information, and respectful of the many prior decisions of the Texas Attorneys General charged with interpreting and enforcing the Act, I would hold that a "part, section, or portion" of a private organization or corporation is "supported in whole or in part by public funds" and thus a "governmental body" if it (1) receives public funds, (2) not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the entity's activities, and (3) those activities promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship. Because the evidence establishes all three of these elements in this case, I would hold on this record that the Greater Houston Partnership is a governmental body. Because the Court holds otherwise, I respectfully dissent.

## I.

### Background

This case presents a single question of statutory construction: what does the Texas Public Information Act mean when it refers to a "part, section, or portion" of an entity that is "supported in whole or in part by public funds"? *Id.* Purporting to rely on "[f]amiliar interpretive guides and established canons of construction," *ante* at 59, the Court discards over forty years of legal interpretations and announces a brand new interpretation that, at best, reflects the Court's concerns instead of the Legislature's language. In light of the Court's analysis, and to place the issue in perspective, I begin by highlighting the Act's relevant requirements, the reasons for its enactment, prior constructions of the language

at issue, and the evidence here regarding the Partnership and its support.

### A. Requirements of the Act

The Public Information Act requires the "officer for public information of a governmental body"[3] to "promptly produce public information" upon request. TEX. GOV'T CODE § 552.221(a). "Public information" means information "that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business," either (1) "by a governmental body;" (2) "for a governmental body" if the governmental body owns the information, has a right of access to it, or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information;" or (3) "by an individual officer or employee of a governmental body in the officer's or employee's official capacity and the information pertains to official business of the governmental **\*69** body." *Id.* § 552.002(a). "Information is in connection with the transaction of official business if the information is created by, transmitted to, received by, or maintained by an officer or employee of the governmental body in the officer's or employee's official capacity, or a person or entity performing official business or a governmental function on behalf of a governmental body, and pertains to official business of the governmental body." *Id.* § 552.002(a-1).

[3] An "officer for public information" is the governmental body's chief administrative officer (or, in the case of a county, an elected county officer), and the head of each department within the governmental body is the officer's agent for purposes of complying with the Act. TEX. GOV'T CODE §§ 552.201–.202.

The Act does not require a governmental body to produce public information that is "considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. The Act itself provides numerous other exceptions to its disclosure requirement, which include, among other things, certain personnel records, *id.* § 552.102, litigation records, *id.* § 552.103, information that "would give advantage to a competitor or bidder," *id.* § 552.104, attorney-client information, *id.* § 552.107, trade secrets and commercial financial information, *id.* § 552.110, personal and family information of governmental employees, *id.* § 552.117(a), and "information [that] relates to economic development negotiations involving a governmental body

and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body," *id.* § 552.131(a). The Act does not allow a governmental body to unilaterally decide for itself whether it can withhold requested information. Instead, a governmental body that wishes to withhold information in response to a request must ask the Attorney General to decide whether the information fits within one of the Act's exceptions. *Id.* § 552.301(a).

It is difficult to overstate the Attorney General's role in this process. The Act assigns to the Attorney General the duty to "maintain uniformity in the application, operation, and interpretation" of the Act and authorizes the Attorney General to "publish any materials, including detailed and comprehensive written decisions and opinions, that relate to or are based on this chapter." *Id.* § 552.011. Upon receipt of a governmental body's request for a decision, the Attorney General considers comments and arguments from any interested person, *id.* § 552.304(a), and then must "promptly render a decision" on whether the requested information is within one of the Act's exceptions, *id.* § 552.306(a); *see also id.* § 552.306(b) (requiring the Attorney General to issue "a written opinion" and provide a copy to the requestor). Through its Open Records Division, the Attorney General's Office issues thousands of open records letter rulings every year, including more than 23,000 in 2014, and it is on pace to surpass that number this year. [4] If a governmental body fails to **\*70** request an Attorney General decision when and as required, the requested information "is presumed to be subject to required public disclosure and must be released unless there is a compelling reason to withhold the information." *Id.* § 552.302.

[4]     *See Open Records Letter Rulings (ORLs),* OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). Texas law authorizes the Attorney General to announce legal determinations in various forms. The Government Code, for example, authorizes the Attorney General to provide "a written opinion" to certain governmental officials addressing "a question affecting the public interest or concerning the official duties of the requesting person." TEX. GOV'T CODE § 402.042(a). The Attorney General's determinations under this authority are commonly referred to as "attorney general opinions" and are named numerically using the initials of the issuing Attorney General as a prefix. *See About Attorney General Opinions,* OFFICE OF THE ATT'Y GEN. OF

TEX. , www.texasattorneygeneral.gov/opinion/about-attorney-general-opinions (last visited June 22, 2015). In addition, the Public Information Act authorizes and requires the Attorney General to issue a "decision," in the form of a "written opinion," announcing whether a governmental body may withhold information in response to a request under the Act. TEX. GOV'T CODE §§ 552.301(a), .306(a), (b). Pursuant to this authority, Attorneys General sometimes issue "open records decisions," which "are formal opinions relating to the Public Information Act" that "usually address novel or problematic legal questions and are signed by the Attorney General." *See Open Records Decisions (ORDS),* OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/og/open-records-decisions-ords (last visited June 22, 2015). These decisions are named numerically using the initials "ORD" as a prefix. *See id.* More often, Attorneys General have resolved open records questions by issuing "open records letter rulings," which "[u]nlike Open Records Decisions, [are] informal letter rulings ... applicable only to the specific documents and circumstances surrounding them[.]" *See Open Records Letter Rulings (ORLs),* OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). These rulings are named numerically using the initials "OR" and the year of issuance as a prefix. *See id.* Through the years, Texas Attorneys General have utilized all three methods to address open records issues, including the issue of what constitutes a "governmental body" under the Act.

If a governmental body refuses to request an Attorney General decision or refuses to produce public information or information that the Attorney General has determined is public and not excepted from disclosure, the Attorney General or a requestor may file suit for a writ of mandamus compelling the governmental body to make the information available. *Id.* § 552.321. Conversely, a governmental body may file suit against the Attorney General, seeking declaratory relief from compliance with the Attorney General's decision. *Id.* § 552.324(a). In that suit, however, a governmental body can only rely on exceptions it asserted when it requested the Attorney General's decision, unless the exception is based on a federal law requirement or involves another person's property or privacy interests. *Id.* § 552.326(a), (b).

The Act's requirements apply only to a "governmental body," which the Act defines to mean:

(i) a board, commission, department, committee, institution, agency, or office that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members;

(ii) a county commissioners court in the state;

(iii) a municipal governing body in the state;

(iv) a deliberative body that has rulemaking or quasi-judicial power and that is classified as a department, agency, or political subdivision of a county or municipality;

(v) a school district board of trustees;

(vi) a county board of school trustees;

(vii) a county board of education;

(viii) the governing board of a special district;

(ix) the governing body of a nonprofit corporation organized under Chapter 67, Water Code, that provides a water supply or wastewater service, or both, and is exempt from ad valorem taxation under Section 11.30, Tax Code;

(x) a local workforce development board created under Section 2308.253;

(xi) a nonprofit corporation that is eligible to receive funds under the federal community services block grant program and that is authorized **\*71** by this state to serve a geographic area of the state; and

(xii) the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds[.]

*Id.* § 552.003(1)(A)(i)–(xii). The question here is whether the Greater Houston Partnership is "supported in whole or in part by public funds," and thus a "governmental body" under part (xii). "Public funds" means "funds of the state or of a governmental subdivision of the state." *Id.* § 552.003(5).

**B. Reasons for the Act**

The Public Information Act is unique in its extensive explanation of the policies that led to its enactment. As the Court explains, the Legislature first adopted the Act in response to the "Sharpstown scandal." *Ante* at 57. The Act begins by expressing the "fundamental philosophy" that "government is the servant and not the master of the people" and "the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). While the people of Texas have delegated governing authority to public employees, they "do not give their public servants the right to decide what is good for the people to know and what is not good for them to know." *Id.* Because "[t]he people insist on remaining informed so that they may retain control over the instruments they have created," the Act expressly provides that it "shall be liberally construed to implement this policy." *Id.* Courts must construe the Act's provisions "in favor of disclosure of requested information." *Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 293 (Tex.2011); *see also* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information.").

**C. Prior Constructions of the Act**

Pursuant to their responsibility to "maintain uniformity in the application, operation, and interpretation" of the Act, TEX. GOV'T CODE § 552.011, Texas Attorneys General have issued numerous opinions addressing whether private entities —including several chambers of commerce and similar organizations—were "supported in whole or in part by public funds." Respecting the Attorney General's unique role, courts have given deference to Attorney General interpretations and applications, most notably the Fifth Circuit in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224, 228 (5th Cir. 1988).

**1. Pre-*Kneeland* Attorney General Decisions**

In 1973, shortly after the Act became effective, the Attorney General's very first open records decision addressed the statutory language we address today and concluded that a private bank was not "supported in whole or in part by public funds" merely because it received and held deposits of public funds. Tex. Att'y Gen. ORD–1 (1973). Six years later, the Attorney General concluded that an organization very similar to the Partnership—a private, nonprofit corporation

chartered to promote the interests of the Dallas–Fort Worth metropolitan area—was a governmental body under the Act. Tex. Att'y Gen. ORD–228 (1979). Pursuant to a contract, the City of Fort Worth paid the corporation $80,000 to "[c]ontinue its current successful programs and implement such new and innovative programs as will further its corporate objectives and common **\*72** City's interests and activities" over a three-year period. *Id.* The Attorney General concluded that, by using the phrase "supported in whole or in part," the Legislature "did not intend to extend the application of the Act to private persons or businesses simply because they provide specific goods or services under a contract with a governmental body." *Id.* But this contract did not "impose a specific and definite obligation on the [corporation] to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.* Thus, not every "contract with a governmental body causes the records of a private contractor to be open," but a private entity is supported by public funds, and is thus a "governmental body," when the public funds are "used for the general support of the [entity] rather than being attributable to specific payment for specific measurable services." *Id.*

Three years later, the Attorney General relied on ORD–228 to find that another chamber-of-commerce-like organization—a private, nonprofit entity created to promote manufacturing and industrial development in the Bryan area—was a governmental body because the City of Bryan's contractual payment of $48,000 was like an "unrestricted" grant, rather than payment for specific measurable services. Tex. Att'y Gen. ORD–302 (1982) (noting that the situation was "virtually identical" to that in ORD–228). That same year, the Attorney General concluded that a private medical service provider for the Amarillo Hospital District was not a governmental body under the Act because the parties' contract prescribed specific measurable services, including ambulance services, for which the provider received a monthly sum "equal to the difference between cash receipts and approved operating expenditures of the ambulance service." Tex. Att'y Gen. ORD–343 (1982).

The following year, the Attorney General determined that a proposed athletic conference consisting of member universities would be a governmental body under the Act because each university would pay an upfront "membership fee" and subsequent annual fees that would be used for the conference's "general support ... rather than being attributable to specific payments for specific measurable services." Tex.

Att'y Gen. Op. No. JM–116 (1983) (quoting Tex. Att'y Gen. ORD–228). The conference's constitution stated one of its purposes was to aid members in incorporating intercollegiate athletics within their educational programs and to "place and maintain such athletics under the same administrative and academic control." *Id.* The constitution did not identify any specific, measurable services that the conference would provide in exchange for the public funds. *Id.*

The Attorney General later determined that a private high school and a private nonprofit water supply corporation were not governmental bodies because neither of them received any public funds. Tex. Att'y Gen. Op. Nos. JM–154 (1984), JM–596 (1986). Then, in 1987, the Attorney General concluded that a volunteer fire department was a governmental body under the Act because fire protection is "traditionally provided by governmental bodies," volunteer fire departments have "strong affiliations with public agencies," and the contract provided the department with funds "to carry on its duties and responsibilities," which the Attorney General considered to be for its "general support." Tex. Att'y Gen. Op. No. JM–821 (1987). The Attorney General stated that the "test" for whether an entity is a governmental body under the Act "cannot be applied mechanically" and that the "precise **\*73** manner of funding is not the sole dispositive issue." *Id.* Instead, the Attorney General considered "[t]he overall nature of the relationship," and concluded "a contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship" will bring the private entity within the Act's definition of governmental body. *Id.*

### 2. *Kneeland v. NCAA*

In 1988, the Fifth Circuit was asked whether the National Collegiate Athletic Association (NCAA) and the former Southwest Conference (SWC), which received public funds from several Texas public universities, were "supported in whole or in part by public funds" and thus "governmental bodies" under the Act. *Kneeland,* 850 F.2d at 228. In addressing this issue, the Court expressly based its analysis on the Attorneys General's prior decisions, noting that "[t]he usual deference paid to formal opinions of state attorneys general is accentuated in this case because the Texas Legislature has formally invited its Attorney General to interpret the Act when asked to do so." *Id.* at 228–29. Construing the statute's language and extrapolating principles from the Attorneys General's decisions, the Court cobbled together the following criteria—now known as the

"*Kneeland* test"—for determining whether a private entity is "supported ... by public funds" and thus a governmental body under the Act:

- "The Act does not apply to 'private persons or businesses simply because they provide specific goods or services under a contract with a government body.' " *Id.* at 228 (quoting Tex. Att'y Gen. ORD–1).

- "[A]n entity receiving public funds becomes a governmental body under the Act, unless its relationship with the government imposes 'a specific and definite obligation ... to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser.' " *Id.* (quoting Tex. Att'y Gen. Op. No. JM–821, which quotes Tex. Att'y Gen. ORD–228).

- "[A] contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship between a private entity and a public entity will bring the private entity within the ... definition of a 'governmental body.' " *Id.* (quoting Tex. Att'y Gen. Op. No. JM–821).

- "[S]ome entities, such as volunteer fire departments, will be considered governmental bodies if they provide 'services traditionally provided by governmental bodies.' " *Id.* (quoting Tex. Att'y Gen. Op. No. JM–821).

Based on these principles and the Attorneys General's decisions from which they were drawn, the *Kneeland* court held that the NCAA and SWC were not governmental bodies under the Act. *Id.* at 230–31. With respect to the NCAA, the court concluded that the universities "receive[d] a *quid pro quo,* in sufficiently identifiable and measurable quantities of services," in exchange for the public funds they paid to the NCAA. *Id.* at 230. Similarly, the court concluded that the SWC provided "specific and guageable services which negate[d] the general support element required for a governmental body designation." *Id.* at 231.

### 3. Post-*Kneeland* Attorney General Decisions

Attorneys General have had several opportunities to address the issue since *Kneeland,* and in doing so have adopted **\*74** the federal court's synopsis of the principles from their prior decisions. A few years after *Kneeland,* the Attorney General concluded that a private commission created by the San Antonio Chamber of Commerce to coordinate the annual Fiesta celebration was not a governmental body. Tex. Att'y Gen. ORD–569 (1990). The city designated the commission as its "official agency" responsible for planning, coordinating, and financially supporting the festival and gave the commission the right, subject to necessary approvals, to lease city-owned premises, obtain permits for parades and concession stands along parade route, grant permission to place seating along parade route, and assign its permit and lease rights to other entities sponsoring the event. *Id.* The Attorney General nevertheless concluded that the commission was not a governmental body because it did not receive any public funds. *Id.* ("The threshold question is whether the commission receives any funds from the City of San Antonio."). The Attorney General rejected the argument that money the commission received from the sale of tickets for seating along the parade route was "public funds" because the money would otherwise have been paid to the city. *Id.* ("By requiring the commission to get a permit for erecting bleachers and limiting the charge per seat, the city is not granting public funds to the commission, nor do the charges for seats constitute funds of the city.").

In 1992, the Attorney General concluded that the Dallas Museum of Art was a governmental body under the Act, even though it received 85% of its revenue from private sources. Tex. Att'y Gen. ORD–602 (1992). The city owned some of the artwork at the museum, owned and maintained the premises housing the museum, and paid the museum's utilities, half of the museum employees' salaries, and a pro rata portion of the insurance premiums. *Id.* The museum admitted that it received public funds but argued that it received the funds in exchange for "known, specific, and measurable services" as opposed to general support. *Id.* Relying on *Kneeland* and the prior decisions, the Attorney General disagreed, concluding that while the city received "valuable services in exchange for its obligations" to the museum, those "highly specialized, unique services" could not be "known, specific, or measurable," and the city thus instead provided funds for the museum's general support. *Id.* The Attorney General nevertheless held that the museum was not required to disclose the requested records because only the part of the museum supported by public funds was a governmental body, and the records related to a collection the museum owned as part of its permanent collection, not to the part of the museum for which the city provided "direct support." *Id.* (noting the city's ownership of the building in which the collection was housed and its payment of a portion of the overhead expenses was "tangential" and "insufficient

to bring documents relating to the collection within the scope of the act").

Again addressing chamber-of-commerce-type entities, the Attorney General conducted a similar analysis in holding that the Arlington Chamber of Commerce and the Arlington Economic Development Foundation were governmental bodies under the Act. *See* Tex. Att'y Gen. ORD–621 (1993). The foundation admitted that it received public funds but argued that it did so in exchange for specific, measurable services. *Id.* The Attorney General disagreed, concluding that while the city received "valuable services in exchange for the public funds," the agreement failed "to impose on the foundation a specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect **\*75** to find in a typical arms-length contract." *Id.* The Attorney General concluded that the chamber of commerce was also a governmental body, even though it received public funds through the foundation rather than from the city directly. *Id.*

Eight years later, the Attorney General reached the same result with respect to the Round Rock Chamber of Commerce, observing that its contract with the City of Round Rock neither restricted the chamber's use of the public funds it received nor imposed any "specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect to find in a typical arms-length contract." Tex. Att'y Gen. OR2001–4849 (2001).

And a few years after that, the Attorney General held that the Greater Houston Partnership itself was a governmental body under the Act, under a similar analysis. Tex. Att'y Gen. OR2004–4221 (2004). The Partnership specified in its request for an Attorney General's ruling that the requested records related to a project being handled by a specific part of the Partnership, the Economic Development Division. At that time, different contracts governed the Partnership's relationship with the City of Houston. Examining those contracts' provisions—including one that obligated the Partnership to "support the efforts of the University of Houston Small [B]usiness Development Center in the conduct of the Director Business Assistance Program, designed to assist and promote the efforts of local businesses and entrepreneurs to form new business ventures or to expand existing business ventures"—the Attorney General determined that, "[a]lthough ... the city is receiving valuable services in exchange for its obligations under this

contract, the [Partnership] has not sufficiently demonstrated that the nature of the services it provides are known, specific, or measurable." *Id.* "Consequently," the Attorney General concluded, "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information." *Id.* (emphasis added).

In addition to arguing that it was not a governmental body, the Partnership alternatively relied on the Act's exceptions to disclosure for certain economic development information and for certain email addresses. *See id.*; TEX. GOV'T CODE §§ 552.131 (excepting certain information relating to economic development negotiations), 552.137 (excepting certain email addresses). The Attorney General agreed in part and disagreed in part, instructing the Partnership to release some but not all of the documents submitted to the Attorney General for review. *See* Tex. Att'y Gen. OR2004–4221.

In 2007, the Attorney General again relied on *Kneeland* and the distinction between use of public funds for "general support" as opposed to payment for "specific and measurable services" to conclude that a family planning service provider that contracted with the Department of State Health Services was a governmental body under the Act. Tex. Att'y Gen. OR2007–06167 (2007). Similarly, in 2011, the Attorney General decided that channel Austin, a nonprofit corporation that contracted with the City of Austin "to manage the equipment, building, resources, and the three channels for Public Access," received public funds as an "unrestricted grant" for its "general support rather than payment for specific services." Tex. Att'y Gen. OR2011–17967 (2011).

In a 2008 formal opinion, the Attorney General observed, consistent with the *Kneeland* test, that it is sometimes significant that the private entity has a "common purpose or objective or one that creates an **\*76** agency-type relationship" with the governmental entity, or that it performs services "traditionally provided by governmental bodies." Tex. Att'y Gen. Op. No. GA–666 (2008). But the Attorney General explained that the "primary test" is "whether the entity receives public funds for the general support of its activities, rather than using those funds to perform a specific and definite obligation." *Id.* (determining that an association of appraisal districts, which received membership fees from governmental entities in exchange for promoting "effective and efficient functioning and administration of appraisal districts in Texas," was a governmental body). Four years later, the Attorney General held that a health services provider

was a governmental body under the Act because the contract language evidenced a "common purpose or objective between the health service and the district such that an agency-type relationship [wa]s created." Tex. Att'y Gen. OR2012–11220 (2012) (considering contract in which the parties agreed "to cooperate to provide services to the residents of Nacogdoches County who are in need of service avoiding duplication of services when possible" and "to refer patients for services, as needed, and in doing so will provide documentation for patient records when needed").

### D. The Partnership's "Support"

With the statute's language and these prior decisions in mind, I turn to the facts at issue here. The Greater Houston Partnership is a private nonprofit corporation that functions as a chamber of commerce to promote job creation, increased trade, and capital investment in the greater Houston area. For many years, including 2007 and 2008, the Partnership entered into an annual "Agreement for Professional Services" with the City of Houston, in which the Partnership agreed to perform certain marketing, research, and promotional services designed "to increase investment in, and to improve the economic prosperity of Houston and the Houston Airport System." [5] The contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan." (Emphasis added). In exchange for these services, the City agreed to pay the Partnership a lump sum amount of $196,250.00 per quarter. The City's payments constituted less than 8% of the Partnership's total annual revenue, 90% of which came from dues the Partnership's members paid.

[5]    The Local Government Code authorizes municipalities to contract with private entities like the Partnership "for the administration of a program" to promote "local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODE § 380.001.

The services agreements specified that the Partnership was an independent contractor, but they also gave the City certain rights to participate in and control some of the Partnership's activities. Among other things, the Partnership agreed to coordinate its efforts with the directors of the City's Department of Convention & Entertainment Facilities, Department of Planning and Development, and the Houston Airport System (the Directors); to submit quarterly progress reports "describing in detail services performed"; to provide

any other reports the Directors request; to produce any non-confidential records the City Attorney requires to evaluate the Partnership's compliance with the contract; and to inform the City of any claims arising out of the Partnership's failure to pay its employees, subcontractors, or suppliers. The contracts granted the City "full membership and exclusive benefits as a General Partner" of the Partnership, **\*77** which included membership in the Partnership's policy-level committees, but prohibited the City from participating on any of the Partnership's governing boards.

The 2008 agreement differs from the 2007 agreement in several respects. While the 2007 agreement required the Partnership to "implement a program" to increase investments in the Houston area, the 2008 agreement required the Partnership to provide "specific, measurable services" to increase investments. While the 2007 contract permitted the City to require the Partnership to terminate any employee or subcontractor whose work the Directors deemed unsatisfactory, the 2008 contract only required the Partnership to "consider removing" any such employee or subcontractor. And unlike the 2007 agreement, the 2008 agreement stated that the City's payments were solely for services rendered and were not intended as general support for the Partnership's other activities, and expressly provided that nothing in the agreement shall be construed to imply that the Partnership is subject to the Texas Public Information Act.

In May 2008, [6] Houston-area resident Jim Jenkins submitted a Public Information Act request to the Partnership, asking that it provide him with "a copy of the check register ... for all checks [the Partnership] issued for the year 2007," including "for each check issued: check number, check date, payee name, and check amount." Jenkins later submitted a second request, seeking the same information for all checks the Partnership issued in 2008. The Partnership refused to provide the requested information, and instead asked the Attorney General to decide whether the Partnership is a "governmental body" subject to the Public Information Act. The Partnership did not assert that only "a part, section, or portion" of the Partnership is "supported in whole or in part by public funds," as it had successfully argued in 2004. *See* Tex. Att'y Gen. OR2004–4221. Nor did it assert that any information in the check register was not "public information" or that one of the Act's exceptions applied, as it had also asserted in 2004. *See id.* Instead, the Partnership relied solely on its contention that it is not a governmental body under the Act.

[6]    The Partnership and City executed the 2008 services agreement in August 2008, a few months after receiving Jenkin's first request for information, which may explain the differences we have described between the 2007 and 2008 agreements.

Consistent with its 2004 ruling, the Attorney General's Open Records Division ruled that the Partnership is a governmental body and must comply with the Act's requirements. Tex. Att'y Gen. OR2008–16062 (2008). The Partnership filed suit against the Attorney General to challenge the ruling, and Jenkins intervened. The trial court agreed with the Attorney General and held that the Partnership is a governmental body under the Act. The Partnership appealed, and the court of appeals affirmed, with one justice dissenting. 407 S.W.3d 776. We initially denied the Partnership's petition for review, but we later granted its motion for rehearing and its petition, to address when a private entity may qualify as a governmental body under the Act.

## II.

### "Supported in Whole or In Part"

The issue here is whether the Greater Houston Partnership is "supported in whole or in part by public funds" and is thus a "governmental body" under the Act.[7] The interpretation of the Act presents **\*78** questions of law. *City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 357 (Tex.2000). In light of the Act's strong policy in favor of disclosure, a party seeking to withhold requested information bears the burden of proving that the information is not subject to disclosure under the Act. *See Thomas v. Cornyn,* 71 S.W.3d 473, 488 (Tex.App.–Austin 2002, no pet.) (holding that "a governing body should bear the burden of proving in a judicial proceeding that an exception to disclosure applies").

[7]    Although the Partnership has previously argued that requested records related solely to its Economic Development Division, *see* Tex. Att'y Gen. OR2004–4221 (2004), it has made no similar effort to identify or limit the Act to any particular sections or divisions in this case. Our issue is therefore whether the Partnership, as a whole, is "supported in whole or in part by public funds," and not whether any particular "part, section, or portion" of the Partnership is.

The Partnership makes three arguments as to why it is not a "governmental body" under the Public Information Act.

First, the Partnership contends the phrase "supported ... by public funds" unambiguously does not include the City's contractual payments to the Partnership. Next, the Partnership argues, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory language. Third, if the Court does adopt the *Kneeland* test, the Partnership argues it is not "supported ... by public funds" even under that test. The Court agrees with the Partnership's first argument—that the statute unambiguously does not apply to the Partnership—but also notes its displeasure with the *Kneeland* test. I disagree. I would hold that the statute is ambiguous, adopt but clarify the *Kneeland* test, and conclude that under that test the Partnership "is supported in whole or in part by public funds."

### A. The Court's Interpretation

The Court begins its analysis by noting that the term "supported" can have several different meanings. *Ante* at 72–75. Because "supported by" in the clause at issue refers specifically to "public funds," the Court concludes that the Act focuses solely on monetary support. *Ante* at 72–75. The Court then proceeds to identify two different requirements that must each exist for a private entity to receive monetary "support," which I will refer to as the "sustenance" requirement and the "functional equivalent" requirement. *Ante* at 58–59 (agreeing with Partnership's contention that definition only includes "entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds"). Although the Court asserts that it is simply applying a "plain language" approach to construing the statute, *ante* at 58–59, and is not relying on any "extra-textual analytical construct," *ante* at 56, neither of the Court's two requirements appears anywhere in the statute's language. I do not agree that the Act's language "unambiguously" supports the judicial insertion of either requirement into its definition of a "governmental body."

### 1. The "Sustenance" Requirement

Addressing the first requirement, the Court says "supported" can mean (and here must mean) "sustenance, maintenance, or both." *Ante* at 59. The Court provides this as the "maintenance" definition of "supported": "to pay the costs of: maintain; to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining[.]" *Ante* at 59 (quoting WEBSTER'S THIRD

NEW INT'L DICTIONARY 2297 (2002)). The Court then concludes that "supported" cannot mean "maintenance" in this context **\*79** because otherwise the definition would include "any private entity that received any public funds," and "even a paper vendor with hundreds of clients would qualify as a 'governmental body' merely by virtue of selling office supplies to a single state office." *Ante* at 60.

In contrast to the "maintenance" definition, the Court gives this "sustenance" definition of "supported": "to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of." *Ante* at 59 (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY at 2297). The Court thus distinguishes between the "maintenance" meaning of "supported" and the "sustenance" meaning of "supported" and concludes that in the context of the Act, "supported by" can only mean the latter, so the Act applies only to private entities "sustained, at least in part, by public funds, meaning they would not perform the same or similar services without public funds." *Ante* at 53.

Although the Court reads far more into these two definitions of "support" than I find there, as explained below, I generally agree that the term "support" must refer here to monies paid as general funds to sustain the recipient, rather than funds paid as consideration for specific goods or services. But the Court goes far beyond that principle today, and holds that an entity is "supported in whole or in part by public funds" only if the entity cannot survive without those funds. As a result, the Court writes the words "in part" completely out of the statutory definition. To be sure, the Court creates the appearance that it is actually enforcing the statute as written by referring to the "supported ... in part" language several times in its opinion:

- "requires us to decide whether the term 'supported' encompasses private entities ... sustained—in whole *or in part* —by [public] funds," *ante* at 53 (emphasis added);

- " 'supported' ... unambiguously includes only those entities *at least partially* sustained by public funding," *ante* at 54 (emphasis added);

- "[the Partnership] is not wholly or *partially* sustained by public funds," *ante* at 54 (emphasis added);

- "the [Act] applies only to entities acting as the functional equivalent of a governmental body that are 'sustained'

*at least in part,* by public funds," *ante* at 60 (emphasis added); and

- "we define 'supported in whole or *in part* by public funds' to include only those private entities or their sub-parts sustained, *at least in part,* by public funds," *ante* at 63 (emphases added).

But despite these lip-service payments to the statute's language, the Court repeatedly holds that an entity (or any part, section, or portion of an entity) that receives public funds as sustenance (as opposed to maintenance) is not a governmental body unless it cannot survive and pursue its mission without those funds:

- "defining 'supported' as 'sustenance' ensures that only an entity, or its 'part, section or portion,' whose existence is predicated on the continued receipt of government funds would qualify as a 'governmental body,' " *ante* at 60;

- "[t]o be 'sustained' by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision," *ante* at 60;

- "a private entity would qualify under a financially dependent construction **\*80** of 'supported' if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors. In short, an entity 'supported' by public funds would not just receive government funds; it would require them to operate in whole or in part," *ante* at 61;

- "[the Partnership] is not 'supported' by public funds because it receives only a small portion of its revenue from government contracts[, a]nd even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources," *ante* at 61;

- "the statute encompasses only those private entities dependent on the public fisc to operate as a going concern," *ante* at 61; and

- "An entity ... that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds," *ante* at 63.

The Court thus holds that a private entity that receives public funds can be a governmental body under the Act only if

it cannot "survive" or "exist" or "pursue its mission and objectives" without those public funds, even if those funds are just "one of several contributing sources." I disagree. An entity that is "sustained" (as the Court uses that word) by funds it receives from several different sources is sustained "in part" by the funds from each of those sources, even if it could survive and pursue its mission without the funds from any one source. The Court asserts that "sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations." *Ante* at 60. But even if that were true,[8] "sustenance *in part* " implies the exact opposite. If "part" of an entity's "sustenance" comes from one source, it is "sustained *in part* " by that source even if it could survive without that part.

[8]   The Court fails to identify any dictionary that defines "supported" to mean financially dependent upon for its very existence. *See ante* at 59–60. While there are many definitions of "support" that refer to "sustenance or maintenance" or even "*a* basis for the existence or subsistence of," *see ante* at 59 (emphasis added), none of the definitions require an absolute dependence, and in any event, the statute's definition expressly excludes such a requirement by referring to support "in part."

The Court attempts to justify its "surviv[al]" requirement by suggesting that the statute's " 'in part' language may envision a multi-division entity that does business with the government, but not uniformly and not across all units." *Ante* at 66. "For instance," the Court explains, if a "large corporation" has a "subdivision" that "is wholly funded by government contracts," but the government funds are only "a relatively small portion of the corporation's total revenue," the corporation "may be said to be supported 'in part' by public funds." *Ante* at 66. This illustration confuses the statute's reference to "supported in part" with its reference to the "part, section, or portion" of an entity. The statute provides that the "part, section, or portion" of an entity is a governmental body if it is "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1) (A)(xii). The Court is correct that, if one subdivision of a large corporation is "supported in whole ... by public funds," then the corporation itself is "supported ... in part by public funds." But the statute permits the corporation to limit the Act's application to the subdivision by showing that only that subdivision (i.e., that "part, section, or portion" of the corporation) **\*81** is "supported in whole or in part" by public funds. The illustration the Court "conceptualize[s]" has nothing to do with the Court's "surviv[al]" requirement.

A relevant illustration is this: even if only 5% of the funds that support the Court's hypothetical corporate subdivision were public funds, the subdivision would still be "supported *in part* " by those funds, and would thus be a governmental body under the Act's plain language. An entity "supported ... in part by public funds" is a governmental body, regardless of whether it could "survive" or "pursue its mission" without those funds. *See id.* The Court's construction reads this language out of the Act by requiring the whole of the entity to live or die by the public fisc.

### 2. The "Functional Equivalent" Requirement

The Court also holds that an entity is not "supported in whole or in part by public funds" unless it is "acting as the functional equivalent of a governmental body," *ante* at 64, and providing "services traditionally considered governmental prerogatives or responsibilities," *ante* at 62. As with its first requirement, the Court does not derive this requirement from the statutory definition at issue. Subsection (xii) expressly identifies several types of entities that typically are not public (or governmental) entities, including an "organization," a "committee," an "institution," and—importantly, here—a "corporation." The Act says such private entities are governmental bodies if they are "supported in whole or in part by public funds," not if they are acting as the "functional equivalent" of a governmental body or performing traditional government responsibilities. TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court, however, asserts three bases for imposing this requirement: (1) the Act's "stated purpose"; (2) the statute's omission of "any broad reference to private entities"; and (3) the "scope and nature of the eleven other types of entities more clearly described as a 'governmental body' in the same provision," *ante* at 61. I do not agree that any of these justifies writing the Court's "functional equivalent" requirement into the statute.

First, the Court suggests that requiring a private entity to be the "functional equivalent" of a governmental body is necessary to ensure that our construction of "supported" is "compatible with" the Act's "stated purpose." *Ante* at 59. This "stated purpose," the Court explains, is to provide the public with "complete information about the affairs of government and the official acts of public officials and employees" to "allow the public to 'retain control over the instruments they have created.' " *Ante* at 59 (quoting TEX. GOV'T CODE § 552.001(a)). Although the Court makes no effort to explain why this purpose necessitates or implies the "functional equivalent" requirement, I presume

the Court finds hidden meaning in the purpose statement's reference to the "affairs of *government,*" the "acts of *public* officials and employees," and the "*instruments* ... created," as if the words I have emphasized exclude any purpose to require disclosure of information held by a private entity. But to emphasize a different word, the statute's purpose is to provide "*complete* information" about those affairs, acts, and instruments. The Legislature may have believed that the only way to ensure the public has "complete" information about what their government is doing is to treat some private entities as governmental bodies under the Act. Whatever we may presume about what the Legislature may have "believed," what the Legislature "said" was that "governmental body" includes any entity "supported in whole or in part **\*82** by public funds," not any entity that is the "functional equivalent" of a governmental body.

As a second reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court asserts that the definition does not include "any broad reference to private entities." *Ante* at 60. [9] Assuming that the Legislature "carefully omitted" any such "broad reference," and presuming that the Legislature "purposefully selected" this omission, the Court concludes that the definition, "as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government," and thus "only applies to private entities acting as the functional equivalent of the government." *Ante* at 60. Respectfully, I fail to follow the Court's logic. It might be logical to conclude from the omission of any "broad reference" to private entities that the Legislature did not intend to include *all* private entities as "governmental bodies." But it is illogical to conclude that the omission of a "broad reference" somehow indicates which private entities the Legislature intended to include and which it did not. And it is simply preposterous to conclude that the omission somehow indicates that they intended to include "only those entities acting as the functional equivalent of the government." *Ante* at 59–60. We need not engage in such sophistry, because the statute tells us which private entities the Legislature intended to include as governmental bodies: those that are "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court finds support for its judicially created functional equivalent test only by manufacturing a "broad reference" to stack upon its misconstruction of the Act's "stated purpose."

[9] This assertion is simply wrong. The very definition at issue "broadly refers" to private entities by using a string of particularly broad terms to reference private entities of all types: "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or is supported in whole or in part by public funds[.]" TEX. GOV'T CODE § 552.001(1)(A)(xii). The "omission" on which the Court relies simply does not exist.

For the third (though "not dispositive") reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court relies on the "canon of statutory construction known as *noscitur a sociis.*" *Ante* at 61. This canon provides "that a word is known by the company it keeps." *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 750 (Tex.2006) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). It "directs that similar terms be interpreted in a similar manner," *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011), but there is no similarity between the words in definition (xii)—an "organization" or "corporation" that is "supported in whole or in part by public funds"—and those in the preceding definitions. If definition (xii) provided "general" language, following "specific and particularized enumerations" in the first eleven definitions, then we would "treat the general words as limited and apply them only to the same kind or class of [things] as those expressly mentioned." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003). But definition (xii) uses specific language, inherently different than the language of the other definitions, and thus refers to something specific, not just a catch-all to conclude the preceding definitions. Under *noscitur a sociis,* we should look to the words "immediately surrounding" the phrase "supported by," which include the words "public **\*83** funds" and, importantly, "in whole *or in part* " (which the Court ignores). *See* BLACK'S LAW DICTIONARY 1224 (10th ed. 2014) (defining *noscitur a sociis* as "a canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it").

Even if the Court were applying the doctrine of *noscitur a sociis* correctly here, that doctrine cannot be used to render express statutory language meaningless. "If ... the specific terms exhaust the class of items enumerated in the statute, it must be presumed that any generic term that follows must refer to items transcending the class, since a contrary construction 'would contravene the more important rule of construction that all words are to be given effect.' " *Shipp v. State,* 331 S.W.3d 433, 437 (Tex.Crim.App.2011) (quoting 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER,

SUTHERLAND STATUTORY CONSTRUCTION § 47:21 at 390–91 (7th ed.2007)); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."); *City of San Antonio,* 111 S.W.3d at 29 (rejecting construction that would render some statutory language unnecessary and citing *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915), for the proposition that "[i]t is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative"). We must "read the statute contextually," *Office of Att'y Gen.,* 422 S.W.3d at 629, considering the relevant language in the context of the statute as a whole, rather than as "isolated provisions," *TGS–NOPEC Geophysical,* 340 S.W.3d at 439, and endeavoring to "giv[e] effect to every word, clause, and sentence," *In re Office of Att'y Gen.,* 422 S.W.3d 623, 629 (Tex.2013), so that none of the language is rendered superfluous, *see Crosstex Energy Servs., L.P. v. Pro Plus, Inc.,* 430 S.W.3d 384, 390 (Tex.2014). Because the Court's construction renders the phrase "in whole or *in part* " meaningless, I do not agree that definition (xii) includes "organizations" and "corporations" only if they "function as quasi-public" entities. *Ante* at 62.

**B. A More Accurate Interpretation**

If a statute's words are susceptible to two or more reasonable interpretations, and we "cannot discern legislative intent in the language of the statute itself," the statute is ambiguous, and we may rely on applicable canons of statutory construction. *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 639 (Tex.2010). I would conclude that the words "supported by" are ambiguous in this context, and would thus grant deference to the Attorneys General's long-standing construction of the Act's definition of a "governmental body." *See Combs v. Health Care Servs. Corp.,* 401 S.W.3d 623, 629–30 (Tex.2013) (stating that we grant deference to construction of agency that is charged with enforcement of statute if statute is ambiguous, agency interpretation results from formal proceedings, and interpretation is reasonable). Though not controlling, I would consider the Attorney General constructions to be persuasive, particularly in light of the responsibility the Legislature has given the Attorney General for "interpreting" and promoting uniformity in the application of the Act. *See* TEX. GOV'T CODE § 552.011; *see also City of Dall. v. Abbott,* 304 S.W.3d 380, 384 (Tex.2010) (observing that Attorneys General's

interpretations of Public Information Act are persuasive but not controlling). **\*84** But I would also clarify the *Kneeland* test to provide greater simplicity and guidance.

**1. Ambiguity**

The Court and the parties agree that not every private entity that contracts with the government and receives payments of public funds is "supported ... by public funds." More specifically, they agree with the Attorneys General's conclusion that an ordinary, arms-length transaction between a private party and a governmental entity does not render the private party a "governmental body" under the Act. They agree that something more is required, but they dispute whether that something is present here. I too agree that something more is required, but I conclude that the statute is ambiguous as to what that something is. [10]

[10] The Court argues that "governmental body" should not include every single vendor who sells a product or service to the government in a *quid pro quo* transaction, and cites authority from other jurisdictions to support this contention. This is, of course, a straw man argument, as everyone in the case agrees that we cannot construe the term that broadly. But merely because one extreme construction is available that would lead to an (arguably) absurd result does not mean that every less extreme construction within the range from narrowest to broadest possible constructions is unreasonable. Moreover, no one argues that the Partnership is merely an ordinary vendor under the contracts at issue here.

The phrase "supported by" can have multiple common, ordinary meanings, including:

1. To carry the weight of, exp. from below.

2. To maintain in position so as to keep from falling, sinking, or slipping.

3. To be able to bear: WITHSTAND.

4. To keep from failing or yielding during stress.

5. To provide for, by supplying with money or necessities. <*support* a large family>

6. To furnish corroborating evidence for <*support* a witness's testimony>

7. To aid the cause of by approving, favoring, or advocating <*support* for a political candidate>

8. To endure: tolerate.

9. a. To act (a part or role). b. To act in a secondary or subordinate role to (a leading performer).

WEBSTER'S II NEW COLLEGE DICTIONARY 1108 (1995).

I agree with the Court that most of these definitions do not apply in this statutory context, which limits "support" to a function that can be performed by money. *See TGS– NOPEC Geophysical,* 340 S.W.3d at 441 (using statutory context to eliminate inapplicable meanings of a word in the statute). An ordinary reader could construe some of the broader definitions to include financial "support": e.g., public funds could "carry the [financial] weight of" an entity. *See* WEBSTER'S II NEW COLLEGE DICTIONARY at 1108. In context, the most relatable definition is "[t]o provide for, by supplying with money or necessities." *Id.* The Partnership relies on this common meaning and argues that, just as a person "pays" an employee but "supports" a family member, the City "paid" rather than "supported" the Partnership. But even this definition of "support" does not resolve the statute's ambiguity because the statute requires only that the entity be supported "in whole or *in part*" by public funds. TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added).

As the Court notes, in the broadest sense, virtually any income from public funds could reasonably be considered to **\*85** "provide for" the Partnership "in part" by supplying it with money, even if the City pays the money in exchange for specific goods or services rendered. *Ante* at 84; *see also Tex. Ass'n of Appraisal Dists., Inc. v. Hart,* 382 S.W.3d 587, 591–92 (Tex.App.–Austin 2012, no pet.) (observing that the dictionary definitions of "support" are "so broad and varied that any private entity that receives any public funds can be said to be, at least in part, 'supported' by those public funds," yet all authorities have agreed that "simply receiving public funds does not make a private entity a 'governmental body' under the [Act]"). The same problem results from the Court's definition of "supported" to mean "to provide a basis for the existence or subsistence of." *Ante* at 59. At least "in part," the City's payments for chamber-of-commerce services provide a reason for the Partnership's existence and enable it to "pursue its mission," and the City's payments for those services constitute at least a "part" of the revenue that sustains the Partnership. *See ante* at 84. I would conclude that the Act's reference to entities that are "supported in whole or in part by public funds" is ambiguous, and thus turn to existing

precedents—and specifically Attorney General decisions and the *Kneeland* test—or further guidance. [11]

[11] A statute is ambiguous if two or more plausible constructions are reasonable. *Tex. Lottery Comm'n,* 325 S.W.3d at 639. The Court finds the phrase "supported in whole or in part by public funds" unambiguous, although it suggests that two of the dictionary definitions ("sustenance" and "maintenance") are "remotely possible." *Ante* at ——. The Court pursues a backwards approach to the ambiguity analysis: it relies on context, purpose, and canons of construction first to exclude every possible meaning of the word "supported" except two, then to exclude all but the most narrow of those two "possible" definitions, and then declares that the term is "unambiguous" because there's only one "reasonable" definition." I find the term ambiguous because, even in context and considering the statute's purpose, it is susceptible to more than one reasonable meaning, and I thus turn to canons of construction and persuasive authorities for assistance in determining what the statute's actual language must mean.

## 2. A Clarified *Kneeland* Test

Although this Court has not previously construed the Act's "supported by" language, the Fifth Circuit has in *Kneeland,* and Attorneys General have since consistently relied on the *Kneeland* test as the governing standard. The Partnership urges us to reject the *Kneeland* test, asserting that it "has no basis in the statutory text" and leaves too much uncertainty in the law. The Attorney General counters that the *Kneeland* test "satisfies the legislature's intent[ ] to shed light on the affairs of government" and "provides a workable framework for determining whether an entity is a governmental body under the [Act] because it treats entities functioning as governmental bodies as such while eliminating vendors providing goods and services through arms-length contracts from the definition."

I would conclude that the *Kneeland* test and its related precedent offer persuasive, though not controlling, legal authority. *See Christus Health Gulf Coast v. Aetna, Inc.,* 237 S.W.3d 338, 343 & n.8 (Tex.2007) (noting that Fifth Circuit precedent is persuasive but not binding on this Court) (citing *Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993)). The test is founded on deference to the Attorneys General's interpretations of the Act, which are likewise persuasive but not controlling. *See City of Dall.,* 304 S.W.3d at 384. The Court complains that the *Kneeland*

test has a "questionable foundation," noting that even the *Kneeland* court acknowledged that its explanation of its holding was "a mite uncertain." *Ante* at 65 (quoting *Kneeland, 850 F.2d at 224*). But as **\*86** the Court notes, it is the "direction given" in *Kneeland* that the court described as "uncertain," not the "foundation" on which the court relied. Although the court acknowledged that its description of the test was less than clear, "[o]ne may have no quarrel with the formulae" it adopted. *Kneeland,* 850 F.2d at 228. I would take this opportunity to clarify the *Kneeland* test by articulating three basic requirements for determining whether a private entity that provides services to or for the government and is paid with public funds is "supported in whole or part by public funds" and is thus a governmental body under the Act.

### a. Receipt of Public Funds

First, to be "supported by" public funds, a private entity must at least "receive" public funds, so an entity that does not receive public funds is not a governmental body under this provision. Thus, while the Attorney General was cognizant in JM–821 that the role of a volunteer fire department is one "traditionally provided by governmental bodies," this fact, standing alone, is not enough. *See* Tex. Att'y Gen. Op. No. JM–821. Arguably, at least, the private high school in JM–154, the water supply corporation in JM–596, and the Fiesta planning commission in ORD–569 also provided services "traditionally provided by governmental bodies." *See* Tex. Att'y Gen. ORD–569; Tex. Att'y Gen. Op. Nos. JM–154, JM–596. But because they did not receive public funds, they were not governmental bodies under part (xii). *See* TEX. GOV'T CODE § 552.003(1)(A)(xii). As the Attorney General recognized, "[t]he threshold question is whether the [private entity] receives any funds from the [public fisc]." Tex. Att'y Gen. ORD–569; *see also* Tex. Att'y Gen. OR2013–09038 (determining that El Paso Zoological Society that received no public funds was not a governmental body).

### b. Support, Not Consideration

Everyone agrees, however, that merely "receiving" public funds does not equate to being "supported by" those funds. Governmental entities regularly purchase a wide variety of goods and services from private vendors, including everything from legal pads to legal services, and I agree that such vendors are generally not "supported ... by public funds" as a result of such transactions, at least as the Act

uses that term. Thus, a private entity that receives public funds in exchange for assuming an "obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser" is not "supported by" those public funds, and is not a governmental body under the Act. *CareFlite v. Rural Hill Emergency Med. Servs., Inc.,* 418 S.W.3d 132, 141–42 (Tex.App.–Eastland 2012, no pet.) (holding that medical service provider was not a governmental body); *see also Hart,* 382 S.W.3d at 595 (holding that association of appraisal districts was not a governmental body).

A second requirement for a private entity to be "supported ... by public funds," then, should be that the private entity must receive public funds not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities. *See* Tex. Att'y Gen. Op. No. GA–666; *compare* Tex. Att'y Gen. ORD–228 (concluding that commission was governmental body because it received public funds "used for [its] general support"); Tex. Att'y Gen. ORD–302 (concluding that promoter of manufacturing and industrial development was governmental body because it was **\*87** provided "unrestricted" grant of public funds); Tex. Att'y Gen. Op. No. JM–116 (concluding that athletic association was governmental body because it was provided public funds to be "used for [its] 'general support ... rather than being attributable to specific payments for specific measurable services' "), *with* Tex. Att'y Gen. ORD–343 (concluding that ambulance service provider was not governmental body because it was paid specific amounts to cover specific, measurable services provided under service contract).

This requirement would most easily be met when a governmental entity provides a "grant" to promote the private entity's activities, but it may also be met when the governmental entity "pays" the private entity to provide services to or for the governmental entity or its constituents. The terminology that the parties choose to use should not be determinative. A key factor in the context of a service contract like those at issue here would be whether the relationship between the service provider and the governmental entity is the kind of "*quid pro quo* " relationship common in the service industry, *see Kneeland,* 850 F.2d at 230, or whether the relationship is something more akin to a governmental body outsourcing governmental services to a private entity, *see* Tex. Att'y Gen. ORD–228, ORD–302; *see also Hart,*

382 S.W.3d at 595 (observing that association of appraisal districts did not perform services traditionally performed by governmental bodies and instead provided services under conditions similar to what would be expected in typical arm's-length transaction).

In this context, I note that the Attorney General's ruling here should have come as no surprise to the Partnership, as Attorneys General have repeatedly concluded that chambers of commerce, *see* Tex. Att'y Gen. Nos. ORD–621 (Arlington Chamber of Commerce), OR2001–4849 (Round Rock Chamber of Commerce), chambers-of-commerce-like entities, *see* Tex. Att'y Gen. ORD–228 (entity chartered to promote interest of Dallas–Fort Worth metropolitan area), ORD–302 (entity promoting manufacturing and industrial development around City of Bryan), and even the Partnership itself, *see* Tex. Att'y Gen. OR2004–4221, are governmental bodies under the Act. But these conclusions are based on a "fact-specific" analysis of the contract and context of each case. *See Kneeland,* 850 F.2d at 228; *see also CareFlite,* 418 S.W.3d at 138 ("The answer to the [governmental-body] inquiry depends upon the circumstances of each case."). As the Attorney General has confirmed, a chamber of commerce that is not "supported in whole or in part by public funds" is not a governmental body under the Act. *See* Tex. Att'y Gen. OR2015–05495 (2015) (finding Central Fort Bend Chamber of Commerce is not governmental body because it only received public funds as membership fees paid for specific measurable services).

With regard to this second requirement, I would not dictate that the public funds equal a particular amount or percentage of the entity's total revenue, nor would I mandate that the entity require those funds for its existence or survival. The Act defines "governmental body" to include "the part, section, or portion" of an entity that is "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). Thus, public funds could make up only a small portion of an entity's total revenues and yet provide general support, and even the sole support, for a particular part, section, or portion of the entity, or support "in part" of the entity as a whole. *See* Tex. Att'y Gen. ORD–602 (holding that city provided general support to museum even though public funds constituted only 15% of total revenue, but only portion of museum that received "direct support" was a governmental **\*88** body). Under this construction of the Act, that part, section, or portion of the entity is a governmental body under the Act, even if the rest of the entity is not. *See id.* In short, because the statute includes the "part, section, or portion"

of entities that are supported "in part" by public funds, it is the nature of the public funds (as support or sustenance and not as compensation or consideration), and not the amount or percentage of the public funds, that matters.

### c. A Shared Common Purpose

Finally, to ensure that the funds are received as a general or unrestricted payment to subsidize or underwrite the private entity's activities, a third requirement should be that the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue even in the absence of their contractual relationship. The mere existence of an "agency-type relationship" or a "common purpose or objective," or even the fact that the service is one "traditionally provided by governmental bodies," should not be sufficient by itself to meet this third requirement. *See* Tex. Att'y Gen. Op. No. GA–666; *Kneeland,* 850 F.2d at 228–29.[12] It is not unusual for an arms-length services vendor to take on an agency-type role for its customer, or for a governmental agency to enter into an arms-length contract for government services that the agency itself traditionally provides, and contracting parties will ordinarily share at least the common objective of effectuating the obligations and purposes of their contract. In ORD–343, for example, the Amarillo Hospital District and its ambulance service provider shared the common goal of the contract: providing the people of Amarillo with emergency transportation to local hospitals. *See* Tex. Att'y Gen. ORD–343. But such relationships do not necessarily result in the governmental body "supporting" the private entity.

[12]     *See also CareFlite,* 418 S.W.3d at 142 ("[W]e have not found [ ] any authority, primary or persuasive, that stands for the proposition that, if a private entity and a governmental body share a common purpose or objective, the private entity is automatically a governmental body for purposes of the [Act]. Neither are we aware of any like authority when an entity provides services traditionally provided by governmental bodies.").

Instead, I would hold that a supportive relationship exists when the parties share a true "identity of interests" that each of them has beyond any particular transaction or finite series of transactions between them. *See Kneeland,* 850 F.2d at 228–29 ("[T]here apparently is some common purpose or objective between the association and the universities, or they would not be drawn to each other, but there is no real identity

of interest and neither may be considered the agent of the other."). The volunteer fire department in JM–821 provides an example of this more extensive "identity of interests" relationship. *See* Tex. Att'y Gen. Op. No. JM–821. There, the private entity and the governmental entity each independently had the purpose of protecting citizens and property from fires and other hazards, and the governmental entity promoted the private entity's pursuit of that purpose by providing "general support." *See id.*

I would thus distinguish between (1) a situation in which a private entity contractually undertakes a governmental entity's objectives because the governmental entity agrees to pay for those services, and (2) a situation in which a private entity and a governmental entity that each independently have the same purpose or interest, and thus an "identity of interest," contractually **\*89** agree to pursue that interest in cooperation and using public funding. *See Kneeland,* 850 F.2d at 228–29. For example, when a governmental entity hires a law firm to represent it in litigation, the firm and the government share interests and objectives specific to the firm's representation of that entity, but they do not necessarily have an "identity of interests." Although both the firm and the client may desire and jointly pursue the same outcome from the representation, the firm's interest in achieving that outcome is transaction specific: the law firm takes on that goal because the client pays it to do so, and but for the client-attorney relationship, the law firm generally has no stake in the outcome of the litigation. [13]

[13] Contrary to the Court's concern, this distinction would apply as effectively when the government contracts with a private firm to "provide more enduring and wide-ranging counsel" as it would when it hires a firm to handle a specific matter. *See ante* at 66. In either case, the third requirement (common purpose) typically would not be met because it is not part of the law firm's mission or purpose to achieve the specific objectives that the government hires it to achieve, other than to fulfill its obligation to its client. But if the government paid funds to a special interest firm whose mission as a firm was to protect the environment, or promote a pro-life agenda, or increase health care for children, for example, this third requirement might be satisfied if the purpose of the government's payment was to "support" the firm's efforts to accomplish that mission. If the second requirement were also satisfied (i.e., the government paid the funds to subsidize or underwrite the firm's efforts, rather than as consideration for specific, measurable services), the firm would be a governmental body under the Act.

In summary, then, I would clarify the *Kneeland* test and hold that a private entity (or a part, section, or portion thereof) is "supported in whole or in part by public funds," and is thus a governmental body under the Public Information Act, if (1) the private entity receives public funds; (2) it does so not as compensation or consideration made in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities; and (3) the funds provided are intended to promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship.

### III.

### Application to the Partnership

The Partnership, which undisputedly received public funds, asserts that its agreements with the City were arm's-length, *quid pro quo* contracts that only obligated it to perform specific and measurable services. The Attorney General disagrees, contending that the Partnership was "paid a certain amount of money on a quarterly basis to accomplish a broad range of goals designed to promote the City." The Court agrees with the Partnership. Under the facts of this record, I would conclude that the Partnership meets all three requirements for being "supported ... by public funds."

#### A. Payments to Subsidize the Partnership's Activities

The parties do not dispute, and I agree, that some of the provisions in the Partnership's contracts with the City imposed specific and definite obligations on the Partnership to provide a measurable amount of service. The court of appeals also agreed, but found that the Partnership's "major obligations under the contract are not specific, definite, or tied to a measurable amount of service for a certain amount of money." 407 S.W.3d at 784. The court **\*90** provided these examples of the Partnership's indefinite obligations to:

- [i]dentify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business;

- partner with the airport system to recruit, relocate, and expand business which supports the master plan, and to identify business incentives available in both public and private sectors;

- make its research capabilities available to the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau for marketing reports;

- support and coordinate with HAS to develop new air routes, stimulate increased international trade and business for Houston companies;

- promote HAS stories in international markets and highlight HAS efforts to provide airports allowance for expansion and ease of transportation;

- "coordinate on matters of mutual interest" before the U.S. Congress, federal agencies, the Texas Legislature, and Texas agencies; and

- assist the City of Houston's mayor, should she ask for help, with "advancing various Economic Development and Marketing Initiatives."

*Id.* at 784. In light of these provisions, the court of appeals concluded that it could not "say that overall the contract here imposes specific and definite obligations on [the Partnership] to provide a measurable amount of services to the City of Houston in exchange for a certain amount of money, as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.*

The Partnership contends, and the Court apparently agrees, that its contractually mandated performance reports provide the missing specifics for the broader obligations on which the court of appeals relied. The Partnership also asserts that some of its contractual obligations are necessarily vague because "in the context of intangible deliverables it would be nearly impossible to provide greater details." For example, the contracts require the Partnership to "make its research capabilities available on request to" the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau "to facilitate the creation of professional, sophisticated marketing reports," but the City cannot predict all of the groups that might approach it during the course of a year with an interest in the convention center. The Partnership also takes issue with the court of appeals' observation that the Partnership does not

perform its obligations "in exchange for a certain amount of money," as the Partnership is paid a set amount on a quarterly basis "regardless of whether or how much it does in furtherance of the contract's goals." According to the Partnership, "this observation fails to acknowledge or appreciate that all payments under the contracts are made 'in arrears and are contingent upon receipt and approval' " of the Partnership's performance reports.

I agree with the court of appeals that while some of the services the Partnership provides under the contracts are specific and measurable, the major obligations are broad and open-ended. Although the performance reports may identify specific services that the Partnership performed in fulfilling those general promises, these after-the-fact reports of services the Partnership decided to provide do not impose a **\*91** contractual obligation on the Partnership to provide those specific services. And although the contracts provide that the City's quarterly payments to the Partnership are "contingent upon receipt and approval by the Director of [the] written progress reports in accordance with Article III(C)," that article merely authorizes the Director to require reports and to determine their format and content; it does not authorize the Director to dictate what services must be provided or included in the report or otherwise narrow the Partnership's broad discretion to decide the types and amounts of services to provide. Finally, the fact that it might be difficult or impossible for the contracts to provide greater detail about some of the "intangible deliverables" does not weigh in favor of treating those provisions as if they called for "specific, measurable services" when they do not. In ORD–602, the Attorney General recognized that the "highly specialized, unique services" the museum provided to the City of Dallas could not be "known, specific, or measurable," but the Attorney General still concluded that the museum was, in part, a governmental body under the Act. *See* Tex. Att'y Gen. ORD–602 (1992).

As the court of appeals pointed out, the contracts at issue do not tie the City's payments to the Partnership to discrete services or measurable amounts of service. Instead, the City paid the Partnership a flat fee of $196,250 per quarter, regardless of whether, or how, or how extensively the Partnership made efforts to "identify new business opportunities, secure economic incentives, and increase outreach and recruitment activities to the region's targeted key industries to strengthen Houston as a competitive place to do business." The absence of an identifiable link between the services provided and the payment due, when considered

in conjunction with the lack of specificity and measurability in many of the contract's service requirements, demonstrates that the City paid the Partnership public funds to subsidize, underwrite, and support the Partnership's activities.

It is true that public funds make up only a small "part" of the Partnership's support. But when an entity, or "part, section, or portion" of an entity, receives public funds for its general support, the entity has broad discretion to use those funds as it sees fit to accomplish its goals, and the entity shares those goals with a public entity that would otherwise use the funds to accomplish those goals itself, the entity, or that "part, section, or portion" of the entity, is "supported in whole or in part by public funds." This does not mean that the public has a right to know how the Partnership spends all of its funds, but the Partnership has made a tactical decision here not to provide information about where the public funds go within the Partnership or how the public funds are spent, so that we could limit its duty to produce records under the Act to "records concerning its *operations that are directly supported by governmental bodies,*" as the Attorney General has done for the Partnership in the past. *See* Tex. Att'y Gen. OR2004–4221 (emphasis added).

Finally, as noted, the 2008 services agreement included language specifying that the City's funds were "solely for services rendered under this Agreement and are not intended to support [the Partnership] in any of its activities not specifically set forth in this Agreement." But the determination of this issue must depend on the actual nature of the services and payment obligations under the contract. The 2008 contract's conclusory statements that the contract does not render the Partnership a governmental body and that the contract payments are not for general support do not make it so. Just as a governmental **\*92** body cannot avoid the Act's requirements by promulgating rules, *see Indus. Found. of the S.,* 540 S.W.2d at 677, it cannot do so by contractually agreeing that the Act does not apply. Otherwise, every entity contracting with the government would shield itself from the Act simply by stating in the contract that it is not a governmental body. In light of the broad, open-ended services the Partnership agreed to perform under these contracts, I would conclude that the second requirement is met.

### B. Identity of Interests

I now consider whether the City's funds were intended to promote a purpose, interest, or mission that the City and the Partnership share and would each pursue even in the absence of their contractual relationship. The evidence here readily establishes that this requirement is met. Independent from any contract with the City, the Partnership exists to promote job creation, increased trade, and capital investment in the greater Houston area. As the Court agrees, even without the City's contract, the Partnership "could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members." *Ante* at 61. The City contracted with the Partnership because the City independently shares those same interests. The City did not pay the Partnership to provide services merely to promote the City's individual objectives, but to promote objectives that the City and the Partnership share. In fact, the contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan." (Emphasis added.) The interest the City and Partnership share does not arise solely out of the parties' contractual relationship—both parties independently share these objectives. The City has an inherent motive to promote its own financial interests, and promotion of the City's economic development was a primary focus of the Partnership's purpose.

Under these circumstances, I would hold that the Partnership was "supported in whole or in part by public funds" so as to fall within the definition of a "governmental body" under the Public Information Act. *See* TEX. GOV'T CODE § 552.003(1)(A)(xii).

## IV.

### Policymaking

Although the Court acknowledges the Act's instruction that we construe it liberally in favor of a request for information, *see id.* § 552.001(b), the Court chooses to adopt the most narrow construction of "supported" possible, because a broader construction would permit "public intrusion into the private affairs of non-governmental entities," *ante* at 62, "pry open the sensitive records of private entities," *ante* at 62 n.12, and subject the Partnership to "invasive disclosure requirements," *ante* at 67. Even if we could construe the Act according to our preferred results rather than the text of the statute (which we cannot, or at least, should not), I find the Court's concerns to be not nearly as troubling as the Court suggests.

What the Court fails to acknowledge is that the Act protects the Partnership's "sensitive records," but the Partnership elected not to seek that protection. The Act expressly excepts from disclosure all information that is "confidential by law, either constitutional, statutory, or by judicial decision." TEX. GOV'T CODE § 552.101. Even if the information is not confidential by law, the Act still excepts it from disclosure if, for example, it constitutes the Partnership's commercial or financial information **\*93** and (as the Court assumes) its disclosure would cause the Partnership "substantial competitive harm." *Id.* § 552.110(b). In fact, as the Court recently held, the Act excepts the information if its release would even just "give advantage to a competitor." *See Boeing Co. v. Paxton,* No. 12–1007, —— S.W.3d ——, —— (Tex. June 19, 2015) (construing TEX. GOV'T CODE § 552.104). And particularly apropos to the Partnership's activities, the Act specifically excepts certain "information [that] relates to economic development negotiations involving a governmental body and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body." TEX. GOV'T CODE § 552.131(a). The Partnership did not assert any of these exceptions in this appeal. In fact, it did not assert any exceptions at all, even though it has successfully asserted exceptions in the past. *See* Tex. Att'y Gen. OR2004–4221. Nor did it ever contend that only a "part, section, or portion" of the Partnership is supported by public funds, even though it successfully made that assertion in the past as well. *See id.*

The Partnership contends that the court of appeals' decision represents a "vast overexpansion of the Public Information Act to reach private business information that the public has no inherent or legitimate right to know." In response, the Attorney General asserts that the Partnership's construction of the statute would permit governmental bodies to evade public scrutiny by contracting with private entities to carry out government business. "If governmental bodies can shield information from public scrutiny by outsourcing their business to private companies," the Attorney General contends, "the purpose of the [Act] is frustrated." In short, each party warns that the other's proposed construction will have dire consequences, either destroying private entities' ability to keep their private information private or undermining the people's right to know what their government is doing. The Partnership asserts, "The stakes are tremendous." [14]

[14] We have also received amicus briefs from several chambers of commerce arguing that the court of appeals'

holding, if allowed to stand, will be "catastrophic" for chambers of commerce in Texas and will render them "wholly unable to function."

I am not convinced that the effect of our determination would or must be as drastic as either party, or the Court, suggests. Although the Court concludes that the Partnership is not a governmental body, the Act still empowers the public to require the City to disclose all "information that is written, produced, collected, assembled, or maintained" by or for the City "under a law or ordinance or in connection with the transaction of official business." TEX. GOV'T CODE § 552.002(a)(1) (defining "public information"). This extends to not only the City's service agreements with the Partnership and all reports and other information the Partnership provided to the City under those contracts, but also all information the Partnership collects, assembles, or maintains for the City "in connection with the transaction of official business," if the City "owns," "has a right of access to," or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information." *Id.* § 552.002(a). Even if the requested information is not in the City's actual possession, the Act still provides broad access to the Partnership's information related to "the transaction of official business." *Id.*

Conversely, if the Court concluded, as I do, that the Partnership is a governmental body, the Partnership could still protect its confidential and commercially sensitive **\*94** information by relying on the Act's numerous exceptions. In addition, the Partnership could assert (as it has previously asserted), that only a particular "part, section, or portion" of the Partnership is supported in whole or in part by public funds, and only that "part, section, or portion" is required to disclose information in response to a public information request. *See id.* § 552.003(1)(A)(xii); *see also* Tex. Att'y Gen. OR2004–4221 (concluding that "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information") (emphasis added). In its appeal to this Court, however, the Partnership does not assert any exceptions, does not contend that only a particular "part, section, or portion" of the Partnership was supported by public funds, and has made no other effort to protect the information in its check registers, other than to claim it is not a governmental body. It is a risky litigation strategy, and the Court should not let it motivate us to misinterpret the Act for fear that the Partnership's confidential financial information would otherwise be disclosed.

In any event, regardless of whether the effects will be as drastic as the Court, the Partnership, or the Attorney General suggest, our job is to interpret and apply the statute as written, not to rewrite it to achieve the policy outcomes they or we may prefer. *See In re Tex. Dep't of Family & Protective Servs.,* 210 S.W.3d 609, 614 (Tex.2006) ("It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written.") (citation omitted). [15]

15     *See also F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 690 (Tex.2007) ("[W]e do not pick and choose among policy options on which the Legislature has spoken. 'Our role ... is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent.' ") (quoting *McIntyre v. Ramirez,* 109 S.W.3d 741, 748 (Tex.2003)) (alteration in *F.F.P. Operating Partners,* 237 S.W.3d at 690).

## V.

### Conclusion

I would hold that the Greater Houston Partnership was supported in whole or in part by public funds and would thus agree with the Attorney General, the trial court, and the court of appeals that the Partnership is a governmental body for purposes of Jenkins's public information requests. The Partnership has not argued that only a particular "part, section, or portion" of the Partnership received public funds, or that any of the information at issue falls within one of the Act's exceptions to required disclosure. I would therefore affirm the court of appeals' judgment requiring the Partnership to disclose its 2007 and 2008 check registers pursuant to the Public Information Act.

### All Citations

468 S.W.3d 51, 58 Tex. Sup. Ct. J. 1362

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    State v. Titan Land Development Inc.,

Tex.App.-Hous. (1 Dist.),     June 11, 2015

826 S.W.2d 138
Supreme Court of Texas.

Paul F. JOHN, Lillie John and John's
Welding & Construction, Inc., Petitioners,

v.

The STATE of Texas, Respondent.

No. D–1557.    |    Feb. 26, 1992.    |
Rehearing Overruled April 22, 1992.

Landowners appeal from judgment of the District Court No. 274, Guadalupe County, Fred Moore, J., entered in eminent domain proceeding. The San Antonio Court of Appeals affirmed, and landowners applied for writ of error. The Supreme Court held that landowner's time to object to special commissioner's award in condemnation proceeding is tolled until clerk sends notice to landowner pursuant to statute requiring clerk to send notice by next working day indicating condemnation award.

Reversed and remanded.

West Headnotes (6)

**[1]**      **Eminent Domain**

 Objections and Exceptions

148   Eminent Domain
148III   Proceedings to Take Property and Assess Compensation
148k225   Assessment by Commissioners, Appraisers, or Viewers
148k235   Objections and Exceptions
Landowner's time to object to special commissioner's award in condemnation proceeding is tolled until clerk sends notice to landowner pursuant to statute requiring clerk to send notice by next working day indicating condemnation award. V.T.C.A., Property Code § 21.049.

5 Cases that cite this headnote

**[2]**      **Eminent Domain**

 Strict Compliance with Statutory Requirements

148   Eminent Domain
148III   Proceedings to Take Property and Assess Compensation
148k167   Statutory Provisions and Remedies
148k167(4)   Strict Compliance with Statutory Requirements
Procedures set forth in condemnation statute must be strictly followed and its protections liberally construed for benefit of landowner. V.T.C.A., Property Code § 21.049.

15 Cases that cite this headnote

**[3]**      **Eminent Domain**

 Filing Report and Notice

148   Eminent Domain
148III   Proceedings to Take Property and Assess Compensation
148k225   Assessment by Commissioners, Appraisers, or Viewers
148k234   Report and Findings or Award
148k234(5)   Filing Report and Notice
Statute requiring clerk of court to send notification of special commissioner's decision in condemnation proceeding no later than next working day after day of decision is mandatory because it is part of the statutory scheme authorizing eminent domain actions and is designed to protect landowner. V.T.C.A., Property Code § 21.049.

12 Cases that cite this headnote

**[4]**      **Notice**

 Requisites and Sufficiency of Formal Notice in General

277   Notice
277k9   Requisites and Sufficiency of Formal Notice in General
When statute provides method by which notice shall be given in particular instance, notice provision must be followed with reasonable strictness.

4 Cases that cite this headnote

**[5]** **Action**

👉 Change of Character or Form

**Eminent Domain**

👉 Objections and Exceptions

13 Action

13II Nature and Form

13k36 Change of Character or Form

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation

148k225 Assessment by Commissioners, Appraisers, or Viewers

148k235 Objections and Exceptions

Filing timely objections in condemnation proceeding invokes jurisdiction of trial court and transforms administrative proceeding into pending cause. V.T.C.A., Property Code § 21.049.

4 Cases that cite this headnote

**[6]** **Eminent Domain**

👉 Objections and Exceptions

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation

148k225 Assessment by Commissioners, Appraisers, or Viewers

148k235 Objections and Exceptions

If objections are not timely filed in condemnation proceeding, trial court can only perform its ministerial function and render judgment based on special commissioner's award. V.T.C.A., Property Code § 21.049.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*139** Bennie Bock, II, New Braunfels, Laura Cavaretta, and Paul M. Green, San Antonio, for petitioners.

George R. Jennings, and Mark Heidenheimer, Austin, for respondent.

**Opinion**

PER CURIAM.

 **[1]** This is a condemnation case. At issue is whether landowners are entitled to notice providing an opportunity to timely object after a condemnation award is filed with the trial court. The court of appeals held that Paul F. John, Lillie John and John's Welding & Construction Inc. (collectively "the Johns") did not file timely objections to the condemnation award because the timetable for objecting to the award starts with the filing of the award, not the sending or receiving of notice. A majority of this court holds that, in a condemnation proceeding, the parties' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code.

The state commenced an eminent domain action to condemn the property owned by the Johns. At the special commissioners' hearing, on March 28, 1990, the Johns received an award for the value of their property. On April 2, 1990, the special commissioners' award was filed with the trial court. On April 3, 1990, the clerk should have sent notice to the Johns informing them that the commissioners' award had been filed with the trial court. *See* Tex. Prop.Code § 21.049 (providing that the clerk shall send notice to the parties in the proceeding, by the next working day, indicating that the condemnation award had been filed with the trial court). On April 25, 1990, the clerk finally sent the required notice to the Johns. Two days later, on April 27, 1990, the Johns filed their objections to the award and demanded a trial to determine the value of the property.

The trial court held that it did not have jurisdiction to consider the merits of the case without timely objections and could only perform its ministerial function of entering judgment based upon the commissioners' award. *See* Tex. Prop.Code § 21.018(a) (providing that objections to the condemnation award must be filed on or before the Monday next following the twentieth day after the day the commissioners file their findings with the court). The court of appeals affirmed the judgment of the trial court on the basis that the Johns did not file timely objections. To support that result, the court of appeals compared section 21.049 of the Texas Property Code to rule 239a of the Texas Rules of Civil Procedure which governs default judgments. [1] The notice requirement of rule 239a has been considered directory, rather than mandatory. *See Petro–Chemical Transport, Inc. v. Carroll,* 514 S.W.2d

240, 244–45 (Tex.1974) (the clerk's failure to send required notice does not affect the **\*140** finality of the judgment but such a failure may be a predicate for bill of review); *see also Bloom v. Bloom,* 767 S.W.2d 463, 468 (Tex.App.—San Antonio 1989, writ denied) (the clerk's failure to provide the required notice, pursuant to rule 239a, does not constitute reversible error). Thus, reasoning that section 21.049 is likewise directory, the court of appeals held that the clerk's failure to comply with the notice provision does not toll the timetable for objecting to the commissioners' award.

1    Rule 239a of the Texas Rules of Civil Procedure provides, in part, that "[i]mediately upon the signing of the judgment, the clerk shall mail written notice thereof to the party against whom the judgment was rendered...."

[2]    Contrary to the court of appeals' analysis, the notice requirements of section 21.049 of the Texas Property Code and rule 239a of the Texas Rules of Civil Procedure are not analogous. Default judgments are distinguishable for two reasons. First, rule 239a specifically states that "failure to comply with the provisions of the rule shall not affect the finality of the judgment." Tex.R.Civ.P. 239a. Thus, unlike section 21.049 of the Texas Property Code, the notice requirement is directory by the express language of rule 239a. [2] Second, in a condemnation action, the landowner is given a single opportunity to recover damages for the taking of his property by the state for the public benefit. *Coastal Indust. Water Auth. v. Celanese Corp. of Am.,* 592 S.W.2d 597, 599 (Tex.1979). As a result, the procedures set forth in the condemnation statute must be strictly followed and its protections liberally construed for the benefit of the landowner. *See Rotello v. Brazos County Water Control & Improvement Dist.,* 574 S.W.2d 208, 212 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ). *See also Coastal Indust. Water Auth.,* 592 S.W.2d at 599; *Walling v. State,* 394 S.W.2d 38, 40 (Tex.Civ.App.—Waco 1965, writ ref'd n.r.e.).

2    When a defaulting party does not receive any actual or official notice, rule 306a(4) of the Texas Rules of Civil Procedure provides a limited extension of time before the judgment becomes final and the trial court loses its plenary power. After that limited extension of time has lapsed, the clerk's failure to send notice will not affect the finality of the judgment. Tex.R.Civ.P. 239a.

[3]    One such procedure is section 21.049 of the Texas Property Code, which mandates that:

> [N]ot later than the next working day after the day the decision [by the

special commissioners] is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

Tex.Prop.Code § 21.049. In contrast to rule 239a, this section must be construed as mandatory because it is part of the statutory scheme authorizing eminent domain actions and it is designed to protect the landowner. Moreover, since the language of the statute is clear and unambiguous, it should be enforced as written, giving its terms their usual and ordinary meaning, and without resorting to the rules of construction. *See Balios v. Texas Dep't of Pub. Safety,* 733 S.W.2d 308, 310 (Tex.App.—Amarillo 1987, writ ref'd). [3] Therefore, in condemnation cases, the clerk must comply with the notice provisions.

3    The state argues that the notice provision of section 21.049 is directory rather than mandatory because Senator McFarland stated, during the floor debate on the revised property code, that this bill is "a nonsubstantive codification." 2nd and 3rd Reading of Senate Bill 49 on the Senate Floor, p. 2, 1. 23–24. In 1983, during the first called session, the Legislature amended art. 3265 § 5 to require notice to the parties, by the next working day, indicating that the condemnation award had been filed with the trial court. Act of June 19, 1983, H.B. No. 1118, § 5, 68th Legislature, 1st C.S., ch. 838, 1983 Tex.Gen.Laws 4766. During the second call of the same session, the legislature incorporated this change into the Property Code. Act of 1984, S.B. 49, § 1(d), 68th Legislature, 2nd C.S., ch. 18, 1984 Tex.Gen.Laws 95 (codified as Tex.Prop.Code § 21.049.) Thus, the substantive change occurred prior to the 1984 codification.

    Furthermore, the express language of the statute states that the clerk "shall" send notice to the parties in the condemnation proceeding. Shall "is an imperative term, by ordinary meaning, and requires the performance of the act to be performed. Thus, it should be treated as a mandatory term, unless it is apparent that the legislature intended otherwise." *Balios v. Texas Dep't of Pub. Safety,* 733 S.W.2d 308, 310 (Tex.App.—Amarillo 1987, writ ref'd) (citations omitted).

[4]   [5]   [6]   In light of section 21.049 of the Texas Property Code, the court of appeals **\*141** incorrectly applied *Dickey v. City of Houston,* 501 S.W.2d 293 (Tex.1973) which held

that a landowner who received notice of the condemnation was charged with the duty to "take cognizance" of subsequent acts of the commissioners including making an award, returning it to the trial court, and having the trial court enter the judgment unless timely objections were filed. *Id. at 294.* After *Dickey,* the legislature passed this mandatory provision, Tex.Prop.Code § 21.049, which supplanted the holding in *Dickey* and required the clerk to send notice to the landowner, by the next working day, confirming that the condemnation award had been filed with the trial court. Thus, notice of the condemnation hearing is not sufficient notice that the landowners' time to object to the condemnation award has begun to run. In the case at bar, the clerk failed to notify the Johns that the special commissioners' award had been filed with the court until after the deadline to object had passed. [4] As a result, the Johns' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code. [5]

[4]    When a statute provides the method by which notice shall be given in a particular instance, the notice provision must be followed with reasonable strictness. *See Rotello v. Brazos County Water Control & Improvement Dist.,* 574 S.W.2d 208, 212 (Tex.Civ.App.—Houston [1st

Dist.] 1978, no writ). By sending notice to the Johns after their time to object had lapsed, the clerk failed to follow the notice requirement with reasonable strictness.

[5]    Filing timely objections invokes the jurisdiction of the trial court and transforms the administrative proceeding into a pending cause. *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 937 (1958); *see Seiler v. Intrastate Gathering Corp.,* 730 S.W.2d 133, 137 (Tex.App.—San Antonio 1987, no writ). If objections are not filed timely, the trial court can only perform its ministerial function and render judgment based upon the commissioner's award. *See Pearson,* 315 S.W.2d at 938. However, the clerk's failure to send notice tolls the landowner's time to object. Therefore, in the case at bar, the trial court had jurisdiction to consider the merits of the case because the Johns filed timely objections. *Cf. Packer v. Fifth Court of Appeals,* 764 S.W.2d 775 (Tex.1989).

Accordingly, pursuant to Tex.R.App.P. 170, without hearing oral argument, a majority of this court grants the Johns' application for writ of error, reverses the judgment of the court of appeals, and remands the cause to the trial court for further proceedings consistent with this opinion.

**All Citations**

826 S.W.2d 138

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6672494
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

ONCOR ELECTRIC DELIVERY
COMPANY LLC, Appellant

v.

James Milton James Milton SCHUNKE, Appellee.

No. 04–13–00067–CV.  |  Dec. 18, 2013.

**Synopsis**
**Background:** Electric company filed a condemnation petition. Special commissioners awarded landowner $367,000.00 in damages for the condemnation of his land. Landowner filed a motion seeking judgment on the commissioners' award. The 35th Judicial District Court, Mills County, Stephen Ellis, J., concluded that company's objections to commissioners' award were untimely filed, granted landowner's motion, and rendered judgment on the commissioners' award. Company appealed.

**[Holding:]** The Court of Appeals, Karen Angelini, J., held that company's time to file objections to the special commissioners' damages award was tolled until the trial court clerk mailed the notice of decision to company, as required by condemnation statute.

Reversed and remanded.

West Headnotes (2)

**[1]** **Eminent Domain**
　🔑 Objections and exceptions

148　Eminent Domain
148III　Proceedings to Take Property and Assess Compensation
148k225　Assessment by Commissioners, Appraisers, or Viewers

148k235　Objections and exceptions
Electric company's time to file objections to the special commissioners' damages award to landowner in condemnation action was tolled until the trial court clerk mailed the notice of decision to company, as required by condemnation statute, and because the trial court clerk never mailed the notice as required by statute, company's time to file objections to the commissioners' award was tolled. V.T.C.A., Property Code § 21.049.

Cases that cite this headnote

**[2]** **Eminent Domain**
　🔑 Filing report and notice

148　Eminent Domain
148III　Proceedings to Take Property and Assess Compensation
148k225　Assessment by Commissioners, Appraisers, or Viewers
148k234　Report and Findings or Award
148k234(5)　Filing report and notice
Where attorney for electric company gave the notice of special commissioners' decision to the trial court clerk, who filed the notice and handed company's attorney a file-stamped copy of the notice, the act of handing file-stamped copy of the notice of decision to one of company's attorneys did not satisfy the clerk's mandatory duty to mail the notice to the parties or their attorneys pursuant to condemnation statute. V.T.C.A., Property Code § 21.049.

Cases that cite this headnote

From the 35th Judicial District Court, Mills County, Texas, Trial Court No. 11–04–6278, Stephen Ellis, Judge.

**Attorneys and Law Firms**

Joann N. Wilkins, Lance Cooper Travis, Burford & Ryburn, Dallas, TX, for Appellant.

Luke Ellis, Jons, Marrs, Ellis, and Hodge, LLP, Austin, TX, for Appellee.

Sitting: KAREN ANGELINI, Justice, MARIALYN BARNARD, Justice, REBECA C. MARTINEZ, Justice.

## MEMORANDUM OPINION

Opinion by KAREN ANGELINI, Justice.

**\*1** Oncor Electric Company LLC appeals from a judgment rendered on a special commissioners' award in a condemnation case. We conclude the trial court erred in rendering judgment on the commissioners' award. We therefore reverse and remand for further proceedings.

## BACKGROUND

A condemnation action begins as an administrative proceeding and, if necessary, may be converted to a judicial proceeding. *City of Tyler v. Beck,* 196 S.W.3d 784, 786 (Tex.2006). To begin a condemnation action, a condemning entity files a petition in the appropriate trial court. *Id.; State v. Garland,* 963 S.W.2d 95, 97 (Tex.App.-Austin 1998, pet. denied). The trial court then appoints special commissioners, who conduct a hearing and determine just compensation. *Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97. Any party to a condemnation action may object to the commissioners' award by filing written objections with the court. *Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97. If any party timely files objections, the commissioners' award is vacated and the administrative proceeding becomes a judicial proceeding. *Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97. However, if no objections are filed, or if objections are untimely filed, the trial court does not acquire jurisdiction beyond its ministerial duty to render judgment on the commissioners' award. *Garland,* 963 S.W.2d at 97 (citing *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 938 (1958)).

In this case, Oncor filed a condemnation petition in the district court in Mills County, Texas. In its petition, Oncor sought to condemn land owned by James Milton Schunke. The district court appointed special commissioners, who heard the case and decided to award Schunke $367,000.00 in damages for the condemnation of his land. Oncor filed the commissioners' award and a notice of the commissioners' decision with the trial court clerk on September 26, 2011. The notice of decision instructed the trial court clerk to mail, by certified or registered mail, a copy of the notice to Schunke's and Oncor's attorneys of record. On September 28, 2011, the trial court clerk mailed a copy of the notice of decision to Schunke's attorneys of record, but she did not mail a copy of the notice of

decision to Oncor's attorneys of record. Oncor filed objections to the commissioners' award on October 19, 2011.

Thereafter, Schunke filed a motion seeking judgment on the commissioners' award. In the motion, Schunke argued the trial court was required to render judgment on the commissioners' award because Oncor failed to file its objections in a timely manner. According to Schunke, Oncor's objections were due on October 17, 2011, which was the first Monday following the twentieth day after the commissioners' award was filed with the trial court clerk.

The trial court held a hearing on Schunke's motion. At the hearing, a trial court clerk testified that the notice of the commissioners' decision was not sent to Oncor in the manner specified by the property code. Nevertheless, Schunke argued that the clerk's failure to send the notice of decision to Oncor in the manner specified by the property code did not toll Oncor's time for filing objections because the relevant property code provisions were designed to protect landowners rather than condemning entities. Schunke further argued that Oncor had actual notice of the filing of the notice of decision. In response, Oncor argued its objections were not untimely because the property code required the clerk to mail the notice of decision to the parties or their attorneys of record and the clerk failed to do so. Furthermore, Oncor claimed that it relied on the law stating that the time for filing objections was tolled until the clerk mailed the notice of decision to the parties or their attorneys of record. The trial court concluded Oncor's objections were untimely filed, granted Schunke's motion, and rendered judgment on the commissioners' award. Oncor appealed.

## DISCUSSION

**\*2** On appeal, Oncor argues its objections were timely filed and therefore the trial court erred in rendering judgment on the commissioners' award. Two provisions of the Texas property code are central to the issue presented in this appeal. The first provision, section 21.049, states:

> The judge of a court hearing a proceeding under this chapter shall inform the clerk of the court as to a decision by the special commissioners on the day the decision is filed or on the next working day after the day the decision is filed. Not later than the

next working day after the day the decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

TEX. PROP.CODE ANN. § 21.049 (West 2000). The second provision, section 21.018, states:

(a) A party to a condemnation proceeding may object to the findings of the special commissioners by filing a written statement of the objections and their grounds with the court that has jurisdiction of the proceeding. The statement must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.

(b) If a party files an objection to the findings of the special commissioners, the court shall cite the adverse party and try the case in the same manner as other civil causes.

TEX. PROP.CODE ANN. § 21.018 (West 2003).

These provisions were construed by the Texas Supreme Court in *John v. State,* 826 S.W.2d 138 (Tex.1992). Section 21.049 requires the trial court clerk to mail the notice of decision to the parties not later than the next working day after the day the decision is filed. TEX. PROP.CODE ANN. § 21.049. In *John,* the trial court clerk failed to mail the notice of the commissioners' decision to the landowners in the time period specified in the statute. 826 S.W.2d at 139. Instead, the clerk mailed the notice twenty-two days late, which was after the time for filing objections had passed under section 21.018(a). *Id.* Two days after the clerk mailed the notice of decision, the landowners filed their objections. *Id.* The Texas Supreme Court held that the landowners' objections were timely filed because the time to object to the commissioners' award was tolled until the clerk mailed the notice of decision as required under section 21.049. *Id.* The Texas Supreme Court construed section 21.049 as mandatory, concluding that "in condemnation cases, the clerk must comply with the notice provisions." *Id.* at 140. In reaching its holding, the Texas Supreme Court noted that when a statute provides the method by which notice shall be given in a particular instance, the notice provision must be followed with reasonable strictness. *Id.* at 141 n. 4 (citing *Rotello v. Brazos Cnty. Water Control and Improvement Dist. No. 1,* 574 S.W.2d 208, 212 (Tex.App.-Houston [1st Dist.]

1978, no writ)*, disapproved of on other grounds by State v. Bristol Hotel Asset Co.,* 65 S.W.3d 638, 642 (Tex.2001)).

**\*3** **[1]** Here, it is undisputed that the trial court clerk never sent notice to Oncor as required by section 21.049. A deputy clerk testified that one of Oncor's attorneys gave her the notice of decision for filing, she filed the notice of decision, and handed the attorney a file-stamped copy of the notice. The clerk also testified that she mailed a copy of the notice of decision to Schunke's attorney, but she never mailed a copy to Oncor's attorney because it was her understanding that she did not need to mail the notice to the condemning entity. The clerk further testified that no one else in her office mailed a copy of the notice to Oncor because it would have been noted in the file.

Applying *John* to these facts, we conclude Oncor's time to file objections to the commissioners' award was tolled until the trial court clerk mailed the notice of decision as required by section 21.049. *See John,* 826 S.W.2d at 139 ("A majority of this court holds that, in a condemnation proceeding, the parties' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code."); *Garland,* 963 S.W.2d at 101 (holding that the timetable for filing objections begins when the commissioners' decision is filed with the trial court, subject to tolling if proper notice is not sent). Because the trial court clerk never mailed the notice as required under section 21.049, Oncor's time to file objections to the commissioners' award was tolled.

**[2]** Despite the rule articulated in *John,* Schunke claims that Oncor's objections were untimely filed. Schunke argues that *John* does not apply to this case because Oncor had actual notice of the filing of the notice of the commissioners' decision. Specifically, Oncor's lawyer gave the notice of decision to the trial court clerk, who filed the notice and handed Oncor's attorney a file-stamped copy of the notice. [1] We disagree with Schunke's assertion that the act of handing a file-stamped copy of the notice of decision to one of Oncor's attorneys satisfied the clerk's mandatory duty to mail the notice to the parties or their attorneys under section 21.049. Section 21.049, which makes no mention of actual notice, specifies the manner in which notice is to be provided, stating "the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record." *See* TEX. PROP.CODE ANN. § 21.049. As the Texas Supreme Court stated in *John,* the

requirements set out in section 21.049 must be followed with reasonable strictness. *John,* 826 S.W.2d at 141 n. 4.

[1]     Apparently, the practice of a party filing the notice of decision on behalf of the commissioners is not unusual. A similar practice was described in *State v. Garland,* 963 S.W.3d 95, 99 (Tex.App.-Austin 1998, no pet.) ("We are informed ... that a representative of the condemnor typically offers to carry out the actual filing of the document, and that such offer is usually accepted by the commissioners. We see no reason why the commissioners may not authorize another person, including a party to the proceeding, to fulfil[l] this responsibility.").

Schunke next argues this case warrants a departure from the rule articulated in *John* because the clerk failed to send notice to the condemning entity as opposed to the landowner. Schunke points out that *John* was based in part on the principle that condemnation statutes are to be liberally construed for the benefit of the landowner. *Id.* at 140. However, *John* was also based on the principle that statutes that are clear and unambiguous must be enforced as written. *Id.* ("Moreover, since the language of the statute is clear and unambiguous, it should be enforced as written, giving its terms their usual and ordinary meaning, and without resorting to the rules of construction."). Notably, section 21.049 does not direct the clerk to mail the notice to the landowner only. Rather, section 21.049 expressly requires the clerk to mail the notice "to the *parties* in the proceeding, or to *their* attorneys of record." *See* TEX. PROP.CODE ANN. § 21.049 (emphasis added).

**\*4** Schunke further argues that Oncor's objections were untimely because Oncor failed to satisfy the requisites for equitable tolling and because Oncor judicially admitted that the commissioners' award was filed with the clerk on September 26, 2011. We find these arguments unconvincing. First, under the rule articulated in *John,* Oncor was not required to satisfy the requirements for equitable tolling. Second, any admission concerning the date the commissioners' award was filed does not change the fact that the time to file objections was tolled until the clerk mailed notice to the parties or their attorneys as required by section 21.049.

In sum, the clerk's act of handing a file-stamped copy of the notice of decision to one of Oncor's attorneys did not satisfy the clerk's duty to mail the notice of decision as required by section 21.049. Moreover, Oncor was entitled to rely on the rule articulated in *John,* which provides that the time for filing objections to the commissioners' award is tolled until the clerk mails notice to the parties or their attorneys as required by section 21.049. *See* 826 S.W.2d at 139.

### CONCLUSION

The trial court erred in concluding Oncor's objections were untimely filed and in rendering judgment on the commissioners' award. Because Oncor's objections were timely filed, the administrative condemnation proceeding was converted to a judicial condemnation proceeding. Therefore, the trial court's judgment is REVERSED, and this case is REMANDED to the trial court for further proceedings.

**All Citations**

Not Reported in S.W.3d, 2013 WL 6672494

---

          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** In re Bliss & Glennon, Inc., Tex.App.-Hous. (1 Dist.), January 7, 2014

341 S.W.3d 919
Supreme Court of Texas.

Larry ROCCAFORTE, Petitioner,

v.

Jefferson COUNTY, Respondent.

No. 09–0326.    |    Argued Oct. 14, 2010.    |    Decided April 29, 2011.

**Synopsis**

**Background:** Former chief deputy constable brought § 1983 wrongful termination action against county, county constable, and county employees. After jury returned a verdict in favor of former chief with respect to the claims against constable, the 136th District Court, Jefferson County, Milton G. Shuffield, J., granted county's plea to jurisdiction, and former chief brought interlocutory appeal. While interlocutory appeal was pending, the District Court rendered final judgment against constable. Constable appealed, and former chief cross-appealed. The Beaumont Court of Appeals affirmed in part, reversed in part, and rendered judgment that former chief take nothing. In the interlocutory appeal, the Beaumont Court of Appeals, 281 S.W.3d 230, modified the dismissal order to reflect that the dismissal was without prejudice and affirmed the order as modified. Former chief petitioned for review.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

[1] even if court erred in rendering final judgment after it had issued a stay in proceedings, former chief waived such error;

[2] Court of Appeals would treat interlocutory appeal that was pending when trial court issued a final judgment as an appeal from the final judgment;

[3] provision in statute requiring notice of suit against county via mail was not a jurisdictional requirement; and

[4] provision in statute requiring notice of suit against county via mail was satisfied by hand-delivery of notice.

Reversed and remanded.

Willett, J., concurred in part and filed opinion.

West Headnotes (5)

**[1]**   **Appeal and Error**
　　 Judgment

30   Appeal and Error
30V   Presentation and Reservation in Lower Court of Grounds of Review
30V(B)   Objections and Motions, and Rulings Thereon
30k223   Judgment
Even if court erred in rendering final judgment after it had issued a stay in proceedings pending an interlocutory appeal by plaintiff, former chief deputy constable waived such error in wrongful termination action brought by former chief deputy constable against county and other constable; trial court's final judgment was voidable, rather than void, and former chief deputy constable failed to object to entry of final judgment.

4 Cases that cite this headnote

**[2]**   **Appeal and Error**
　　 Nature and grounds of right

30   Appeal and Error
30IV   Right of Review
30IV(A)   Persons Entitled
30k136   Nature and grounds of right
The right of appeal should not be lost due to procedural technicalities.

1 Cases that cite this headnote

**[3]**   **Appeal and Error**
　　 Interlocutory Proceedings Brought Up in General

30   Appeal and Error
30XVI   Review
30XVI(B)   Interlocutory, Collateral, and Supplementary Proceedings and Questions

30k869 On Appeal from Final Judgment

30k870 Interlocutory Proceedings Brought Up in General

30k870(1) In general

Court of Appeals would treat interlocutory appeal that was pending when trial court issued a final judgment as an appeal from the final judgment; claims against defendant that were subject matter of interlocutory appeal were not severed prior to entry of final judgment, defendant remained a party to the underlying proceeding, and final judgment implicitly modified the interlocutory order, which merged with it. Rules App.Proc., Rule 27.3.

16 Cases that cite this headnote

[4] Counties

Notice, Demand, or Presentation of Claim

104 Counties

104XII Actions

104k211 Conditions Precedent

104k213.5 Notice, Demand, or Presentation of Claim

104k213.5(1) In general

Provision in statute governing local government providing that, upon motion by the defendant, an action against a county or county official must be dismissed if plaintiff failed to provide written notice via mail to the county judge or district attorney, was not a jurisdictional requirement. V.T.C.A., Local Government Code § 89.0041.

4 Cases that cite this headnote

[5] Counties

Service or presentation; timeliness

104 Counties

104XII Actions

104k211 Conditions Precedent

104k213.5 Notice, Demand, or Presentation of Claim

104k213.5(2) Service or presentation; timeliness

Statute requiring that a plaintiff filing suit against a county or county official must provide notice of suit via mail to county judge or district attorney was satisfied by hand-delivery of notice, rather than delivery by mail, in wrongful termination action brought by former chief deputy constable

against county and other constable. V.T.C.A., Local Government Code § 89.0041.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*920** Laurence W. Watts, Watts & Associates, P.C., Missouri City, TX, Brandon David Mosley, Cowan & Lemmon, LLP, Houston, TX, for Larry Roccaforte.

Thomas F. Rugg, District Attorney's Office, First Assistant—Civil Div., Steven L. Wiggins, Jefferson County District Attorney Office, Thomas E. Maness, Criminal District Attorney, Beaumont, TX, for Jefferson County.

Todd K. Sellars, Dallas County Assistant Attorney, Dallas, TX, for Amicus Curiae Dallas County, Texas.

**Opinion**

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, Justice GUZMAN, and Justice LEHRMANN, and joined by Justice WILLETT as to parts I through III.

The Local Government Code requires a person suing a county to give the county judge and the county or district attorney notice of the claim. TEX. LOC. GOV'T CODEE § 89.0041. The plaintiff provided that notice here, but did so by personal service of process, rather than registered or certified mail as the statute contemplates. We conclude that when the requisite county officials receive timely notice enabling them to answer and defend the claim, the case should not be dismissed. Because the court of appeals concluded otherwise, we reverse its judgment and remand the case to the trial court for further proceedings.

**I. Background**

Former Chief Deputy Constable Larry Roccaforte sued Jefferson County and Constable Jeff Greenway, alleging that his wrongful termination deprived him of rights guaranteed by the Texas Constitution. Roccaforte personally served County Judge Carl Griffith with the suit, and fifteen days later, the County (represented by the district attorney) and Constable Greenway answered, denying liability. The County propounded written discovery requests, deposed Roccaforte,

and presented County officials for depositions. The County also filed a plea to the jurisdiction, asserting that Roccaforte did not give requisite notice of the suit. *See* TEX. LOC. GOV'T CODEE § 89.0041. Roccaforte disagreed, arguing that the statute applied only to contract claims. Alternatively, he argued that 42 U.S.C. § 1983 preempted the notice requirements and that he substantially complied with them in any event.

Although the trial court indicated that it would sustain the County's plea and sever those claims from the underlying case, it did not immediately sign an order doing so. In the meantime, Roccaforte tried his claims against Greenway. A jury returned a verdict in Roccaforte's favor. Afterwards, the trial court signed an order granting the County's jurisdictional plea. The order did not sever the claims from the underlying case. Roccaforte then pursued this interlocutory appeal. His notice of appeal stated that "[p]ursuant to Civ. P. Rem.Code § 51.014(b), all proceedings are **\*921** stayed in the trial court pending resolution of the appeal." But the proceedings were not stayed.

In the underlying case, Greenway moved for judgment notwithstanding the verdict, which the trial court granted as to Roccaforte's property interest and First Amendment retaliation claims but denied as to Roccaforte's claimed violation of his liberty interest. Roccaforte moved for entry of judgment. Notwithstanding the statutory stay referenced in Roccaforte's notice of appeal, the trial court rendered judgment for Roccaforte and awarded damages, attorney's fees, and costs. The judgment was titled "FINAL JUDGMENT"; it "denie[d] all relief no [sic] granted in this judgment"; and it stated "[t]his is a FINAL JUDGMENT." The County was included in the case caption. No one objected to the continuation of trial court proceedings despite the statutory stay.

Greenway appealed, and Roccaforte cross-appealed, raising as his only issues complaints regarding the trial court's JNOV on his claims against Greenway. The court of appeals affirmed in part and reversed in part, rendering judgment that Roccaforte take nothing. *Greenway v. Roccaforte*, 2009 WL 3460683, at \*6, 2009 Tex.App. LEXIS 8290, at \*15 (Tex.App.-Beaumont 2009, pet. denied).[1]

[1]   Today, we deny that petition for review.

In Roccaforte's separate interlocutory appeal, the court of appeals made the following notation:

Roccaforte notes that immediately after the dismissal order, the trial of the case proceeded to judgment without the County as a party. No one disputes that all the claims against all other parties have been resolved. The order of dismissal is therefore appealable whether or not the statute at issue is jurisdictional.

281 S.W.3d 230, 231 n. 1. The court ultimately concluded that Roccaforte's failure to notify the County of the suit by registered or certified mail mandated dismissal of his suit against the County, but not because the trial court lacked jurisdiction. *Id.* at 236–37. Accordingly, the court modified the dismissal order to reflect that dismissal was without prejudice and affirmed the order as modified. *Id.*

Roccaforte petitioned this Court for review, which we granted.[2] 53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010).

[2]   Dallas County submitted an amicus curiae brief in support of Jefferson County.

## II. Did the trial court's final judgment moot this interlocutory appeal?

Before turning to the merits, we must decide a procedural matter: What happens when a party perfects an appeal of an interlocutory judgment that has not been severed from the underlying action, and that action proceeds to trial and a final judgment? The trial court did not sever Roccaforte's claims against the County[3] and denied "all relief not granted" in its final judgment. Ordinarily, under these circumstances, Roccaforte would have to complain on appeal that the trial court erroneously dismissed those claims. Roccaforte, however, did not complain about the County's dismissal in his appeal from the final judgment. His separate interlocutory appeal, then, rests on a precipice of mootness.

[3]   "As a rule, the severance of an interlocutory judgment into a separate cause makes it final." *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, P.C.,* 63 S.W.3d 795, 795 (Tex.2001) (per curiam).

## \*922 A. Roccaforte waived any complaint about the trial court's actions during the statutory stay.

Although Roccaforte's interlocutory appeal was supposed to stay all proceedings in the trial court pending resolution of

the appeal,[4] Roccaforte did not object to the trial court's rendition of judgment while the stay was in effect. To the contrary, he affirmatively moved for entry of judgment. Because a final judgment frequently moots an interlocutory appeal,[5] we must decide whether the trial court's failure to observe the stay made the final judgment void or merely voidable. If the final judgment is void, it would have no impact on this interlocutory appeal. *Lindsay v. Jaffray,* 55 Tex. 626 (Tex.1881) ("A void judgment is in legal effect no judgment.") (quoting FREEMAN ON JUDGMENTS, § 117).[6] If voidable, then we must decide whether it moots this proceeding. *See Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (observing that voidable orders must be corrected by direct attack and, unless successfully attacked, become final). We conclude it is voidable.

[4]  TEX. CIV. PRAC. & REM.CODE § 51.014(b); *see also* TEX.R.APP. P. 29.5 (providing that "[w]hile an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and *unless prohibited by statute* may make further orders, including one dissolving the order complained of on appeal") (emphasis added).

[5]  *See, e.g., Hernandez v. Ebrom,* 289 S.W.3d 316, 319 (Tex.2009) ("Appeals of some interlocutory orders become moot because the orders have been rendered moot by subsequent orders.").

[6]  *See also Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (noting that "[a] judgment is void ... when it is apparent that the court rendering judgment had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act") (quoting *Browning v. Prostok,* 165 S.W.3d 336, 346 (Tex.2005)).

Two of our courts of appeals have held that the failure to object when a trial court proceeds despite the automatic stay waives any error the trial court may have committed by failing to impose it. *See Escalante v. Rowan,* 251 S.W.3d 720, 724–25 (Tex.App.-Houston [14th Dist.] 2008), *rev'd on other grounds,* 332 S.W.3d 365 (Tex.2011) (per curiam); *Henry v. Flintrock Feeders, Ltd.,* No. 07–04–0224–CV, 2005 WL 1320121, at *1, 2005 Tex.App. LEXIS 4310, at *1 (Tex.App.-Amarillo June 1, 2005, no pet.) (mem.op.). In *Escalante,* the court of appeals held that a party's failure to object to a trial court's ruling on summary judgment motions during the statutory stay "failed to preserve error as to any objection that the summary judgment is voidable based on the stay."

*Escalante,* 251 S.W.3d at 725. In *Henry,* the court held that a party's failure to object to the trial court's action in violation of the stay waived any error resulting from that action. *Henry,* 2005 WL 1320121, at *1–2, 2005 Tex.App. LEXIS 4310, at *4 (holding that trial court's grant of summary judgment mooted interlocutory appeal challenging denial of special appearance). We find particularly instructive a case involving a trial court's rendition of final judgment while an interlocutory appeal of a class certification order was pending:

> [I]f a trial court proceeds to trial during the interlocutory appeal, the class action plaintiff must inform the court of section 51.014(b) and request that the stay be enforced. If a court proceeds to trial over the objection of a class action plaintiff, the class action plaintiff could request a mandamus and this court would grant it. However, if the class action plaintiff fails to inform the trial court of section 51.014(b), and allows the court to proceed to trial, as happened here, the **\*923** plaintiff waives the right to object or request any relief on appeal. *See* TEX.R.APP. P. 33.1(a). We see this as no different from any other trial court error that is not preserved—it is waived.

*Siebenmorgen v. Hertz Corp.,* No. 14–97–01012–CV, 1999 WL 21299, at *3, 1999 Tex.App. LEXIS 311, at *10–11 (Tex.App.-Houston [14th Dist.] Jan. 21, 1999, no pet.) (dismissing as moot interlocutory appeal of order denying class certification).

A third court of appeals has implicitly concluded that parties can waive the right to insist on a section 51.014(b) stay. *See Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715 (Tex.App.-Dallas 2003, no pet.). In that case, the court observed that the trial court's grant of summary judgment while an interlocutory appeal was pending violated the statutory stay. Noting that "neither party requested a stay from this Court" and "both parties sought to commence the 'trial' below by filing and/or arguing motions for summary judgment while this appeal was pending," the court of appeals did not conclude that the trial court's summary judgment was void. *Id.* at 715. Instead, the appellate court held that the summary judgment mooted the interlocutory appeal. *Id.*

at 715–16 (noting that the interlocutory class certification order merged into the final judgment). The court concluded: "By rendering a final judgment during this appeal, the trial court also rendered itself powerless to reconsider its class certification ruling were we to conclude here the ruling was entered in error." *Id.* at 715.

We agree with those decisions that have held that a party may waive complaints about a trial court's actions in violation of the stay imposed by section 51.014(b). That stay differs from a situation in which the relevant statute vests "exclusive jurisdiction" in a particular forum. *See, e.g., Kalb v. Feuerstein,* 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (noting that bankruptcy law in effect at the time "vested in the bankruptcy courts exclusive jurisdiction" and "withdr[ew] from all other courts all power under any circumstances"). For that reason, we have held that actions taken in violation of a bankruptcy stay are void, not just voidable. *Cont'l Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988). [7]

---

[7] *But see Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) (holding that, under the 1978 Bankruptcy Act, "the better reasoned rule characterizes acts taken in violation of the automatic stay as voidable rather than void"); *see also Chisholm v. Chisholm,* No. 04–06–00504–CV, 2007 WL 1481574, at *2–3, 2007 Tex.App. LEXIS 3936, at *6–7 (Tex.App.-San Antonio May 23, 2007, no pet.) (noting conflict between *Sikes* and *Continental Casing* ); *In re De La Garza,* 159 S.W.3d 119, 120–21 (Tex.App.-Corpus Christi 2004, no pet.) (same); *Oles v. Curl,* 65 S.W.3d 129, 131 n. 1 (Tex.App.-Amarillo 2001, no pet.)(same); *Chunn v. Chunn,* 929 S.W.2d 490, 493 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (same).

[1] But as we have noted, "a court's action contrary to a statute or statutory equivalent means the action is erroneous or 'voidable,' not that the ordinary appellate or other direct procedures to correct it may be circumvented." *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990); *cf. Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) (noting that failure to comply with a non-jurisdictional statutory requirement may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived). That is the case here. The trial court's rendition of final judgment while the stay was in effect was voidable, not void, and Roccaforte's failure to object to the trial court's actions waived any error related to the stay. We must, therefore, confront the fact that the trial **\*924**

court signed a final judgment disposing of all parties and all claims and that Roccaforte did not present in his appeal from that judgment the arguments he advances in this interlocutory appeal.

## B. The trial court's final judgment implicitly modified its interlocutory order, and we treat this appeal as relating to that final judgment.

[2] We have repeatedly held that the right of appeal should not be lost due to procedural technicalities. [8] Roccaforte timely perfected appeals from both the interlocutory order and the final judgment, and this is not a situation in which further proceedings mooted the issues raised in Roccaforte's interlocutory appeal. [9]

---

[8] *See, e.g., Guest v. Dixon,* 195 S.W.3d 687, 688 (Tex.2006) ( "[W]e have repeatedly stressed that procedural rules should be construed and applied so that the right of appeal is not unnecessarily lost to technicalities."); *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121–22 (Tex.1991) (per curiam)(stating that procedural rules should be "liberally construed so that the decisions of the courts of appeals turn on substance rather than procedural technicality").

[9] *See, e.g., Isuani v. Manske–Sheffield Radiology Grp., P.A.,* 802 S.W.2d 235, 236 (Tex.1991) (holding that final judgment mooted interlocutory appeal of order granting or denying temporary injunction); *Providian Bancorp Servs. v. Hernandez,* No. 08–04–00186–CV, 2005 WL 82197, at *1, 2005 Tex.App. LEXIS 288, at *2 (Tex.App.-El Paso Jan. 13, 2005, no pet.) (mem.op.) (dismissing as moot interlocutory appeal from order denying motion to compel arbitration, because trial court entered an order compelling arbitration); *Mobil Oil Corp. v. First State Bank of Denton,* No. 2–02–119–CV, 2004 WL 1699928, at *1, 2004 Tex.App. LEXIS 6940, at *2 (Tex.App.-Fort Worth July 29, 2004, no pet.) (dismissing as moot interlocutory appeal from class certification order, because trial court subsequently vacated order, decertified class, and dismissed class action); *Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715–16 (Tex.App.-Dallas 2003, no pet.) (dismissing as moot interlocutory appeal of order granting class certification, as trial court subsequently granted summary judgment motion); *see also Hernandez,* 289 S.W.3d at 321 (acknowledging that a party may not, after trial and an unfavorable judgment, prevail on a complaint that the party's summary judgment motion should have been granted, nor could a party complain of a failure to dismiss a health care liability claim based on an inadequate expert

report, after a full trial and evidence establishing the elements of that claim).

**[3]** Our procedural rules provide that:

> After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment, or if the trial court vacates the order or judgment and replaces it with another appealable order or judgment, the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment. The subsequent order or judgment and actions relating to it may be included in the original or supplemental record. Any party may nonetheless appeal from the subsequent order or judgment.

TEX.R.APP. P. 27.3. Here, although the trial court's final judgment did not expressly modify its interlocutory order, it did so implicitly. Because the claims against the County had not been severed, the County remained a party to the underlying proceeding despite the interlocutory appeal. The final judgment necessarily replaced the interlocutory order, which merged into the judgment, [10] even though Roccaforte's interlocutory appeal remained pending. Under our rules, however, we may treat this interlocutory appeal as an **\*925** appeal from the final judgment. That permits us to reach the merits of Roccaforte's claims rather than dismiss the interlocutory appeal as moot.

[10]     *See Webb v. Jorns,* 488 S.W.2d 407, 408–09 (Tex.1972) (holding that interlocutory judgment merged into final judgment, which was then appealable).

Although not relying on rule 27.3, the court of appeals took a similar approach, treating Roccaforte's appeal as though it were from the final judgment. 281 S.W.3d at 231 n. 1. Similarly, we treat Roccaforte's appellate complaints about the trial court's grant of the County's jurisdictional plea as though they related to the appeal of the final judgment. We turn now to the merits of his claim.

**III. The post-suit notice requirements are not jurisdictional.**

Local Government Code section 89.0041 provides:

> (a) A person filing suit against a county or against a county official in the official's capacity as a county official shall deliver written notice to:
>
> > (1) the county judge; and
> >
> > (2) the county or district attorney having jurisdiction to defend the county in a civil suit.
>
> (b) The written notice must be delivered by certified or registered mail by the 30th business day after suit is filed and contain:
>
> > (1) the style and cause number of the suit;
> >
> > (2) the court in which the suit was filed;
> >
> > (3) the date on which the suit was filed; and
> >
> > (4) the name of the person filing suit.
>
> (c) If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official.

TEX. LOC. GOV'T CODEE § 89.0041. In 2005, the Legislature amended the Government Code to provide that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034.

The County contends section 311.034 makes Roccaforte's failure to comply with section 89.0041's notice requirements jurisdictional—an issue we have never decided. Our courts of appeals, however, have concluded that the notice requirements are not jurisdictional, even in light of section 311.034. *See El Paso Cnty. v. Alvarado,* 290 S.W.3d 895, 898–99 (Tex.App.-El Paso 2009, no pet.) (holding that section 89.0041 is not jurisdictional because section 311.034 applies only to prerequisites to file suit, not post-suit notice requirements); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); 281 S.W.3d 230, 232–33 (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 754–56 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same); *Cnty. of Bexar v. Bruton,* 256 S.W.3d 345, 348–49 (Tex.App.-San Antonio 2008, no pet.) (same).

**[4]** We presume "that the Legislature did not intend to make the [provision] jurisdictional[,] a presumption overcome only by clear legislative intent to the contrary." *City of DeSoto v. White,* 288 S.W.3d 389, 394 (Tex.2009). The statutes' language reflects no such intent here. Section 311.034 applies to *prerequisites* to suit, not notice requirements that can be satisfied only *after* suit is filed. *Compare* TEX. GOV'T CODE § 311.034, *with* TEX. LOC. GOV'T CODEE § 89.0041 (requiring notice of cause number, court in which case is filed, and date of filing). Nor does Local Government Code section 89.0041 show such intent: that section states that a trial court may **\*926** dismiss a case for noncompliance only after the governmental entity has moved for dismissal. TEX. LOC. GOV'T CODEE 89.0041(c) ("If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official."). The motion requirement means that a case may proceed against those governmental entities that do not seek dismissal—in other words, that a county can waive a party's noncompliance. This confirms that compliance with the notice requirements is not jurisdictional. *See Loutzenhiser,* 140 S.W.3d at 359 ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). We find no basis upon which to conclude that the Legislature intended section 89.0041 to be jurisdictional.

### IV. Where the appropriate county officials receive timely notice of the suit, the case should not be dismissed if notice was provided by some means other than mail.

Roccaforte provided timely notice of every item required by section 89.0041, and the requisite officials received that notice. Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?

Roccaforte argues that the County's actual notice of the suit and his substantial compliance with section 89.0041 should suffice. A number of courts of appeals (though not the court of appeals in this case) agree with him. [11] The County disagrees, arguing that the statute requires strict compliance with its terms, and dismissal is mandated if those terms are not satisfied.

[11]     *Compare Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with section 89.0041 was

sufficient because the purpose of the statute was to ensure notice, and that purpose was accomplished), *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same), *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same), *and Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same), *with* 281 S.W.3d at 237 (holding that "[r]eading a broad actual notice or service exception into the statute—without any attempt by plaintiff to comply—would, in effect, largely eliminate the specified, additional written notice requirement of the statute"). That conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

**[5]** Section 89.0041 ensures that the appropriate county officials are made aware of pending suits, allowing the county to answer and defend the case. *See Howlett,* 301 S.W.3d at 846 ("The apparent purpose of section 89.0041 is to ensure that the person responsible for answering and defending the suit—the county or district attorney-has actual notice of the suit itself."); *Coskey,* 247 S.W.3d at 757 ("Section 89.0041's notice of suit requirement against a county serves the purpose of aiding in the management and control of the City's finances and property...."). That purpose was served here—the county judge and the district attorney had notice within fifteen days of Roccaforte's filing, and they answered and defended the suit. *Cf. Loutzenhiser,* 140 S.W.3d at 360 (observing that "if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired"). The statute was not intended to create a procedural trap allowing a county to obtain dismissal even though the appropriate officials have notice of the suit. *See* **\*927** *Southern Surety Co. v. McGuire,* 275 S.W. 845, 847 (Tex.Civ.App.-El Paso 1925, writ ref'd) (holding that failure to present written claim to commissioners' court as required by statute did not bar the claim, because "[t]he purpose of the statute was fully accomplished by [oral presentment]"); *see also Coskey,* 247 S.W.3d at 757 ("The manner of delivery specified by the statute assures that county officials will receive notice of a suit after it has been filed to enable it to respond timely and prepare a defense."). Because those officers had the requisite notice, we conclude that the trial court erred in dismissing Roccaforte's claims.

### V. Conclusion

Roccaforte's claims against the County should not have been dismissed for lack of notice. [12] We reverse the court of appeals' judgment as to those claims and remand the case

to the trial court for further proceedings. TEX.R.APP. P. 60.2(d).

[12]      Because this issue is dispositive, we do not reach Roccaforte's argument that 42 U.S.C. § 1983 preempts section 89.0041's notice requirements.

Justice WILLETT delivered a concurring opinion.

Justice WILLETT, concurring in part.

I join Parts I–III of the Court's opinion. As for Part IV, I join the result but not the reasoning. There is a better approach, one more allegiant to the Legislature's words. Roccaforte's claim should proceed, but the reason is rooted not in his substantial compliance but rather the County's substantial dalliance.

\* \* \*

Aristotle would have enjoyed this case, which perfectly illustrates the challenge he recognized of reconciling the "absoluteness" of the written law with equity in the particular case. [1] Believing that "the equitable is superior" and that rigid laws must bend, [2] Aristotle urged "a correction of law where it is defective owing to its universality." [3] From Athens, Greece to Athens, Texas (and beyond), judges still debate the bounds of interpretive discretion—whether it is appropriate to temper the "absoluteness" of statutory mandates and ameliorate their seeming harshness. Millennia may have passed since Aristotle's Lyceum, but this great philosophical and jurisprudential debate endures.

[1]      Aristotle, Nicomachean Ethics bk. V, ch. 10.

[2]      *Id.*

[3]      *Id.*

## I

As the Court persuasively explains in Part III, the post-suit notice requirements in Section 89.0041 are not jurisdictional, meaning a County can waive a plaintiff's noncompliance. [4] Here, the County objected to Roccaforte's noncompliance, prompting the Court to ask: "Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?" [5] If phrased that way, our recent and unanimous precedent answers the question "yes,"

since "the surest guide to legislative intent" is the language lawmakers chose. [6] In other words, "Where text is clear, it is determinative of that intent." [7] The Court today agrees that nothing in Section 89.0041 relieves **\*928** Roccaforte from compliance. So, to escape the statute's emphatic "shall dismiss the suit" mandate, [8] the Court pivots on "actual notice" and "substantial compliance" and holds that the statute's purpose was fulfilled via hand-delivery.

[4]      341 S.W.3d 919, 926 (explaining that compliance with the notice requirements of Section 89.0041 of the Local Government Code "is not jurisdictional") (citation omitted).

[5]      341 S.W.3d at 926.

[6]      *Presidio Indep. Sch. Dist. v. Scott,* 309 S.W.3d 927, 930 (Tex.2010) (citation and quotation marks omitted).

[7]      *Id.*

[8]      *See* TEX. LOC. GOV'T CODEE § 89.0041(c).

Honoring a statute's plain words is indispensable, even if enforcing those words as written works an unpalatable result. To be sure, courts deviate from otherwise-clear textual commands to avert "absurd" results or to vindicate constitutional principles. [9] But as a general matter, if the legal deck is stacked via technical statutory requirements, the Legislature should reshuffle the equities, not us. [10]

[9]      The absurdity doctrine, rightly understood, is a safety valve reserved for truly exceptional cases, not just those where the mandated statutory outcome is thought unwise or inequitable. *See generally* John F. Manning, *The Absurdity Doctrine,* 116 HARV. L.REV.. 2387 (2003). As Chief Justice Marshall famously put it, a court's allegiance to the text ceases when applying the text "would be so monstrous that all mankind would, without hesitation, unite in rejecting the application." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 203, 4 L.Ed. 529 (1819).

[10]      The Legislature can, of course, if it wishes, statutorily overturn today's holding that Section 89.0041 is nonjurisdictional and subject to an actual-notice exception.

As for whether Section 89.0041's use of phrases like "shall deliver," [11] "must be delivered," [12] "as required," [13] and "shall dismiss" [14] mandates strict compliance, I would take the statute at face value. Beyond that, those desiring

additional reassurance that lawmakers intended what they enacted can find it in a properly contextual reading of other notice-related statutes.

11    TEX. LOC. GOV'T CODEE § 89.0041(a).

12    *Id.* § 89.0041(b).

13    *Id.* § 89.0041(c).

14    *Id.*

First, the Legislature, while omitting an actual-notice exception from Section 89.0041, expressly included one in the Tort Claims Act, stating the Act's pre-suit notice requirements "do not apply if the governmental unit has actual notice...."[15] The Legislature understands how to let actual notice excuse technical noncompliance; it easily could have said actual notice suffices, thus obviating the need for service via certified or registered mail. Instead, it opted against actual notice, presumably on purpose. For better or worse, lawmakers enacted strict compliance, not substantial compliance. Our interpretive focus, both textual and contextual, must be on the law as written, and we should refuse to engraft what the Legislature has refused to enact.

15    TEX. CIV. PRAC. & REM.CODE § 101.101(c).

Second, reading "actual notice" into Section 89.0041's *post*-suit notice requirement robs it of any real meaning and also makes Section 89.004's *pre*-suit notice requirement redundant. Section 89.004 forbids someone from suing a county or county official "unless the person has presented the claim to the commissioners court and the commissioners court neglects or refuses to pay all or part of the claim...."[16] This presentment requirement assures actual notice of a claim before it is filed and was already on the books when Section 89.0041 was added in 2003. Logically then, Section 89.0041 must require something *in addition to* the preexisting notice and presentment requirements.[17]

16    TEX. LOC. GOV'T CODEE § 89.004(a).

17    Another point: As the Court notes, some courts of appeals have concluded that a substantial-compliance exception lies hidden within Section 89.0041, notwithstanding the statute's emphatic "shall dismiss" mandate. 341 S.W.3d at 928 (citing *Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with Section 89.0041 was sufficient because

the purpose of the statute was to ensure notice, and that purpose was accomplished); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same)). Two of the three courts of appeals even cite as support two of our decisions involving notice in other contexts. *Coskey,* 247 S.W.3d at 757 ("Both *Artco–Bell Corp.* and *Cox Enterprises, Inc..* support a standard of substantial compliance with notice requirements under certain circumstances, and we conclude that standard applies in these circumstances.") (citations omitted); *Ballesteros,* 286 S.W.3d at 571–72. A third court of appeals opinion in turn relies upon *Coskey. See Autry,* 251 S.W.3d at 158.

Closer analysis reveals *Coskey* and *Ballesteros* offer feeble support, as they misinterpret this Court's holdings in *Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.,* 706 S.W.2d 956 (Tex.1986), and *Artco–Bell Corp. v. City of Temple,* 616 S.W.2d 190 (Tex.1981). The issue in *Cox* involved *how much* particularity was required in notice. 706 S.W.2d at 960 (noting that "less than full disclosure is not substantial compliance" and that "the Open Meetings Act requires a full disclosure of the subject matter of the meetings"). *Artco–Bell* is likewise inapposite. In *Artco–Bell,* the Court simply invalidated the notice requirement in a city's charter and held the plaintiff had provided sufficient notice. 616 S.W.2d at 193–94 ("[W]e hold that the requirement of verification represents an unreasonable limitation on the City's liability and is invalid as it is contrary to the limitation of authority placed upon home rule cities....") (footnote omitted). *Cox* was about the specificity of notice; *Artco–Bell* resulted in the invalidation of notice. In neither case did the Court craft an *exception* for notice. The lower courts' treatment of these cases was thus strained, and should not be taken as a correct reading of our jurisprudence on statutory notice requirements.

**\*929** The requisite officials here received notice, but they did not receive "requisite notice," as the Court states.[18] The Court may deem it *adequate,* but it is irrefutably not *requisite.* As the Court reads Section 89.0041, it is not only nonjurisdictional (I agree on this point), but also nonmandatory. I acknowledge the statute's no-exceptions mandate works a harsh result,[19] but to the degree this seems a trap for the unwary, it is a trap the Legislature left well marked.

18  341 S.W.3d at 927.

19  Had the County "timely asserted" Roccaforte's noncompliance, dismissal would have been mandatory under the statute's rigid, no-discretion mandate, thus raising the question of whether Section 89.0041's notice regime is preempted by 42 U.S.C. § 1983. *See Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). That question, while interesting legally, is not before us.

## II

Having said all that, I agree with the Court that Roccaforte ultimately wins his notice dispute, but on different grounds. Instead of asking whether the Legislature meant to bar Roccaforte's claim,

I would rephrase the question in a manner less assaultive to the statutory text: Did the County effectively *waive* Roccaforte's noncompliance by not timely asserting it? I believe so.[20]

20  Waiver may actually be the wrong term; it may be more accurate to call this forfeiture. As the United States Supreme Court explains: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the *timely assertion* of a right, waiver is the intentional relinquishment of a known right." *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (emphasis added) (citations and quotation marks omitted). In any event, under our definition:

> "[W]aiver" is the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right. The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right.
>
> *Perry Homes v. Cull,* 258 S.W.3d 580, 602–03 (Tex.2008) (citations omitted).

**\*930** True, the County, after waiting for limitations to expire, filed a motion for dismissal complaining that Roccaforte provided notice via personal service rather than registered or certified mail. I believe that obscures the key point, which on these facts is not *whether* the County sought dismissal, but *when.* A governmental body can raise a jurisdictional bar like immunity from suit whenever it pleases because "the trial court does not have—and never had—power to decide the case,"[21] thus making judgments forever vulnerable to delayed attack. Not so with nonjurisdictional requirements like this, which are waived if not timely raised. Under our precedent, dismissal delayed is sometimes dismissal denied: "The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but *that failure must be timely asserted* and compliance can be waived."[22] Moreover, "if a governmental unit is to avoid litigation to which it should not be subjected because of lack of notice, it should raise the issue as soon as possible."[23] On these facts, there was no timely assertion, much less one made "as soon as possible."[24]

21  *In re United Servs. Auto. Ass'n,* 307 S.W.3d 299, 306 (Tex.2010) (citation omitted).

22  *Loutzenhiser,* 140 S.W.3d at 359 (emphasis added).

23  *Id.* at 360. "Moreover, if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired." *Id.*

24  Reading Section 89.0041 in tandem with our settled precedent distinguishing mandatory requirements (waivable) from jurisdictional ones (nonwaivable) is consistent with a textualist approach that integrates established interpretive norms. For example, even the most ardent textualist would read a statute of limitations in light of the common-law rules of equitable tolling. *See Young v. United States,* 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations and quotation marks omitted); *see also United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). As Justice Scalia noted in *Young,* a limitations period is subject to the principles of equitable tolling, so long as the statutory text does not preclude such tolling. 535 U.S. at 47, 122 S.Ct. 1036. Same here, where the Legislature drafts notice requirements in light of our decisions differentiating between mandatory and jurisdictional provisions and the consequences that flow from each characterization.

We have held that waiver is decided on a case-by-case basis, meaning courts look to the totality of the circumstances.[25]

Here, **\*931** the County sought dismissal based on imperfect notice more than two years after suit was filed; more than two years after the County filed its answer; more than two years after the County filed its special exceptions; after the County presented three County officials for deposition and defended those depositions; after the County sent written discovery requests; after the County deposed Roccaforte; and after the County filed a motion for continuance. If two-plus years qualifies as "timely asserted" or "as soon as possible"— at least in the context of a statutory notice requirement commanding action—then these phrases have been drained of all meaning. [26] Indeed, the only thing the County "timely asserted" was limitations. I would disallow the County's belated insistence on dismissal given its decision to defend the case for so long, asserting noncompliance only after seizing tactical advantage via limitations, and thus materially prejudicing Roccaforte. There is no countervailing prejudice in allowing Roccaforte's suit to proceed against the County, which can hardly argue at this late stage that imperfect notice has harmed its legal position (unlike its fiscal position, having underwritten years of legal and judicial expenses). On these facts, two-plus years of litigation activity to run out the limitations clock betrays the County's too-little, too-late request for dismissal and constitutes waiver.

[25] *See Perry Homes,* 258 S.W.3d at 589–91 (explaining that a party waives an arbitration clause by engaging in substantial litigation to the other party's detriment or prejudice).

In *Jernigan v. Langley*, the Court considered whether a defendant physician waived his statutory right to contest the adequacy of the plaintiff's expert reports by waiting too long. 111 S.W.3d 153, 153 (Tex.2003). The Court held that delay does not always result in waiver, but it does when the defendant's silence or inaction for such a long period shows an intent to yield a known right. *Id.* at 157. I would hold that the County's actions are inconsistent with the intent to assert its statutory right to up-front dismissal based on defective notice. Moreover, *Jernigan* predates our 2004 decision in *Loutzenhiser,* which speaks specifically to statutorily mandated notice requirements involving governmental units and says notice-based objections should be asserted "as soon as possible." 140 S.W.3d at 360.

[26] It is true that defendants may assert defenses like limitations in the trial court even following extensive discovery and other pre-trial activity. *See* TEX.R. CIV. P. 94 (affirmative defenses including limitations must be pleaded); TEX.R. CIV. P. 63 (pleadings may be amended without leave of court until seven days before trial). Today's case, though, involves a statutory notice requirement that mandates action within a prescribed time, something *Loutzenhiser* held should be raised "as soon as possible" since the statutory purpose is to avoid litigation altogether. 140 S.W.3d at 360.

Section 89.0041 may not be a prerequisite to bringing suit, but it is a postrequisite to maintaining suit. In my view, Section 89.0041, unlike the Tort Claims Act, does not allow actual notice to forgive defective notice, but that does not mean actual notice may not affect the *waiver* inquiry of whether a defendant "timely asserted" noncompliance. For reasons stated above, I believe a county that quickly asserts statutory noncompliance, even if it has actual notice, is entitled to dismissal under Section 89.0041. But a county with actual notice that untimely asserts noncompliance (here only after limitations had run two-plus years later) has waived its objection and is not entitled to dismissal. *See City of DeSoto v. White,* 288 S.W.3d 389, 400–01 (Tex.2009) (noting that a party that declines to act in light of "full knowledge" of a defect in a nonjurisdictional notice requirement generally waives any complaint). Any other result would incentivize counties to sit on their rights rather than assert them immediately. Here, the County would be rewarded for wasting over two-years' worth of judicial resources and taxpayer dollars in defending a suit it could have easily dismissed from the outset.

\* \* \*

The Court's understandable desire to work an eminently fair result has led it to revise the statute as desired rather than read it as enacted. I favor a different approach to the same outcome. Roccaforte should win not because the Court waived the Legislature's words but because the County did.

**All Citations**

341 S.W.3d 919, 32 IER Cases 346, 54 Tex. Sup. Ct. J. 900

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

🔖 KeyCite Yellow Flag - Negative Treatment

**Superseded by Rule as Stated in** Boyd v. State, Tex.App.-Dallas, March 31, 1998

959 S.W.2d 615
Supreme Court of Texas.

John VERBURGT, individually and
a/n/f of Thomas Verburgt, Timothy
Verburgt and Joseph Verburgt, Petitioners,

v.

Patricia M. DORNER and the Methodist
Mission Home, Respondents.

No. 96–1026.  |  Argued April 24,
1997.  |  Decided Dec. 4, 1997.  |
Rehearing Overruled Feb. 13, 1998.

Father, in his individual capacity and as his children's next friend, sued various parties for intentional infliction of emotional distress and negligent interference with familial relationships. After father nonsuited one defendant, the 37th District Court, Bexar County, David Peeples, J., granted summary judgment for remaining defendants. Father appealed. The Beaumont Court of Appeals, 928 S.W.2d 654, dismissed appeal for want of jurisdiction. Application for writ of error was filed. The Supreme Court, Spector, J., held that motion for extension of time to file cost bond is necessarily implied when appellant, acting in good faith, files bond beyond time allowed by rule but within 15-day period in which appellant would be entitled to move to extend filing deadline.

Judgment of Court of Appeals reversed and remanded.

Enoch, J., filed a dissenting opinion in which Abbott and Hankinson, JJ., joined.

Baker, J., filed a dissenting opinion.

West Headnotes (1)

**[1]  Appeal and Error**
☛ Extension of time and relief in case of failure to file in time

30 Appeal and Error

30VII Transfer of Cause
30VII(C) Payment of Fees or Costs, and Bonds or Other Securities
30k387 Delivery or Filing and Service of Bond or Undertaking
30k387(6) Extension of time and relief in case of failure to file in time
Motion for extension of time to file cost bond is necessarily implied when appellant, acting in good faith, files bond beyond time allowed by rule but within 15-day period in which appellant would be entitled to move to extend filing deadline. Rules App.Proc., Rule 41(a)(1, 2) (Repealed).

989 Cases that cite this headnote

**Attorneys and Law Firms**

**\*615** Jaay D. Neal, San Antonio, for Petitioners.

Edward C. Mainz, Jr., San Antonio, Laurence E. Best, Steven D. Naumann, Houston, for Respondents.

**Opinion**

SPECTOR, J., Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, GONZALEZ, HECHTS, and OWEN, Justices, join.

In this case, we decide whether the court of appeals erred in dismissing an appeal for want of jurisdiction. The appellant, John Verburgt, filed a cost bond on the thirty-fourth day after the trial court rendered judgment against him. Verburgt mistakenly believed that he had timely complied with Rule 41(a)(1) of the Rules of Appellate Procedure in filing the bond and did not concurrently move to extend the time to file under Rule 41(a)(2). [1] We hold that a motion for extension of time is implied when a party, acting good faith, files a cost bond within the fifteen-day period in which Rule 41(a)(2) permits parties to file a motion to extend. We therefore reverse the judgment of the court of appeals and remand to that court.

[1] The Texas Rules of Appellate Procedure were renumbered and substantially revised on September 1, 1997. *See* 60 TEX. B.J. 876 (1997). All references to the Rules of Appellate Procedure in this opinion are to the rules in effect before that date.

Verburgt, in his individual capacity and as his children's next friend, sued Constance Clear, Patricia Dorner, and the Methodist Mission Home for intentional infliction of emotional distress and negligent interference with familial relationships. After Verburgt nonsuited Clear, the trial court granted summary judgment for the remaining defendants. The judgment was signed on October 10, 1995. Because no motion for new trial was filed, Verburgt's cost bond was due within thirty days, by November 9th. *See* TEX.R.APP. P. 41(a)(1). [2] Verburgt did not file the **\*616** bond until November 13th, nor did he file a motion to extend the time to file the bond within fifteen days of the bond's due date. *See* TEX.R.APP. P. 41(a)(2). [3]

[2] Rule 41(a)(1) provides:

> When security for costs on appeal is required, the bond or affidavit in lieu thereof shall be filed with the clerk within thirty days after the judgment is signed, or, within ninety days after the judgment is signed if a timely motion for new trial has been filed by any party or if any party has timely filed a request for findings of fact and conclusions of law in a case tried without a jury. If a deposit of cash is made in lieu of bond, the same shall be made within the same period.

[3] Rule 41(a)(2) provides:

> An extension of time may be granted by the appellate court for late filing of a cost bond or notice of appeal or making the deposit required by paragraph (a)(1) or for filing the affidavit, if such bond or notice of appeal is filed, deposit is made, or affidavit is filed not later than fifteen days after the last day allowed and, within the same period, a motion is filed in the appellate court reasonably explaining the need for such extension. If a contest to an affidavit in lieu of bond is sustained, the time for filing the bond is extended until ten days after the contest is sustained unless the trial court finds and recites that the affidavit is not filed in good faith.

Several weeks later, the court of appeals ordered Verburgt to show cause why it should not dismiss his appeal for lack of jurisdiction. Verburgt's response demonstrated that his counsel had simply miscalculated the date the bond was due. *See* 928 S.W.2d 654, 655. Initially, the court of appeals decided to retain jurisdiction of Verburgt's appeal. But on rehearing *en banc,* the court reversed itself.

The court of appeals in this case recognized the "patent unfairness" of the result it reached:

> We are, therefore, confronted with the question of whether the appellate rules condone a result that allows a litigant who knows he is late with his bond to save his appeal, but rejects the appeal of the litigant who erroneously, but in good faith, believes he has timely filed his bond and, thus satisfied, also believes he has no need to file for an extension of time.

*Id.* Although it acknowledged the arbitrariness of dismissal under these circumstances, the court of appeals nevertheless believed that the interest in finality of judgments outweighed the policy of disposing of appeals on their merits. *Id.* at 656.

In dismissing Verburgt's appeal, the appellate court also relied largely upon a decision by the Court of Criminal Appeals, *Olivo v. State,* 918 S.W.2d 519 (Tex.Crim.App.1996). But the Court of Criminal Appeals itself recognized in *Olivo* that its approach to the perfection of appeals in criminal cases has differed significantly from our more liberal approach. *See id.* at 524–25; *compare Jones v. State,* 796 S.W.2d 183, 186–87 (Tex.Crim.App.1990) (holding that Rule 83 of the Texas Rules of Appellate Procedure did not entitle appellant who filed defective notice of appeal to amend notice beyond the time allowed by Rule 41(a)(2) when the appellant had not requested an extension of time under Rule 41(b)(2)) *with Grand Prairie Indep. Sch. Dist. v. Southern Parts Imports, Inc.,* 813 S.W.2d 499, 500 (Tex.1991) (holding that an appellate court may not dismiss an appeal when the appellant filed the wrong instrument required to perfect the appeal without giving the appellant an opportunity to correct the error).

This Court has never wavered from the principle that appellate courts should not dismiss an appeal for a procedural defect whenever any arguable interpretation of the Rules of Appellate Procedure would preserve the appeal. We have repeatedly held that a court of appeals has jurisdiction over any appeal in which the appellant files an instrument in a bona fide attempt to invoke the appellate court's jurisdiction. *Linwood v. NCNB Texas,* 885 S.W.2d 102, 103 (Tex.1994); *Grand Prairie Indep. Sch. Dist.,* 813 S.W.2d at 500. Our decisions reflect the policy embodied in our appellate rules that disfavors disposing of appeals based upon harmless procedural defects. [4] *See Grand Prairie Indep. Sch. Dist.,* 813 S.W.2d at 500. Thus, we have instructed the courts of appeals to construe the Rules of Appellate Procedure reasonably, yet

liberally, so that the **\*617** right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule. *See Jamar v. Patterson,* 868 S.W.2d 318, 319 (Tex.1993); *see also Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121–22 (Tex.1991); *Gay v. City of Hillsboro,* 545 S.W.2d 765, 766 (Tex.1977).

4    Under Rule 46(f), on motion to dismiss an appeal for a defect in form or substance in any bond, "the appellate court may allow the filing of a new bond or the making of a new deposit in the trial court on such terms as the appellate court may prescribe." Rule 83 provides that "[a] judgment shall not be affirmed or reversed or an appeal dismissed for defects or irregularities, in appellate procedure, either of form or substance, without allowing a reasonable time to correct or amend such defects or irregularities...."

As the dissenting justice in the court of appeals pointed out, the result the court of appeals reached was not "absolutely necessary" under these facts. 928 S.W.2d at 657 (Duncan, J., dissenting) ("[T]he issue is not whether the rules *condone* a patently unfair result but whether they *require* it.") (emphasis in original). Here, the court of appeals acknowledged that Verburgt demonstrated that he had made a bona fide attempt to timely perfect an appeal. *See id.* at 655.

We hold that a motion for extension of time is necessarily implied when an appellant acting in good faith files a bond beyond the time allowed by Rule 41(a)(1), but within the fifteen-day period in which the appellant would be entitled to move to extend the filing deadline under Rule 41(a)(2). Our holding does not indefinitely extend the time in which parties may perfect an appeal, as Justice Enoch implies. Instead, once the period for granting a motion for extension of time under Rule 41(a)(2) has passed, a party can no longer invoke the appellate court's jurisdiction. It also does not alter the time for perfecting an appeal beyond the period authorized by Rule 41(a). Nor does our holding undermine finality of judgments, as the court of appeals believed. *See* 928 S.W.2d at 656. Parties who prevail in the trial court will still know within the time specified in Rule 41(a)(2) whether their opponents will seek to perfect an appeal. We decline to elevate form over substance, as the dissenters would.

Accordingly, we reverse the judgment of the court of appeals and remand to that court to allow it to determine whether Verburgt offered a reasonable explanation for his failure to timely file his bond. *See* TEX.R.APP. 41(a)(2). 5

5    The Texas Supreme Court cases cited by the dissenters are distinguishable from this case. In *Davies v. Massey,* the appellant mailed his cost bond a day before it was due, but the bond was received eight days late. 561 S.W.2d 799, 800 (Tex.1978). We held that the appellant timely perfected his appeal under Rule 5 of the Texas Rules of Civil Procedure. *Id.* at 801. It presents no inconsistency with this case. *Glidden Company v. Aetna Casualty & Surety Company* was a 1956 case in which the Court held that the court of appeals should have dismissed an appeal in which the appellant filed its bond one day late. 155 Tex. 591, 291 S.W.2d 315, 317 (1956). At the time we decided *Glidden,* the rules allowed for no extension of time to file a cost bond, regardless of good cause. *See id.* 291 S.W.2d at 318 ("It is well settled, that the requirement that the bond be filed within thirty days is mandatory and jurisdictional, and that the time prescribed cannot be dispensed with or enlarged by the court for any reason."). We disapprove of *Miller v. Miller,* 848 S.W.2d 344 (Tex.App.—Texarkana 1993, no writ), *El Paso Sharky's Billiard Parlor, Inc. v. Amparan,* 831 S.W.2d 3 (Tex.App.—El Paso 1992, writ denied), and any other authorities in which the court of appeals has dismissed an appeal when the appellant has made a bona fide attempt to invoke the appellate court's jurisdiction by filing a bond within the fifteen days of the date the bond was due.

ENOCH, Justice, joined by ABBOTT and HANKINSON, Justices, dissenting.

From today forward, one need no longer timely appeal to invoke an appellate court's jurisdiction. But just two months ago, this Court retained the longstanding rule that only a timely filed appeal invokes appellate jurisdiction. [1] We insisted that to perfect appeal in a civil case, the notice of appeal *must* be filed within the time prescribed in the rules. *See* TEX.R.APP. P. 26.1. Further, we insisted that to extend the time in which to file the notice of appeal, one must file *not only* the notice of appeal, *but in addition* " a motion" that "*must* state: ... [among other things] the facts relied on to reasonably explain the need for an extension." TEX.R.APP. P. 26.3, 10.5(b)(1)(C). Like our new rules, the plain language of the rule that applies to this case, Rule 41(a)(2), mandates that the appeal be timely; consequently, it compels the result the court of appeals reached in this **\*618** case. Is this a bad result? For the hopeful appellant, perhaps (assuming that the appeal is, in fact, meritorious). But denuding the Court's rules to achieve the Court's chosen result is bad law. I dissent.

[1]    In addition, we specifically stated that while other appellate rules may be suspended from time to time for good cause, "an appellate court may ... *not* ... alter the time for perfecting an appeal in a civil case." TEX.R.APP. P. 2 (emphasis added).

Rule 41(a)(2) permits a party who fails to timely appeal to seek an extension of time. But to do so, the party has to file, within fifteen days of the original due date, *both* the cost bond *and* a motion for extension of time reasonably explaining the need for the extension. The majority's holding, that an "implicit motion" is filed if a would-be appellant files late and files only a cost bond, 959 S.W.2d at 615, simply ignores the rule's requirement that *both* instruments must be filed. Moreover, Rule 41(a)(2) gives the court of appeals discretion whether to allow an extension of time, but this discretion is triggered only by the filing of a motion reasonably explaining the need for the extension. In the absence of a motion, the court of appeals' discretion is never invoked and the late–filed cost bond has no effect. Here, Verburgt did not file a motion to extend time, and he did not file the cost bond timely. He simply did not do what Rule 41(a)(2) clearly requires.

The Court does not cite a single case holding that the untimely filing of an appeal can still be a *bona fide* attempt to invoke the court of appeals' jurisdiction. To the contrary, we have consistently and routinely held that the appeal must be filed timely. *See Davies v. Massey,* 561 S.W.2d 799, 801 (Tex.1978) ("Filing a cost bond ... is a necessary and jurisdictional step in perfecting an appeal."); *Glidden Co. v. Aetna Cas. & Sur. Co.,* 155 Tex. 591, 291 S.W.2d 315, 318 (1956) ("It is well settled ... that the requirement that the bond be filed within thirty days is mandatory and jurisdictional."). Indeed, the court of appeals' decision in this case is predicated on this crucial point:

> [W]hile the supreme court has liberally construed the rules regarding the instruments necessary to confer jurisdiction, we do not discern a retreat in that court from the fundamental requirement that in order to invoke the jurisdiction of the court of appeals, some instrument, whether or not it is the correct instrument, must be timely filed.

928 S.W.2d at 656 (explaining two decisions on which the Court relies today: *Linwood v. NCNB Texas,* 885 S.W.2d 102, 103 (Tex.1994) and *Grand Prairie Indep. Sch. Dist. v. Southern Parts Imports, Inc.,* 813 S.W.2d 499,

500 (Tex.1991)); *see also Olivo v. State,* 918 S.W.2d 519, 524 (Tex.Crim.App.1996) (correctly noting that the "liberal policy" espoused by this Court in *Linwood* and *Grand Prairie* "concerns the substitution of a correct instrument for an incorrect instrument, *which has been timely filed* ").

I agree with the majority that "appellate courts should not dismiss an appeal for a procedural defect whenever any *arguable interpretation* of the Rules of Appellate Procedure would preserve the appeal ." 959 S.W.2d at 616 (emphasis added)(citing *Linwood* and *Grand Prairie* ).[2] But surely that interpretation must be *arguable*. Interpreting Rule 41(a)(2) in contradiction to its plain language is not arguable; indeed, it is remarkably harmful to the concept of justice.

[2]    In fact, the thrust of our new rules is to eliminate the procedural traps often encountered under our former rules. *See* Nathan L. Hecht & E. Lee Parsley, *Procedural Reform: Whence and Whither, in* MATTHEW BENDER C.L.E. , PRACTICING LAW UNDER THE NEW RULES OF TRIAL AND APPELLATE PROCEDURE 1–12 (Nov.1997) (explaining that the 1997 revisions to the rules of appellate procedure "are meant to take the traps out of TRAP"). In its understandable zeal to get rid of "traps," however, the majority unfortunately has lost sight of the significant concept of timeliness as a prerequisite to proper invocation of the court of appeals' jurisdiction. As indicated above, even the new rules of appellate procedure require, as they must, that a party must be *timely* to invoke the court of appeals' jurisdiction.

Under any number of circumstances, time plays a critical role in justice. For example, statutes of limitation and repose exist to ensure that claims are made in a timely fashion. *See, e.g., Trinity River Auth. v. URS Consultants, Inc.,* 889 S.W.2d 259, 263 (Tex.1994) ("We start with the unassailable premise that statutes of limitation, in general, serve a public function. They 'compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses **\*619** are available and the evidence is fresh in their minds.' ") (quoting *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977)). Timely exercise of one's appellate rights is no less significant to predictability, and consequently, to justice. Failure to timely file an appeal has always been a *jurisdictional* error that precludes an appellate court from reaching the merits. *See Davies,* 561 S.W.2d at 801; *Glidden,* 291 S.W.2d at 318. It rightfully should remain so.

The majority's flawed reasoning is also apparent from the cases it cites. In *Linwood* and *Grand Prairie,* we held that

a party's *bona fide* attempt to invoke the appellate court's jurisdiction will preserve its appeal. What is clearly apparent in these opinions is that the procedural defect, which rendered the party's effort at appeal only a *bona fide* attempt, was correctable. Concomitantly, the hopeful appellant had the obligation to correct this defect. But how would one correct untimeliness? One can't. Neither of these cases remotely signals a retreat from the principle that a party must *timely* appeal to invoke the court's jurisdiction.

The majority responds to my criticism by claiming that its decision "does not indefinitely extend the time in which parties may perfect an appeal" because parties supposedly "will still know within the time specified in Rule 41(a)(2) whether their opponents will seek to perfect an appeal." 659 S.W.2d at 617. My colleagues demonstrate that they do not understand what they do. The "indefiniteness" has nothing to do with not knowing whether an appeal will be filed within thirty days or forty-five days. It has everything to do with not knowing when the Court will simply "imply" a condition that never occurred to reach the result it prefers. When next will the Court "imply" filings that were never made? If the clear language of its own rules does not constrain the Court, then what will? If this is not "indefinite," then perhaps I do not understand the meaning of the word.

Finally, the majority mistakenly believes that ignoring its own rules somehow enhances "fairness." Playing by the rules is fair. Changing the rules to produce a particular result is not.

The judgment of the court of appeals should be affirmed. I dissent. [3]

[3] Like Justice Baker, I also dissent to *Verburgt's* companion cases. *See Harlan v. Howe State Bank,* 958 S.W.2d 380 (Tex.1997); *Holmes v. Home State County Ins.,* 958 S.W.2d 381 (Tex.1997); *Boyd v. American Indem. Co.,* 958 S.W.2d 379 (Tex.1997) (Justice Hankinson, who joins me in this dissent, is not sitting in *Boyd,* and therefore joins this footnote only as it relates to *Harlan* and *Holmes* ).

BAKER, Justice, dissenting.

The court of appeals reached the decision required by applying the plain and unambiguous language of Rule 41(a)(2). *See* TEX.R.APP. P. 41(a)(1) and (2); *Davies v. Massey,* 561 S.W.2d 799, 801 (Tex.1978); *Glidden Co. v. Aetna Cas. & Sur. Co.,* 155 Tex. 591, 291 S.W.2d 315, 318 (1956); *see also Miller v. Miller,* 848 S.W.2d 344, 345 (Tex.App.—Texarkana 1993, no writ); *El Paso Sharky's Billiard Parlor, Inc. v. Amparan,* 831 S.W.2d 3, 5 (Tex.App.—El Paso 1992, writ denied).

The Court's opinion dispenses with Rule 41(a)(2)'s requirements, and amends the rule by judicial fiat. The Court's opinion is contrary to its own precedent. *See State Dept. of Highways & Public Transportation v. Payne*, 838 S.W.2d 235, 241 (Tex.1992)( "[W]e do not revise our rules by opinion."); *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992)(same). I would deny the writ [1] . Because the Court decides otherwise, I dissent.

[1] I also dissent to *Verburgt's* companion cases. *See Boyd v. American Indem. Co.,* 958 S.W.2d 379 (Tex.1997); *Harlan v. Howe State Bank,* 958 S.W.2d 380 (Tex.1997); *Holmes v. Home State County Ins.,* 958 S.W.2d 381 (Tex.1997).

**All Citations**

959 S.W.2d 615, 41 Tex. Sup. Ct. J. 138

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle A. Courts
        Chapter 22. Appellate Courts
          Subchapter A. Supreme Court

V.T.C.A., Government Code § 22.004

§ 22.004. Rules of Civil Procedure

Effective: September 1, 2011
Currentness

(a) The supreme court has the full rulemaking power in the practice and procedure in civil actions, except that its rules may not abridge, enlarge, or modify the substantive rights of a litigant.

(b) The supreme court from time to time may promulgate a specific rule or rules of civil procedure, or an amendment or amendments to a specific rule or rules, to be effective at the time the supreme court deems expedient in the interest of a proper administration of justice. The rules and amendments to rules remain in effect unless and until disapproved by the legislature. The clerk of the supreme court shall file with the secretary of state the rules or amendments to rules promulgated by the supreme court under this subsection and shall mail a copy of those rules or amendments to rules to each registered member of the State Bar of Texas not later than the 60th day before the date on which they become effective. On receiving a written request from a member of the legislature, the secretary of state shall provide the member with electronic notifications when the supreme court has promulgated rules or amendments to rules under this section.

(c) So that the supreme court has full rulemaking power in civil actions, a rule adopted by the supreme court repeals all conflicting laws and parts of laws governing practice and procedure in civil actions, but substantive law is not repealed. At the time the supreme court files a rule, the court shall file with the secretary of state a list of each article or section of general law or each part of an article or section of general law that is repealed or modified in any way. The list has the same weight and effect as a decision of the court.

(d) The rules of practice and procedure in civil actions shall be published in the official reports of the supreme court. The supreme court may adopt the method it deems expedient for the printing and distribution of the rules.

(e) This section does not affect the repeal of statutes repealed by Chapter 25, page 201, General Laws, Acts of the 46th Legislature, Regular Session, 1939, on September 1, 1941.

(f) The supreme court shall adopt rules governing the electronic filing of documents in civil cases in justice of the peace courts.

(g) The supreme court shall adopt rules to provide for the dismissal of causes of action that have no basis in law or fact on motion and without evidence. The rules shall provide that the motion to dismiss shall be granted or denied within 45 days of the filing of the motion to dismiss. The rules shall not apply to actions under the Family Code.

(h) The supreme court shall adopt rules to promote the prompt, efficient, and cost-effective resolution of civil actions. The rules shall apply to civil actions in district courts, county courts at law, and statutory probate courts in which the amount in controversy, inclusive of all claims for damages of any kind, whether actual or exemplary, a penalty, attorney's fees, expenses, costs, interest, or any other type of damage of any kind, does not exceed $100,000. The rules shall address the need for lowering discovery costs in these actions and the procedure for ensuring that these actions will be expedited in the civil justice system. The supreme court may not adopt rules under this subsection that conflict with a provision of:

(1) Chapter 74, Civil Practice and Remedies Code;

(2) the Family Code;

(3) the Property Code; or

(4) the Tax Code.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 1989, 71st Leg., ch. 297, § 1, eff. Aug. 28, 1989; Acts 2001, 77th Leg., ch. 644, § 1, eff. June 13, 2001; Acts 2007, 80th Leg., ch. 63, § 1, eff. May 11, 2007; Acts 2011, 82nd Leg., ch. 203 (H.B. 274), §§ 1.01, 2.01, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 906 (S.B. 791), § 1, eff. Sept. 1, 2011.

V. T. C. A., Government Code § 22.004, TX GOVT § 22.004
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Statutes and Codes Annotated
>   Property Code (Refs & Annos)
>     Title 4. Actions and Remedies
>       Chapter 21. Eminent Domain (Refs & Annos)
>         Subchapter C. Damages and Costs (Refs & Annos)

V.T.C.A., Property Code § 21.049

§ 21.049. Notice of Decision of Special Commissioners

Currentness

The judge of a court hearing a proceeding under this chapter shall inform the clerk of the court as to a decision by the special commissioners on the day the decision is filed or on the next working day after the day the decision is filed. Not later than the next working day after the day the decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

**Credits**

Added by Acts 1984, 68th Leg., 2nd C.S., ch. 18, § 1(d), eff. Oct. 2, 1984.

V. T. C. A., Property Code § 21.049, TX PROPERTY § 21.049
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
    Texas Rules of Civil Procedure
        Part I. General Rules (Refs & Annos)

TX Rules of Civil Procedure, Rule 11

Rule 11. Agreements To Be in Writing

Currentness

Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941. Amended by order of July 15, 1987, eff. Jan. 1, 1988.

Vernon's Ann. Texas Rules Civ. Proc., Rule 11, TX R RCP Rule 11
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Docket Style and Number: Application of Sharyland Utilities, L.P. to Amend its Certificate of Convenience and Necessity for the Proposed Antelope-Elk Energy Center to White River 345-kV Transmission Line in Hale and Floyd Counties, Docket Number 42063.

The Application: The application of Sharyland Utilities, L.P. is designated as the Antelope-Elk Energy Center to White River 345-kV Transmission Line Project. The facilities include construction of a new single circuit 345-kV line on double-circuit capable structures. The proposed transmission line will connect the Golden Spread Electric Cooperative, Inc. Antelope-Elk Energy Center, in Hale County, to Sharyland's proposed White River Station in Floyd County. The total estimated cost for the project ranges from approximately $142,167,000 to $158,120,000 depending on the route chosen.

The proposed project is presented with twenty-one (21) alternate routes and is estimated to range from 50.42 miles to 57.86 miles (approximately 55 miles) in length. Any of the routes or route segments presented in the application could, however, be approved by the commission.

Persons wishing to intervene or comment on the action sought should contact the Public Utility Commission of Texas by mail at P.O. Box 13326, Austin, Texas 78711-3326 or by phone at (512) 936-7120 or toll-free at (888) 782-8477. The deadline for intervention in this proceeding is January 27, 2014. Hearing and speech-impaired individuals with text telephones (TTY) may contact the commission through Relay Texas by dialing 7-1-1. All comments should reference Docket Number 42063.

TRD-201305970
Adriana A. Gonzales
Rules Coordinator
Public Utility Commission of Texas
Filed: December 16, 2013

♦    ♦    ♦

## Supreme Court of Texas

IN THE SUPREME COURT OF TEXAS

*(Editor's Note: On December 12, 2013, the Supreme Court of Texas filed Misc. Docket No. 13-9171, Order Approving Forms for Expedited Foreclosure Proceedings, in the Texas Register office. In accordance with Texas Government Code, §2002.014, which permits the omission of material which is "cumbersome, expensive, or otherwise inexpedient," the forms are not included in the print version of the Texas Register. The forms are available in the on-line version of the December 27, 2013, issue of the Texas Register.)*

Misc. Docket No. 13-9171

ORDER APPROVING FORMS FOR EXPEDITED FORECLOSURE PROCEEDINGS

**ORDERED** that:

1. Pursuant to the Act of May 27, 2013, 83rd Leg., R.S. (HB 2978) and section 22.018 of the Texas Government Code, the Supreme Court of Texas approves the following set of forms for use in expedited foreclosure proceedings under Texas Rule of Civil Procedure 736.

2. The Clerk is directed to:

a. file a copy of this order with the Secretary of State;

b. cause a copy of this order to be mailed to each registered member of the State Bar of Texas by publication in the *Texas Bar Journal;*

c. send a copy of this order to each elected member of the Legislature; and

d. submit a copy of the order for publication in the *Texas Register.*

3. These forms may be changed in response to comments received on or before January 31, 2014. Any interested party may submit written comments to Martha Newton, Rules Attorney, at P.O. Box 12248, Austin, TX 78711, or rulescomments@txcourts.gov.

Dated: December 12, 2013

_____

Nathan L. Hecht, Chief Justice

_____

Paul W. Green, Justice

_____

Phil Johnson, Justice

_____

Don R. Willett, Justice

_____

Eva M. Guzman, Justice

_____

Debra H. Lehrmann, Justice

_____

Jeffrey S. Boyd, Justice

_____

John P. Devine, Justice

_____

Jeffrey V. Brown, Justice

TRD-201305907
Martha Newton
Rules Attorney
Supreme Court of Texas
Filed: December 12, 2013

♦    ♦    ♦

Orders Adopting Amendments to Texas Rules of Civil Procedure, Texas Rules of Appellate Procedure, and the Form of the Appellate Record

*(Editor's Note: On December 13, 2013, the Supreme Court of Texas filed Misc. Docket No. 13-9165, Order Adopting Texas Rule of Civil Procedure 21c and Amendments to Texas Rules of Civil Procedure 4, 21, 21a, 45, 57, and 502; Texas Rules of Appellate Procedure 6, 9, and 48; and the Supreme Court Order Directing the Form of the Appellate Record, in the Texas Register office. In accordance with Texas Government Code, §2002.014, which permits the omission of material which is "cumbersome, expensive, or otherwise inexpedient," the rules are not included in the print version of the Texas Register. The rules are available in the on-line version of the December 27, 2013, issue of the Texas Register.)*

**IN THE SUPREME COURT OF TEXAS**

Misc. Docket No. 13-9165

ORDER ADOPTING TEXAS RULE OF CIVIL PROCEDURE 21c AND AMENDMENTS TO TEXAS RULES OF CIVIL PROCEDURE

4, 21, 21a, 45, 57, AND 502; TEXAS RULES OF APPELLATE PROCEDURE 6, 9, AND 48; AND THE SUPREME COURT ORDER DIRECTING THE FORM OF THE APPELLATE RECORD

**ORDERED** that:

1. Pursuant to section 22.004 of the Texas Government Code, and in accordance with Misc. Docket No. 12-9206, as amended by Misc. Docket Nos. 13-9092 and 13-9164, Order Requiring Electronic Filing in Certain Courts, the Supreme Court of Texas adopts Rule of Civil Procedure 21c and amends Rules of Civil Procedure 4, 21, 21a, 45, 57, and 502 and Rules of Appellate Procedure 6, 9, and 48.

2. Pursuant to Texas Rule of Appellate Procedure 34.4, the Supreme Court orders that the appellate record be in the form attached as Appendix C.

3. By order dated August 16, 2013, in Misc. Docket No. 13-9128, the Court proposed the adoption of Rule of Civil Procedure 21c and amendments to Rules of Civil Procedure 4, 21, 21a, and 502; Rules of Appellate Procedure 6 and 9; and Appendix C to the Rules of Appellate Procedure. The Court also invited public comment. Following public comment, the Court made revisions to the rules and to the appendix. This order incorporates those revisions and contains the final version of the rules and appendix, effective January 1, 2014.

4. These rules supersede all local rules and templates on electronic filing, including all county and district court local rules based on e-filing templates; the justice court e-filing rules, approved in Misc. Docket No. 07-9200; the Supreme Court e-filing rules, approved in Misc. Docket No. 11-9152; the appellate e-filing templates, approved in Misc. Docket 11-9118; and local rules of courts of appeals based on those templates.

5. The Clerk is directed to:

a. file a copy of this order with the Secretary of State;

b. cause a copy of this order to be mailed to each registered member of the State Bar of Texas by publication in the *Texas Bar Journal;*

c. send a copy of this order to each elected member of the Legislature; and

d. submit a copy of the order for publication in the *Texas Register.*

Dated: December 13th, 2013.

_____

Nathan L. Hecht, Chief Justice

_____

Paul W. Green, Justice

_____

Phil Johnson, Justice

_____

Don R. Willett, Justice

_____

Eva M. Guzman, Justice

_____

Debra H. Lehrmann, Justice

_____

Jeffrey S. Boyd, Justice

_____

John P. Devine, Justice

_____

Jeffrey V. Brown, Justice

**IN THE COURT OF CRIMINAL APPEALS**

Misc. Docket No. 13-003

ORDER ADOPTING AMENDMENTS TO THE TEXAS RULES OF APPELLATE PROCEDURE

ORDERED that:

1. Pursuant to section 22.108 of the Texas Government Code, the Court of Criminal Appeals amends Rules of Appellate Procedure 6, 9, 37, 48, 68, 70, 71, and 73, Appendix C, Appendix F: Application for a Writ of Habeas Corpus and Appendix G; Appendix E: Order Directing the Form of the Appellate Record in Criminal Cases and Appendix H: Order Regarding Court of Appeals Clerk Preparing Record to Send to the Court of Criminal Appeals is repealed, effective January 1, 2014.

2. Pursuant to Texas Rule of Appellate Procedure 34.4, the Court of Criminal Appeals orders that the appellate record be in the form attached as Appendix C.

3. By order dated September 18, 2013, in Misc. Docket No. 13-2, the Court proposed the adoption of Rules of Appellate Procedure 6, 9, 68, and 73, the Appendix: Application for Writ of Habeas Corpus; Rule 34.4 and Appendix C; and Appendix G. The Court also invited public comment. Following public comment, the Court made revisions to the rules and to the appendix. This order incorporates those revisions and contains the final version of the rules and appendix, effective January 1, 2014.

4. These rules supersede all local rules of the courts of appeals on electronic filing.

5. The Clerk is directed to:

a. file a copy of this order with the Secretary of State;

b. cause a copy of this order to be mailed to each registered member of the State Bar of Texas by publication in the *Texas Bar Journal;*

c. send a copy of this order to each elected member of the Legislature; and

d. submit a copy of the order for publication in the *Texas Register.*

SIGNED AND ENTERED this 11th day of December, 2013.

Sharon Keller, Presiding Judge

_____

Michael Keasler, Judge

_____

Lawrence E. Meyers, Judge

_____

Barbara Hervey, Judge

_____

Tom Price, Judge

_____

Cathy Cochran, Judge

_____

Paul Womack, Judge